GLENN D. POMERANTZ (SBN 112503)
glenn.pomerantz@mto.com
KELLY M. KLAUS (SBN 161091)
kelly.klaus@mto.com
ROSE LEDA EHLER (SBN 296523)
rose.ehler@mto.com
ALLYSON R. BENNETT (SBN 302090)
allyson.bennett@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DISNEY ENTERPRISES, INC.; LUCASFILM LTD. LLC; TWENTIETH CENTURY FOX FILM CORPORATION and FOX BROS. ENTERTAINMENT INC., <br><br> Plaintiffs and Counter-Defendants, <br><br> vs. <br><br> VIDANGEL, INC., <br><br> Defendant and Counter-Claimant. | Case No. 16-cv-04109-AB (PLAx) <br><br> **DECLARATION OF TEDD CITTADINE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Hon. André Birotte Jr. <br><br> Date: October 24, 2016 <br> Time: 10:00 a.m. <br> Crtrm.: 4 <br><br> Trial Date: None Set |

I, Tedd Cittadine, declare as follows:

1. I am the Senior Vice President, Digital Distribution at 20th Century Fox Home Entertainment, which is part of Plaintiff Twentieth Century Fox Film Corporation ("Fox"). I submit this declaration in support of the motion by Plaintiffs in this action for a preliminary injunction. Except as to those matters stated on information and belief, the facts stated herein are known to me personally. As to those matters stated on information and belief, I am informed of the facts and believe them to be true. If called upon and sworn as a witness, I could and would testify competently to the contents of this Declaration.

## INTRODUCTION

2. In my position, I generally oversee our digital business, including the negotiation of digital distribution agreements in the United States and Canada with third party companies who provide our copyrighted entertainment content (motion pictures and television shows, collectively "content") directly to customers. We refer to these business partners as our "clients." I have worked in digital distribution in various roles at Fox since 2009.

3. From my professional experience, I am familiar with Fox's efforts to partner with our clients to distribute our content to consumers across a range of digital viewing options. Through publicly available sources, such as industry publications and the media, I also have knowledge about the analogous efforts of other motion picture studios and the general means by which other studios, including the other Plaintiffs in this action, distribute their content.

4. I understand that Defendant VidAngel, Inc. markets a service that allows consumers to stream our content, and the content of other creators of motion pictures and television shows, over the internet for a fee of $1 or $2 a day. This sort of consumer offering—daily access to a particular movie or television show—is known generally as on-demand streaming. VidAngel does not have a license agreement with Fox to copy, distribute or transmit Fox's copyrighted content.

5.	In this Declaration, I describe Fox's digital business generally and the type of immediate and irreparable harm that Fox faces unless VidAngel's unauthorized exploitation of our content is enjoined:  (a) harm to our basic right to control how, when and through which channels our content is disseminated for viewing by consumers; (b) harm to the market for the online distribution of our content and to our relationships with authorized distributors, including undermining the ability of these distributors to provide their licensed offerings; (c) harm to our ability to secure and protect our content in the online environment; and (d) harm to the overall development of the on-demand streaming market by the provision of user-viewing experiences without our rigorous quality controls.  I believe that the other Plaintiffs in this lawsuit face similar harm from VidAngel's unauthorized activities.  The threat of these harms has increased as VidAngel has grown in both the number of titles it makes available and in the number of end consumers it serves.

## FOX'S DIGITAL BUSINESS

6.	Fox is widely known and recognized for its motion pictures, many of which are very popular with consumers—just to name a few, *The Martian* (2015), *Avatar* (2009) and *Home Alone* (1990).  Fox also has popular television content, including the *Homeland* series.

7.	Fox and its affiliates invest substantial resources to bring motion pictures and television shows to consumers.  Each project involves substantial risk because the upfront costs of producing, marketing and distributing a major motion picture can be tens of millions of dollars or more.  Our willingness to incur this risk depends on our ability to earn a return on our substantial investment through charging for the rights to reproduce, distribute and perform our content.  The success we have in achieving a return on our investment then determines whether we can agree to produce new creative works and how much we can spend in doing so.

8. The lynchpin of our business is our ability to charge for the right to reproduce, distribute, perform or otherwise use our intellectual property. Being able to control the exploitation of the exclusive rights we hold in our copyrighted works is crucial to this endeavor. Copyright protection ensures this control, which allows us to earn returns on our substantial investment and to continue producing film and television content in the future.

9. We offer Fox content to the public through a range of offerings that meet customer demand and at retail price points (set by our clients) tailored to those choices. Currently, Fox (as I understand is also true of the other Plaintiffs), individually and through our affiliates and licensees, offer the following options:

- Customers can see our movies in the theater;
- they can buy a copy on DVD or Blu-ray Disc ("purchase a physical Disc copy");
- they can download and license long-term digital rights to a copy through a service like iTunes or Amazon Video ("purchase a digital download copy");
- they can rent a physical copy at a brick-and-mortar store or kiosk, like Redbox;
- they can rent a movie on demand for a limited period of time through a cable, satellite, or internet video-on-demand platform, such as iTunes or Google Play (transactional "on-demand streaming");
- they can access and view a movie on demand through a subscription streaming service like Netflix, Hulu, HBO NOW or HBO GO[1] (subscription "on-demand streaming");

---

[1] HBO offers HBO NOW as a standalone on-demand streaming service. HBO GO also streams on-demand but is included with the HBO cable television subscription channel.

- they can watch it on a subscription cable television channel like HBO; or

- they can, eventually, watch it for free on network television.

Each of these options is known as a "distribution channel" and is designed to provide different value to consumers matched to their willingness to pay. My business focuses on the multiple online distribution channels.

10. Fox's digital distribution business has become increasingly important in recent years, and we are always looking for new opportunities to grow our business and respond to consumer demand through partnerships with current and new clients.

11. Fox's partnerships with clients take time and resources. Including myself, we have approximately 73 individuals who work full time either negotiating or maintaining our relationships with our digital clients.

12. We have also been very deliberate in our digital strategy and the terms and conditions on which we have agreed to license our content to online services like VUDU, iTunes, Google Play, Netflix and others. Just by way of general example, Fox's agreements for streaming often include, among other terms: (a) detailed provisions requiring technological measures to protect the security of the transmission of the content to ensure against unlawful access, copying and piracy, (b) provisions requiring a certain level of quality for the content's display, to ensure that consumers are receiving appropriate value, and (c) restrictions on making the content available during certain blackout periods where other clients have paid for exclusive distribution rights. Unlicensed services such as VidAngel act independent of these terms, thereby undermining our business and the market more generally.

## VIDANGEL THREATENS FOX AND PLAINTIFFS WITH IMMEDIATE AND IRREPARABLE HARM

13. VidAngel threatens a variety of serious and irreparable harms to Fox and the other Plaintiffs if permitted to continue its unauthorized operations.

***VidAngel Harms Plaintiffs' Right To Control The Distribution Of Their Content***

14. VidAngel's unlicensed use of Fox's content threatens the cornerstone of our digital business—exclusive control over the distribution of our copyrighted works. The ultimate success or failure of our business depends on a carefully designed strategy to build demand for our content with consumers across a variety of viewing options provided by our clients. We therefore negotiate with our clients over *how* (under what conditions), *when* (on what date and for what duration), *what* (which titles) and for *how much* (at what wholesale price) they can obtain the rights to distribute and publicly perform our content.

15. An example of how we strategically exercise our exclusive right to control the dissemination of our content in order to maximize its value is the strategy of "windowing." At Fox, we enter into agreements with clients that restrict *when* (in which "window") after a particular Fox title is released to the home entertainment market that particular client has the right to distribute or perform it.[2] Clients are generally willing to pay more for the right to distribute or perform movies in an earlier window when that content is new, or newer, to the movie-watching public. Some clients will pay more for the exclusive right to distribute and perform our movies during a particular time period. Fox must then negotiate restrictions in other license agreements to allow for these exclusivity periods. Because VidAngel operates illegally (free from licensing restrictions), it risks

---

[2] Fox's strategy is unique and the other Plaintiffs likely employ different specific windowing strategies. Nonetheless, some form of windowing is central to any distribution strategy and allows a content company to match different viewing offerings with the willingness to pay of consumers.

making our movies available during windows occupied by different distribution channels or exclusivity periods held by one or more specific clients, thus interfering with Fox's contractual commitments, its relationship with its clients and its ability to negotiate similar deals in the future.

16. I am aware that VidAngel has interfered with legitimate services' negotiated rights by offering Plaintiffs' content during exclusive windows. The most salient example—albeit of a non-Fox title—is *Star Wars: The Force Awakens* (2015), owned by Plaintiff Lucasfilm. It is well known that *The Force Awakens* was an immensely popular motion picture. Its release to the home entertainment market was very much anticipated and scheduled for April 5, 2016. Public reports made clear that it would be available on DVD, Blu-ray Disc and digital download, but that it would *not* be offered for on-demand streaming in that same window. On the very same day, April 5th, VidAngel released *The Force Awakens* for on-demand streaming, thereby competing directly with these other exclusive viewing options and preempting legitimate on-demand streaming services.

17. Although *Star Wars: The Force Awakens* is not a Fox title, unlicensed use of such a popular film concerns me. VidAngel's conduct shows that it has interfered and (unless enjoined) will continue to interfere with exclusive windowing rights, undermining our clients' ability to maximize the value of the rights we grant them and, in turn, harming Fox's relationships with them and ability to negotiate for similar rights in the future.

***VidAngel Harms Plaintiffs' Relationships With Clients By Undermining Their Ability to Provide Licensed Offerings***

18. Fox's relationships with the companies that distribute and perform our content are very important. The success of our business is very much intertwined with the success of their business.

19. Our clients worry about unlicensed services in the market that compete with their business on unfair terms. They complain to us in partnership meetings,

and especially in negotiations, that it is difficult to compete with services that, like VidAngel, do not act pursuant to licensing restrictions.  This is especially true for unlicensed services that do not pay for the content they exploit.  Our clients complain that it is difficult to compete with unlicensed services' low-cost (or even free) offerings.  As a result, these unlicensed services are a problem for the entire legitimate market for home entertainment, and in particular, for the online distribution market.

20.   VidAngel is a quintessential example of the sort of unlicensed service that undermines the market for authorized content and interferes with our client relationships.  VidAngel markets itself as offering discounted streaming—a mere $1 or $2 per day for movies and television episodes.  In contrast, licensed services' transactional on-demand streaming retail prices typically are $2.99 to $5.99 per rental and their digital download prices typically are $9.99 to $19.99 for a permanent copy.  By offering consumers on-demand streaming at a lower price—which VidAngel can offer only because it misappropriates Fox's content—VidAngel threatens the business of all of our clients who have negotiated legal, authorized licenses for those rights.

21.   VidAngel's marketing and advertising further threatens to confuse consumers and upset the balance between on-demand streaming and physical rentals.  VidAngel operates an on-demand streaming service but some of its marketing compares it to physical DVD rental services, like Redbox.  This threatens to confuse consumers because the two distribution channels offer different value propositions.  Fox makes its titles available in physical disc form to Redbox, which generally operates in a *later* window than on-demand streaming services and only offers physical rentals.  Because consumers generally have a lower willingness to pay in later release windows, Redbox charges a lower price to consumers (e.g., $1 per night for DVD rentals from its kiosks).  In contrast, on-demand streaming services operate in an earlier window and have the rights to stream Fox's content

over the internet, which many consumers find more convenient. VidAngel's marketing confuses the two—seemingly trying to convince consumers that they can have the value of on-demand streaming of newer releases for the price of a Redbox rental. By confusing consumers as to the different value propositions, VidAngel threatens to undermine our clients' abilities to provide their licensed offerings.

22. These harms, in particular, only worsen as VidAngel grows. As a relative matter, a very small and unknown unlicensed service does less harm because it does not pose a serious threat to our clients' businesses. Once an unlicensed service reaches a certain size or level of notoriety, however, the threat increases dramatically. I am aware that VidAngel, in recent months, has been aggressively marketing its service to consumers and has grown its user-base substantially. This concerns me because as VidAngel continues to grow and gain consumers (at the expense of lawful services) the threat to our relationships with clients and the market for authorized streaming will only increase.

***VidAngel Harms Plaintiffs' Ability To Secure And Protect Their Content***

23. VidAngel takes away Fox's right to control the security with which our content is transmitted to the public. This undermines the steps that Fox and the other Plaintiffs take to prevent unauthorized access, illegal copying, and piracy—problems that threaten serious harm to our industry.

24. The internet has been a very valuable tool for digital distribution of our content, especially with the rise of mobile devices. However, the internet can also be used to access, copy and exploit our content on a mass scale. Our industry has responded to this challenge by developing rigorous digital rights management ("DRM") technology and other means of ensuring the security of digital streams and copies transmitted over the internet.

25. Before Fox grants any client the right to stream or digitally distribute our content, we do a thorough and detailed review of the service's security protocols. After investigating these security measures, we negotiate stringent

security and protection requirements that the client must follow. Our agreements also contain provisions for steps a client must take if there is a breach of that security. Because VidAngel's transmission of Fox's content is unlicensed, Fox has not had the ability to vet and negotiate security protocols to protect our content when streamed by VidAngel. Likewise, Fox has no recourse if whatever security measures VidAngel does use fail.

***VidAngel Undermines Our Ability To Insist On Quality Controls, Which In Turn Threatens The Continued Development Of The Online Market***

26. VidAngel's unlicensed service further threatens the development and growth of the on-demand streaming market. Fox works closely with its clients to ensure that customers receive an optimal viewing experience. Customers' positive experiences with on-demand streaming encourages them to use licensed services more. This is important to the continued and sustained growth of the on-demand streaming market, and to digital home entertainment more broadly.

27. VidAngel harms consumers' perceptions of the on-demand streaming market by providing a sub-optimal consumer experience, thereby tarnishing consumer perception of on-demand streaming generally and discouraging consumers from using legitimate on-demand streaming services. For instance, before granting a client the rights to transmit our movies, Fox vets that entity to ensure that it will provide a high-quality viewing experience to customers. In contrast, Fox has no control over the quality of the transmission of the movies from VidAngel and thus I worry that poor quality transmissions could lead to consumer dissatisfaction and damage to consumer perception of on-demand streaming.

28. A bad viewing experience could also tarnish consumers' views of Fox and our branded content. Consumers may come to associate the poor quality with the Fox film they were attempting to watch (in addition to, or instead of VidAngel). We want the movie-watching public to have the best possible experience so they

continue to choose watching movies and television, and Fox-branded content in particular, for their entertainment.

29. I understand that VidAngel may tell its customers that certain movies are "out-of-stock." This message of unavailability is inconsistent with the idea of video "on demand" and risks causing consumer frustration and confusion, thereby hurting the broader on-demand streaming market. This is of particular significance since the "always available, never out of stock" character of on-demand streaming is one of the essential differentiating characteristics of the on-demand experience from that of traditional, physical DVD rental (e.g. Redbox).

30. I also understand that VidAngel limits the number of devices to which a consumer can stream. The ability to stream on several devices for personal or family use (e.g. mobile phone and tablet) is another value proposition of the on-demand streaming market. Again, this availability across a number of devices differentiates on-demand streaming from physical DVD rentals and is important to encouraging consumers to purchase from authorized on-demand services.

31. Fox invests significant amounts of money to market and promote the availability of its various motion pictures and television shows for on-demand streaming. Fox also expends substantial effort and resources in working with our clients to ensure the best possible viewing experience for consumers. These efforts will be hampered if VidAngel's sub-optimal experience turns consumers away from the on-demand streaming market and Fox's movies and television shows.

***The Harms That VidAngel Causes Are Immediate And Irreparable***

32. VidAngel threatens immediate harm to Fox because it directly interferes with exclusive releases to particular licensees. For example, Fox grants HBO exclusive windows for certain movies, in which they are not available for on-

demand streaming on other services.[3]  Right now, both *The Martian* (2015) and *Brooklyn* (2015) are within these HBO exclusive windows.  Customers can watch them on the HBO subscription cable channel through on-demand streaming on HBO NOW or HBO GO.  They are not available on other on-demand streaming services.  VidAngel nonetheless has these same movies available for on-demand streaming on its service—directly impacting HBO's exclusive window.

33.   Likewise, VidAngel threatens immediate harm to Fox because it interferes with the exclusive windows for other distribution channels.  New releases are first released to distributors that sell digital download copies.  Shortly thereafter they are released for purchase on physical Disc.  During these initial release windows, they are typically not available for on-demand streaming.  VidAngel, however, offers newly released titles soon after they are released for purchase on physical Disc.  Accordingly, for each new release that VidAngel offers, it interferes with the exclusive window that iTunes, Google Play, VUDU and others have to sell digital downloads before the title becomes available for on-demand streaming.

34.   The threat from each of the harms that I have described above has increased and continues to increase as VidAngel grows in size and more aggressively markets its service.  Specifically, each new Fox title that VidAngel adds to its service poses a new threat to Fox's ability to control its copyrighted works and that work in particular.

35.   I am informed and believe that, in or around July 2015, VidAngel's outside counsel sent letters to the General Counsel of Fox's corporate parent (and the General Counsels of the corporate parents of the other Plaintiffs as well as other motion picture studios) regarding its service.  I understand from reviewing that letter that VidAngel at that time claimed to have fewer than 5,000 users and was still in a

---

[3] During these windows consumers can purchase permanent copies of Fox's movies through purchasing a physical Disc copy or a digital download copy.

"limited beta test." That letter does not say when VidAngel planned to launch its service publicly. I am informed and believe that my colleagues in Fox's legal department, in conjunction with legal counsel through the Motion Picture Association of America ("MPAA"), immediately commenced investigation of VidAngel's potential liability. I am further informed and believe that Fox's legal department, in conjunction with counsel for the other Plaintiffs, continued to monitor VidAngel's activities and growth through the first part of 2016 as VidAngel began to more aggressively market its service, ultimately filing suit on June 9.

36. VidAngel's growth has been cause for concern. Our clients would not notice (let alone complain) about a service with a mere 5,000 users, but one with 100,000 users is much more problematic. I am not aware of any specific complaints about VidAngel, but know that VidAngel's presence as one more, quickly growing, unlicensed service in the market will frustrate our client relationships, negotiations and the growth of the on-demand streaming market more generally.

37. It is my strong belief that these harms to our relationships with clients and the on-demand streaming market, though they are likely to be very significant, will be extremely hard to measure in dollar terms. It will be extraordinarily difficult to assess what impact VidAngel has on the on-demand streaming market, and how much of that it is a result of negative consumer experiences with services like VidAngel, and even more difficult to assess the effect on Fox of the disruption of its relationships with legitimate licensees.

38. For these reasons, Fox and the Plaintiffs will suffer immediate and irreparable injury unless the Court enjoins VidAngel's service.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 22, 2016 at Century City, California.

_____
Tedd Cittadine