Ryan G. Baker (Bar No. 214036)
  rbaker@bakermarquart.com
Jaime Marquart (Bar No. 200344)
  jmarquart@bakermarquart.com
Scott M. Malzahn (Bar No. 229204)
  smalzahn@bakermarquart.com
Brian T. Grace (Bar No. 307826)
  bgrace@bakermarquart.com
BAKER MARQUART LLP
2029 Century Park East, Sixteenth Floor
Los Angeles, California 90067
Telephone:   (424) 652-7800
Facsimile:    (424) 652-7850

Peter K. Stris (Bar No. 216226)
  peter.stris@strismaher.com
Brendan Maher (Bar No. 217043)
  brendan.maher@strismaher.com
Elizabeth Brannen (Bar No. 226234)
  elizabeth.brannen@strismaher.com
Daniel Geyser (Bar No. 230405)
  daniel.geyser@strismaher.com
STRIS & MAHER LLP
725 South Figueroa Street, Suite 1830
Los Angeles, California 90017
Telephone:   (213) 995-6800
Facsimile:    (213) 261-0299

David W. Quinto (Bar No. 106232)
  dquinto@VidAngel.com
3007 Franklin Canyon Drive
Beverly Hills, California 90210
Telephone:   (213) 604-1777
Facsimile:    (732) 377-0388

*Attorneys for Defendant and
Counterclaimant VidAngel, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DISNEY ENTERPRISES, INC.; LUCASFILM LTD. LLC; TWENTIETH CENTURY FOX FILM CORPORATION; AND WARNER BROS. ENTERTAINMENT, INC., | CASE NO. CV16-04109-AB (PLAx) |
| | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |
| Plaintiffs, | **VIDANGEL'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR** |
| vs. | |

| | | |
|---|---|---|
| 1 | VIDANGEL, INC., | **PRELIMINARY INJUNCTION** |
| 2 | Defendant. | |
| 3 | | Judge: Hon. André Birotte Jr. |
| 4 | | Date: October 24, 2016 |
| 5 | | Time: 10:00 a.m. Courtroom: 4 |
| 6 | | Filed concurrently herewith: |
| 7 | VIDANGEL, INC., | Request for Judicial Notice, Declarations of Neal Harmon, Sigurd Meldal, Jaime Marquart, David Quinto, |
| 8 | Counterclaimant, | Elizabeth Ellis, Theodore Baehr, David Barton, Tim Barton, Gary Bauer, David |
| 9 | vs. | Bozell III, L. Brent Bozell, Connor Boyack, Rick Green, Rebecca Hagelin, |
| 10 | DISNEY ENTERPRISES, INC.; LUCASFILM LTD. LLC; | Donna Rice Hughes, Harry Jackson, Matt Kibbe, Andrea Lafferty, Gary |
| 11 | TWENTIETH CENTURY FOX FILM CORPORATION; AND WARNER | Marz, Bryan and Diane Schwartz, Bob Waliszewkski, Tim Wildmon, and |
| 12 | BROS. ENTERTAINMENT, INC., | Timothy F. Winter; Evidentiary Objections; Application to File Under |
| 13 | Counterclaim Defendants. | Seal with Supporting Declaration of Jaime Marquart and Proposed Order |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION…………………………………………………..….1

FACTUAL BACKGROUND………………………………….………3

    A.    Prior to 2005, Disney Used Copyright Litigation to Prevent Customers Who Purchased Movies for Home Viewing from Filtering Objectionable Content……………………………….3

    B.    Congress Enacted the FMA to Ensure that Families Could Watch Filtered Content in Private……..………………………4

    C.    Congress's Decision to Authorize For-Profit Companies to Stream Lawfully Purchased Movies for Filtered Home Viewing Was Knowingly Made Over Disney's Vigorous Opposition……………………………………………...………5

    D.    In Furtherance of Its Unlawful Agreements with the DGA, Disney Prohibits Filtering in All Streaming Licenses…………7

    E.    Unable to Obtain a License from Disney, VidAngel Has Developed an FMA Authorized Streaming Business Model That Enables Customers Who Purchase Movies for Home Viewing to Filter Objectionable Content………………………8

LEGAL STANDARD………………………………………….…..…9

ARGUMENT…………………………………………………………..9

I.    DISNEY IS NOT LIKELY TO PREVAIL………………………..9

    A.    Disney Will Not Succeed on Its Reproduction and Public Performance Copyright Claims………………………………10

    B.    In Any Event, the FMA Shields Companies Like VidAngel From Liability Under any Provision on the Copyright Act…..12

    C.    VidAngel's Service Does Not Violate the Copyright Act's Anticircumvention Provisions Found in the DMCA………....16

   D. Even if VidAngel Is in Technical Violation of the Law, Its Service Is a Protected Fair Use………………………….....19

     1. VidAngel's Service Is Highly Transformative…….....19

     2. Plaintiffs' Works Are Especially Amendable to Fair Use……………………………………………….20

     3. VidAngel's Users May Access Plaintiffs' Works Only for Transformative Purposes…………………....20

     4. VidAngel's Lawful Filtering Service Increases Disney's Disc Sales…………………………….....21

     5. The *Clean Flicks* Fair Use Analysis Is Inapposite……22

II. DISNEY CANNOT DEMONSTRATE IRREPARABLE HARM…22

   A. Disney's Year and a Quarter Delay Demonstrates That an Injunction Is Unnecessary to Prevent Immediate and Irreparable Harm…………………………………………….22

   B. Disney's Alleged Harms Are Caused by the FMA, Not VidAngel……………………………………………..... 25

   C. Disney's Alleged Harms Are Speculative………………...26

   D. Disney's Alleged Harms Are Economic………………......28

III. THE BALANCE OF HARDSHIPS WEIGHS AGAINST A PRELIMINARY INJUNCTION…………………………………...…29

IV. THE PUBLIC INTEREST STRONGLY FAVORS ALLOWING FAMILIES TO USE VIDANGEL'S FILTERING SERVICE……...…31

   A. The Supreme Court Has Repeatedly Protected the Public from Offensive Content…………………………………....31

   B. VidAngel Serves an Important Public Interest…………….....32

V. ANY INJUNCTION SHOULD BE CONDITIONED ON THE POSTING OF A LARGE BOND…………………………….…..33

CONCLUSION………………………………………………………….... 35

# TABLE OF AUTHORITIES

**Page**

## CASES

*A&M Records, Inc. v. Napster, Inc.*,
  239 F. 3d 1004 (9th Cir. 2001) ........................................................34

*Activant Sols., Inc. v. Wrenchead, Inc.*,
  No. C 03-3376 VRW,
  2004 WL 1887529 (N.D. Cal. Aug. 23, 2004) ...............................31

*All for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................30

*Alvarez v. Tracy*,
  773 F.3d 1011 (9th Cir. 2014) ........................................................15

*American Broadcasting Companies, Inc. v. Aereo, Inc.*,
  573 U.S. 134 S. Ct. 2498 (2014) ...........................................11, 24

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015),
  *cert. denied sub nom. Authors Guild v.*
  *Google, Inc.*, 136 S. Ct. 1658 (2016) .......................................19, 20

*Bird-B-Gone, Inc. v. Bird Barrier Am., Inc.*,
  2013 WL 11730662 (C.D. Cal. Mar. 20, 2013) .............................25

*Buddy Systems, Inc. v. Exer-Genie, Inc.*,
  545 F. 2d 1164 (9th Cir. 1976) .......................................................33

*Cabell v. Markham*,
  148 F.2d 737 (2d Cir. 1945) ...........................................................12

*Campbell v. Acuff–Rose Music, Inc.*,
  510 U.S. 569 (1994) ................................................................19, 21

*Capitol Records v. Redigi*, No. 1:12-cv-00095,
  Order Denying Motion for Preliminary Injunction
  (S.D.N.Y. February 6, 2012) ..........................................................29

*Citibank N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir.1985) ............................................................23

*Clean Flicks of Colo., LLC v. Soderbergh*,
  433 F. Supp. 2d 1236 (D. Colo. 2006) ...........................................22

*Columbia Pictures Indus., Inc. v. Miramax Films Corp.*,
  11 F. Supp. 2d 1179 (C.D. Cal. 1998) ...........................................21

*Corley v. United States*,
    556 U.S. 332 (2009)............................................................12, 13

*Credit Bureau Connection, Inc. v. Pardini*,
    726 F. Supp. 2d 1107 (E.D. Cal. 2010) ........................................34

*Cybermedia, Inc. v. Symantec Corp.*,
    19 F. Supp. 2d 1070 (N.D. Cal. 1998)..........................................34

*Design Furnishings, Inc. v. Zen Path, LLC*,
    2010 WL 5418893 (E.D. Cal. Dec. 23, 2010)................................34

*eBay, Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006).................................................................24, 26

*FCC v. Fox Television Stations, Inc.*,
    556 U.S.  502 (2009)......................................................................32

*FCC v. Pacifica Foundation*,
    438 U.S. 726 (1978).......................................................................32

*Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*,
    654 F.3d 989 (9th Cir. 2011) .......................................................26

*Fox Broadcasting Co. Inc. v. Dish Network, L.L.C.*,
    905 F. Supp. 2d 1088 (C.D. Cal. 2012)..............................25, 26, 29

*Fox Broadcasting Co. v. Dish Network LLC*,
    747 F.3d 1060 (9th Cir. 2013) .................................................25, 29

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) .......................................................25

*Goldie's Bookstore, Inc. v. Super. Ct.*,
    739 F.2d 466 (9th Cir. 1984) .......................................................26

*Green v. U.S. Department of Justice,*,
    No. 1:16-cv-01492-EGS (D.D.C. filed on July 21, 2016)..............18

*Hanginout, Inc. v. Google, Inc.*,
    54 F. Supp.3d 1109 (S.D. Cal. 2014) ...........................................23

*Harper & Row Publishers v. Nation Enters.*,
    471 U.S. 539 (1986)......................................................................21

*Hibbs v. Winn*,
    542 U.S. 88 (2004)........................................................................12

*Huntsman v. Soderbergh*,
    No. 02-M-1662 (MJW),
    200 WL 1993421 (D. Colo. filed Aug. 29, 2002) ....................14, 15

*Hybritech Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed.Cir.1988) .....................................................31

*Indep. Living Ctr. v. Maxwell–Jolly*,
    572 F.3d 644 (9th Cir.2009) ................................................................31

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
    4 F.3d 819 (9th Cir. 1993) .................................................................30

*Kelly v. Arriba Soft*,
    336 F.3d 811 (9th Cir. 2003) .........................................................10, 20

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ............................................................30

*LucasArts Entm't Co. v. Humongous Entm't Co.*,
    815 F. Supp. 332 (N.D. Cal. 1993)......................................................30

*MacDonald v. Chicago Park Dist.*,
    132 F.3d 355 (7th Cir. 1997) ..............................................................31

*MCA, Inc. v. Wilson*,
    667 F.2d 180 (2d Cir. 1981) ...............................................................21

*MDY Industries, LLC v. Blizzard Entertainment, Inc.*,
    629 F.3d 928 (9th Cir. 2010) ..............................................................18

*Mead Johnson & Co. v. Abbott Labs.*,
    201 F. 3d 883 (7th Cir. 2000) .............................................................33

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    545 U.S. 913, 125 S. Ct. 2764 (2005) .................................................17

*MGM v. Honda Motor Co.,*,
    900 F. Supp. 1287 (C.D. Cal. 1995)....................................................34

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985) ............................................................23

*OG Int'l, Ltd. v. Ubisoft Entm't*,
    No. C 11-04980 CRB,
    2011 WL 5079552 (N.D. Cal. Oct. 26, 2011) ................................30

*Ossur Holdings, Inc. v. Bellacure, Inc.*,
    No. C05-1552JLR,
    2005 WL 3434440 (W.D. Wash. Dec. 14, 2005)..........................30

*Overstreet v. United Bros. of Carpenters and Joiners of Am.*,
    409 F.3d 1199 (9th Cir. 2005) ............................................................18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ............................................................20

*Perfect 10, Inc. v. Google, Inc.*,
    653 F.3d 976 (9th Cir. 2011) ..............................................................25

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    134 S. Ct. 1962 (2014)..................................................................24

*Pyro Spectaculars N., Inc. v. Souza*,
    861 F. Supp.2d 1079 (E.D. Cal. 2012) ........................................28

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
    641 F. Supp. 2d 913 (N.D. Cal. 2009)..........................................11

*Reno v. ACLU*,
    521 U.S. 844 (1997).....................................................................32

*Rent-A-Center v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ...................................................26, 28

*Rowan v. United States Post Office Dept.*,
    397 U.S. 728 (1970).....................................................................32

*Sammartano v. First Judicial Dist. Ct.*,
    303 F.3d 959 (9th Cir. 2002) .......................................................31

*Sega Enters. Ltd. v. Accolade Inc.*,
    997 F.2d 1510 (9th Cir. 1992) .....................................................10

*Sierra Forest Legacy v. Rey*,
    577 F.3d 1015 (9th Cir. 2009) .....................................................31

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 1999) .......................................................10

*Sony Corp. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).......................................................................9

*Stone v. INS*,
    514 U.S. 386 (1995).....................................................................12

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .................................................31, 33

*The Squaxin Island Tribe v. State of Washington*,
    781 F. 2d 715 (9th Cir. 1986) ......................................................33

*Topline Corp. v. 4273371 Canada, Inc.*,
    2007 WL 2332471 (W.D. Wash. Aug. 13, 2007)..........................34

*Universal City Studios, Inc. v. Corley*,
    273 F. 3d 429 (2nd Cir. 2001).......................................................11

*U.S. c. Elcom Ltd.,*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002)........................................11

*Valeo Intell. Prop., Inc. v. Data Depth Corp.*,
    368 F. Supp. 2d 1121 (W.D. Wash. 2005) ....................................23

vi

*Warner Bros. Entertainment Inc. v. WTV Systems, Inc.*,
    824 F. Supp. 2d 1003 (2011) ....................................................................22, 23

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)................................................................................31, 33

*Winter v. Natural Res. Defense Council, Inc.*,
    555 U.S. 7 (2008)................................................................................1, 9, 24

## STATUTES

15 U.S.C. § 1114(3)(A)....................................................................................7

17 U.S.C. § 101 .............................................................................................13

17 U.S.C. § 106(1), (4)....................................................................................9

17 U.S.C. § 110(11) ................................................................................ passim

17 U.S.C. § 1203(b)(1)...................................................................................18

17 U.S.C. § 1201(a)(1)(A) .....................................................................9, 16, 18

F.R.C.P. § 65(c) ............................................................................................33

## OTHER AUTHORITIES

150 CONG. REC. H7654-01 (Sept. 24, 2004) ............................................4, 5, 13, 16

150 CONG. REC. s11852-01 (Nov. 24, 2004)....................................................16, 17

151 CONG. REC. H2114-01 (Apr. 10, 2005) .........................................................5

4 Nimmer on Copyright § 14.06[A][3][c] ............................................................23

H.R. REP. No. 108-670 (2004)......................................................................4, 12, 13

H.R. REP. No. 109-33(I) ............................................................................ passim

U.S. COPYRIGHT OFFICE, Docket No. 2014-07, EXEMPTION TO PROHIBITION
    ON CIRCUMVENTION OF COPYRIGHT PROTECTIONS SYSTEMS FOR
    ACCESS CONTROL TECHNOLOGIES (2015).....................................................11

**INTRODUCTION**

1       Disney and three other Hollywood studios ("Disney") have sued VidAngel, a small Utah-based company that operates an online video streaming service designed to enable lawful owners of movies to filter out objectionable content before viewing those movies at home.  According to Disney, VidAngel is a copyright pirate that chooses to steal rather than "negotiate and pay for the rights they use."  *See* Plaintiffs' Memorandum of Points and Authorities ("MPAS") at 1:22-23.  Like many of its movies, however, Disney's story is pure fantasy.

       When that story is fully told, three things are clear: (1) VidAngel is no pirate.  It spent over a third of its capital contributions to buy DVD and Blu-ray discs sold by the studios and re-sells them to consumers, many of whom would not otherwise watch the movies recorded on them.  (2) Disney is no victim.  It is a bully that, acting in concert with other powerful companies, has long engaged in an unlawful effort to block *any* online filtering services for the at-home viewing of lawfully purchased movies.  And (3) this lawsuit is about *filtering*, not piracy.  It is an elegantly disguised attempt by Disney's lawyers to accomplish what its lobbyists could not: obstruction of the Family Home Movie Act of 2005 ("FMA").

       Currently before this court is Disney's motion for a preliminary injunction seeking to shut down VidAngel's operations pending resolution of this litigation.  That motion must be denied.

       It is well settled that a party seeking the "extraordinary remedy" of a preliminary injunction must "clearly show" that it is likely to succeed on the merits; that it will suffer irreparable harm without an injunction; that the balance of equities tips in its favor; and that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008).  Disney has not met—and cannot meet—its burden on *any* (let alone all four) of those factors.

       <u>First</u>, Disney cannot establish that any of its claims are likely to succeed.  VidAngel's service is both legal and fair.

1   It is legal because nothing VidAngel does can reasonably be construed as
2   infringement or circumvention under federal law.  Any possible confusion on that
3   issue was conclusively resolved by Congress over a decade ago.  The FMA
4   authorizes for-profit companies to stream lawfully purchased movies for home
5   viewing with objectionable content filtered out pursuant to each customer's
6   individual choice.  Disney vigorously opposed the FMA.  They lost, but have
7   continued their war against filtering by refusing to license any company ever to
8   filter lawfully purchased content for home viewing.  Without apparent irony, Disney
9   insists that VidAngel's DVD-based business model is illegal, when it is *Disney's*
10  *misconduct* that has effectively made that model the only way in which FMA-
11  authorized filtering can be meaningfully made available to American families.

12      VidAngel's service is also fair.  Contrary to Disney's intimations and
13  accusations, every VidAngel customer must actually purchase a Disney movie
14  before it is streamed for their home viewing.  If Disney's view of the law were
15  adopted, anyone who wanted to purchase and have a filtered movie streamed for
16  home-viewing would be forced to pay Disney *twice* for that privilege: once for the
17  DVD and once to watch it.  That's unfair.

18      Second, Disney cannot show that VidAngel's continued operation pending
19  trial would cause any irreparable harm.  After receiving letters from VidAngel in
20  July and August of 2015, Disney (and all five other major studios) discussed
21  VidAngel's service for almost a year before Disney (but not three other major
22  studios) elected to file this action.  Less than two weeks after receiving VidAngel's
23  first letter, Disney established a VidAngel account, and the major studios exchanged
24  over 1,300 emails related to VidAngel in the ten-plus months before suit.  Disney
25  then waited several more months before seeking to enjoin VidAngel's service.   That
26  is not how Big Hollywood responds to pirates, *however small*, and it is not how they
27  react to those who traffic in DMCA circumvention technologies aimed at facilitating
28  piracy.  In those cases, the studios have always acted quickly and in concert.  Here,

1  in contrast, Disney took a year, not to build a case against a pirate, but to decide how
2  to neutralize an act of Congress.  Such extraordinary delay bars injunctive relief.

3       <u>Finally</u>, Disney cannot prove that the balance of hardships tips decisively in
4  its favor or that the public interest supports a preliminary injunction.  To the
5  contrary, the balancing of hardships weighs strongly in favor of VidAngel, the only
6  participant in a nascent market being suppressed by Disney.  Moreover, as
7  evidenced by the half-million families it has already served, that market serves an
8  important public interest recognized by Congress when it passed the FMA.

9                         **<u>FACTUAL BACKGROUND</u>**

10      This case is about *filtering*, not piracy.  And Disney is going to lose, because
11 Congress said so.  Specifically, the FMA authorizes for-profit companies such as
12 VidAngel to stream lawfully purchased movies for home viewing with objectionable
13 content filtered out pursuant to each customer's individual choice.  Disney and the
14 other major studios vigorously opposed the FMA.  They lost, but have continued
15 their war against filtering by ███████████████████████████.
16 Declaration of Jaime Marquart ("Marquart Dec."), Ex. B at Tr. 83:20-84:21.  That
17 *de facto* ban has necessitated VidAngel's DVD-based business model, which makes
18 the filtering authorized by the FMA meaningfully available to American families.
19 To correct the highly misleading narrative set forth by Disney, we begin with a brief
20 summary of the relevant factual history.

21   **A.   <u>Prior to 2005, Disney Used Copyright Litigation to Prevent</u>**
22       **<u>Customers Who Purchased Movies for Home Viewing From</u>**
         **<u>Filtering Objectionable Content.</u>**

23      Before 2005, the motion picture studios sued every service that tried to
24 provide filtered content to consumers.  H.R. Rep. No. 109-33(1) at 7 (2005).  Like
25 today, Disney and its allies attempted to use scorched-earth litigation tactics to bully
26 smaller players.  As the House Judiciary Committee noted with some incredulity,
27 Disney and its allies had sued companies *lawfully* providing filtering services under
28 the pre-FMA legal regime: "Testimony provided by the Register on June 17, 2004,

makes clear that some parties to the suit should not face liability for their current actions." *Id.* at 5.  *See also* H.R. REP. No. 108-670, at 3 (2004) ("The Committee is . . . concerned that one service that has adopted a model that is already legal under existing law is embroiled in litigation.").  The Committee also observed that if Disney and its allies had allowed the "airline and broadcast versions [of movies to] . . . be[] made available for sale to the public," new legislation (which became the FMA) might not have been needed.  H.R. REP. No. 108-670, at 3 (2004).

Indeed, it was precisely because Big Hollywood refused to acknowledge the moral rights of American families to filter objectionable content that Congress changed the law by enacting the FMA over 11 years ago.

### B.  Congress Enacted the FMA to Ensure that Families Could Watch Filtered Content in Private

There is no serious doubt concerning the purpose of the FMA.  It was enacted to ensure "that existing copyright and trademark law cannot be used to prevent a parent from deciding what their children see in the privacy of their own home" because Congress did "not take kindly to those who would presume to tell parents how they decide what is best for their children."  150 CONG. REC. H7654-01 (Sept. 24, 2004) (statement of Rep. Sensenbrenner).  Congress sought to "shield[] companies that make movie-filtering systems from liability for copyrighting infringement," *id.*, and "ensure" that technology that helps parents "determine what their children see on the screen" would "not face continued legal challenges."  *Id.* (statement of Rep. Smith).

Congress wanted to "allow for technology innovation to flourish without having to face continued legal challenges" and without "requir[ing] limits to be placed on content the studios develop."  *Id.* (statement of Rep. Cannon).  At the same time, though, Congress wanted to allow other use of "*available* technology to skip over portions of a movie."  151 CONG. REC. H2114-01 (Apr. 10, 2005) (statement of Rep. Sensenbrenner).  It was "time for the rights of parents not to be

1    tied up in the courts any longer." *Id.*

2        Congress believed strongly that families should be allowed to filter content

3    shown at home.   The FMA's House sponsor succinctly explained that need:

> Just as the author of a book should not be able to force someone to read that book in any particular manner or order, a studio or director should not be able to force our children to watch a movie in a particular way. No one can argue with a straight face it should be against the law to skip over a few pages or even entire chapters of a book. So, too, it should not be illegal to skip over a few words or scenes in a movie. The Family Movie Act ensures that parents have such rights.

8    150 Cong. Rec. H7654-01 (Sept. 28, 2004) (statement of Rep. Lamar

9    Smith).  Congressman Cannon observed that the FMA was intended to allow parents

10   "to protect their children from the sex, violence, profanity and other objectionable

11   materials that are found in movies" by "clarifying the exemption in the copyright

12   infringement law allowing people to skip, mute or avoid scenes on DVDs."  *Id.*

13       As explained below, the legislative choices that Congress made in the FMA

14   were *directly* intended to prevent studios or directors from using litigation to block

15   parental filtering they disliked.

16   **C.    Congress's Decision to Authorize For-Profit Companies to Stream**
17   **Lawfully Purchased Movies for Filtered Home Viewing Was Knowingly Made Over Disney's Vigorous Opposition.**

18       Disney and all the major studios—as well as the Motion Picture Association

19   of America (MPAA), and the Directors Guild of America (DGA)—fought *intensely*

20   to prevent the passage of the FMA.  *See, e.g.,* H.R. Rep 109-33(1) at 70.  Their

21   central grievance was the same as here, namely, that *only* Disney and its friends

22   should have the right to make "editorial decisions" about movies.  The FMA was

23   problematic because it stopped studios from invoking copyright law to block

24   filtering they did not bless.  *Id.*

25       As Disney's Capitol Hill allies explained in a minority report reflecting the

26   reason for Disney's opposition to the FMA: "The issue in the debate [is] *who should*

27   *make editorial decisions about what movie content children see: parents or a for-*

28   *profit company,"* H.R. Rep. No. 109-33(1) at 69 (emphasis added).  The minority

report further noted that the FMA "does not require that filtering be done with the permission of the content creator or owner, but rather creates an *exemption from copyright* and trademark *liability for filtering." Id.* at 74 (emphasis added).  Indeed, Congresswoman Watson memorably complained that the FMA would "shield[] companies that make movie-filtering systems from liability for copyrighting infringements." *Id.* Exactly.

Then and now, Disney and its allies were and are motivated by the same goal: to prevent *any* parental filtering.[1]  For Disney, home-viewing was and is an all or nothing proposition: "[D]on't let your children watch a movie unless you approve of the content of the entire movie."   H.R. REP. No. 109-33(I) at 72. In Disney's preferred world, parents' only recourse should be to rely on its G, PG, PG-13, R, and NC-17 rating system, which according to Disney, "effectively enable[s] parents to steer their children away from movies they consider inappropriate." *Id.*[2]

In the considered judgment of Congress, that view was an unacceptable insult to the right of parents to control content in their own home in accord with their constitutionally-protected values.  At the same time, Congress was acutely sensitive

---

[1] The inability to completely control what is filtered underlies several of Disney's alleged "irreparable injuries." *See* Cittadine Dec., ¶¶ 5, 15-17, 21-34.  If that were correct, Disney would be irreparably injured every time a movie-watcher closed his eyes to avoid seeing a scary scene.

[2] Of course, as the House Judiciary Committee wryly observed, Disney fails to assert the moral rights of movie directors when such is inconvenient to Disney:

> The Committee is aware of numerous motion pictures being edited for screen size, content, and time purposes with or without the director's consent so that a motion picture can be displayed on the 48-3 aspect ratios of standard definition televisions, or an airplane with objectionable language remove, and on television channels in the traditional 90 or 120-minute time slots.  The Committee sees no difference between the impact upon the moral rights of directors of such modifications and someone wanting to prevent certain content from being displayed on their television.

H.R. REP. No. 109-33(I) at 7.

1   to the prospect that the studios and directors might never license third parties to
2   stream filtered content to consumers.  Accordingly, the FMA was drafted to permit
3   third parties to filter *without consent* and without liability for intellectual property
4   claims the studios and directors might assert.

5       To that end, the FMA amended section 110 of the Copyright Act to provide
6   that "the following are ***not*** infringements of copyright: . . . (11) the making
7   imperceptible, by or at the direction of a member of a private household, of limited
8   portions of audio or video content of a motion picture, during a performance . . .
9   transmitted to that household for private home viewing, from an authorized copy of
10  the motion picture . . . if no fixed copy of the altered version of the motion picture is
11  created . . . ."  17 U.S.C. § 110(11) (emphasis added).   The Lanham Act was
12  similarly amended.  *See* 15 U.S.C. § 1114(3)(A).

13      **D.    In Furtherance of Its Unlawful Agreements with the DGA, Disney Prohibits Filtering in All Streaming Licenses**
14
15      Disney and other MPAA member studios have entered into an agreement with
16  the DGA ("DGA Agreement") that prohibits all but very limited editing or cutting
17  of their major motion pictures and does not allow any form of filtering under the
18  FMA.   (Dkt. No. 11).    VidAngel has counter-complained against Disney for
19  antitrust violations with respect to the DGA Agreement, alleging that the agreement
20  is part of a concerted effort to prohibit the lawful provision of online filtering
21  services pursuant to the FMA.  *Id*.

22      Disney's witness, Tedd Cittadine, admitted that ████████████
        ██████████████████████████████████ Marquart Dec., Ex. B at
23  Tr. 83:20-84:21. He further admitted that ████████████████████
24  ██████████████████████████████████████████████████
25      ████ Marquart Dec., Ex B at Tr. 343:6-21.  That agreement prohibits the VOD
26  provider from "mak[ing], or authoriz[ing] any others to make, any modifications,
27  deletions, cuts, alterations or additions" in or to any of Disney's titles sold by the
28

VOD provider.  Harmon Dec., ¶ 48; Quinto Dec., ¶¶ 2-4, Ex. A.  The terms of service of VOD providers likewise prevent users from filtering Disney titles they buy from a VOD provider.  Meldal Dec., ¶¶ 26, 29, 30, Exs. G & H.  To obviate this motion, VidAngel offered to enter into a standard VOD license agreement with Disney that allowed for filtering.  Harmon Dec., ¶ 59; Quinto Dec., ¶¶ 2-4.  Disney (*i.e.*, each plaintiff in this litigation) refused to consider its offer.  *Id.*  The reason is simple.  Disney does not want the market for filtering its licensed VOD titles to exist.

**E.      Unable to Obtain a License from Disney, VidAngel Has Developed an FMA Authorized Streaming Business Model That Enables Customers Who Purchase Movies for Home Viewing to Filter Objectionable Content.**

The Declarations of VidAngel's CEO, Neal Harmon, and its technological expert, Dr. Sigurd Meldal, explain in detail how VidAngel lawfully acquires DVDs of Disney's titles, sells those discs to its users, and then streams filtered versions of those titles to the lawful owners of those discs for private home viewing.  Harmon Dec., ¶¶ 20, 26, 61; Meldal Dec., ¶¶ 33-44.  The declarations provide much more detail on how the technology works, but the letters VidAngel sent to Disney and other studios *well over a year ago* explained its basic service quite succinctly: (1) VidAngel "purchases [a] disc for the customer and stores it in a physical vault;" (2) using  proprietary technology, it "streams" the contents of the disc to the customer in a filtered format chosen by the customer; then (3) it "re-purchase[s] the disc at a discount from the sale price. . .based on the length of time the customer has owned the disc."  Harmon Dec., ¶ 22, Ex. B.  VidAngel has spent ███████████ █████████ to buy digital video discs and Blu-ray discs (collectively, "DVDs") sold by the studios and re-sells them to consumers, many of whom would not otherwise watch the movies recorded on them.  *Id.*, ¶ 63.  To date, VidAngel has spent over ████████ to purchase content sold by the studios.  *Id.*  No fixed copy of an altered work is ever created.  *Id.*  This service complies with the FMA.

-8-

**LEGAL STANDARD**

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Indeed, the remedy is appropriate only if the movant proves "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id*. at 20.

When a plaintiff seeks to enjoin a technology, as Disney does here, a court should exercise particularly great restraint. As the Supreme Court observed in the seminal Sony Betamax case: "[t]he judiciary's reluctance to expand the protections afforded by copyright without explicit legislative guidance is a recurring theme," *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984), and "it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . to give the public appropriate access to their work product." *Id.* at 429.

**ARGUMENT**

**I.   DISNEY IS NOT LIKELY TO PREVAIL.**

Disney is not likely to prevail on either its first claim for relief, for Copyright infringement, 17 U.S.C. § 106(1), (4), or its second claim for relief, for violation of the DMCA 17 U.S.C. § 1201(a)(1)(A). Knowing that it cannot demonstrate a likelihood of success on its first and most important cause of action, for copyright infringement, Disney focuses first on its second, DMCA claim, in its moving papers. Not only does that argument put the cart before the horse, it reveals the inherent infirmity in Disney's logic. This Court's analysis of the copyright infringement claims should shed light on the larger purpose of the DMCA, which was intended to protect against copyright infringement.

A.    **Disney Will Not Succeed on Its Reproduction and Public Performance Copyright Claims.**

In contending that VidAngel violates Disney's exclusive rights to reproduce and publicly perform its copyrighted works, Disney ignores that it gave up certain rights, and the subsequent owners acquired other rights, when physical copies of Disney's DVDs were lawfully sold in the market.

Disney first argues that VidAngel's intermediate copies violate its reproduction right, citing only case law in which a defendant acted unlawfully by making copies *capable of being viewed by consumers*. But, the case law draws a clear distinction between unlawful copies, which can be viewed by consumers, and lawful "intermediate" copies, which cannot. VidAngel does not make *any* copy that a consumer could watch, even if given access to the relevant files. After decrypting discs it owns, VidAngel creates intermediate files that are not capable of being watched. (Intermediate files can be compared to computer source code, which is unusable until it has been compiled and converted into object code.) VidAngel tags the files for over 80 types of content, breaks them into approximately 1,300 fragments that contain no more than 10 seconds of content (and frequently less), encrypts those fragments, and stores them in a secure, access-controlled location in the cloud. Meldal Dec., ¶¶ 33-38. A consumer given access to the content at any point before his or her disc purchase and selection of filters would be unable to watch it. Such intermediate copies are thus not "copies" as defined by the Copyright Act and, as a matter of law, do not give rise to infringement claims. *Sega Enters. Ltd. v. Accolade Inc.*, 997 F.2d 1510 (9th Cir. 1992); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 1999); *Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2003).

Moreover, the U.S. Copyright Office's most recent triennial report to Congress noted that both legislative history and a Central District of California decision militated in favor of the creation of an exemption for making personal copies of discs one owns (a practice known as "format-shifting") before concluding

1    that the policy judgments related to it "are complex and thus best left to Congress or
2    the courts."  U.S. COPYRIGHT OFFICE, Docket No. 2014-07, EXEMPTION TO
3    PROHIBITION ON CIRCUMVENTION OF COPYRIGHT PROTECTIONS SYSTEMS FOR
4    ACCESS CONTROL TECHNOLOGIES (2015).  Various courts have addressed the issue
5    and noted that the owner of a disc may make a personal copy.  *Universal City*
6    *Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001); *Realnetworks, Inc. v. DVD*
7    *Copy Control Ass'n*, 641 F. Supp. 2d 913, 942-43 (N.D. Cal. 2009); *U.S. v. Elcom*
8    *Ltd.*, 203 F. Supp. 2d 1111, 1125 (N.D. Cal. 2002). And, here, Congress *has* spoken.

9         Nor is the streaming of filtered copies to customers who have purchased
10   DVDs a public performance.  The Supreme Court has declared that a transmission
11   of a copyrighted program is not made to "the public" when it is made "to those who
12   act as owners or possessors of the relevant product."  *Am. Broad. Cos. v. Aereo,*
13   *Inc.*, 134 S. Ct. 2498, 2510 (2014).  Disney characterized that statement as *dictum*,
14   but the Court took pains to craft a "limited holding" that would not discourage "the
15   emergence or use of different kinds of technologies."  *Id.*  It further suggested that
16   the public service right is not be infringed when – as with a filtering service – "the
17   user of a service pays primarily for something other than the transmission of
18   copyrighted works . . . ."  *Id.* at 2511.  Because VidAngel streams filtered versions
19   of motion pictures created at the direction of and owned by its customers, it is
20   simply untrue that VidAngel engages in public performances.

21        Disney's argument requires the Court to find that Congress intended that
22   consumers be charged twice to watch a movie once.   That is not the law.  The FMA
23   requires that any consumer watching filtered content must first have lawfully
24   purchased a copy (*i.e.*, a DVD), thus ensuring that the studios receive a royalty
25   payment.  Then, says Disney, the consumer must pay a separate streaming fee to
26   watch that copy.  But nothing in the FMA suggests that Disney should be paid twice
27
28

when consumers watch a filtered movie once.[3]   Indeed, that suggestion is especially absurd given that Disney does not even provide the filtering service.

### B.   In Any Event, the FMA Shields Companies Like VidAngel From Liability Under any Provision of the Copyright Act.

Even assuming Disney is likely to succeed on the merits of its reproduction and public performance claims, VidAngel has a strong FMA defense.  The FMA *expressly provides* that a third party may *filter* and *transmit* content as specified by a lawful owner of a copy so long as a fixed copy of the altered content is not created. VidAngel complies with those requirements.  Disney's argument that VidAngel's service necessarily violates its public performance right unless Disney chooses to grant a license to VidAngel would improperly give Disney a veto power over the FMA.  If accepted by the Court, Disney's argument would render the first, and now most important, provision of the FMA (allowing a third party to filter and stream the content of a disc owned by a consumer) meaningless.  In actuality, Congress made filtering legal without the studios' consent.

The FMA must be read to give it purpose.  As Judge Learned Hand observed, "it is one of the surest indexes of a mature and developed jurisprudence . . . to remember that statutes always have some purpose or object to accomplish." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945).  *See also Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ."); *Corley v.*

---

[3] Congress intended that the studios would be compensated only through the sale of copies of movies: "the bill would impose a private-sector mandate on copyright owners.  [It] would limit the right of copyright owners to collect compensation under copyright law from persons using or manufacturing a technology that enables making limited changes to a motion picture for a private home viewing."  H.R. REP. NO. 109-33(1) at 22; H.R. REP. NO. 108-670, at 6 (2004).

1 | *United States*, 556 U.S. 332 (2009) (same).

2 |      Here, Congress enacted the FMA to provide a legislative solution to the

3 | studios' refusal to cooperate with third parties seeking to satisfy consumer demand

4 | for filtered motion pictures.  Congress intended that "directors may not control

5 | every detail of how their works are displayed, particularly for a legal copy aired in

6 | the privacy of a consumer's home."  H.R. REP. No. 108-670, at 3 (2004).  To ensure

7 | that neither the studios nor the directors could deny the public the ability to enjoy

8 | filtered content in the privacy of their homes, the FMA "does not require that

9 | filtering be done with the permission of the content creator or owner, but rather

10 | creates an exemption from copyright and trademark liability for filtering."  *Id*. at

11 | 76.  Disney's argument that a filtering service (like VidAngel) needs the identical

12 | permissions it would have needed *before* the FMA's enactment would render this

13 | provision meaningless.

14 |      VidAngel streams "authorized" (not bootlegged) copies of physical discs that

15 | it obtains on the legal market.  Harmon Dec., ¶ 20.  It is not required to obtain any

16 | further authorization from Disney to engage in its filtering service.  *See* 17 U.S.C.

17 | 110(11); 150 CONG. REC. H7654-01 (Sept. 28, 2004) ("The making imperceptible

18 | must be 'from an authorized copy of a motion picture.'  Thus, skipping and muting

19 | from an unauthorized to 'bootleg' copy of a motion picture would not be exempt.")

20 |      Disney does not dispute that VidAngel transmits filtered motion pictures for

21 | private home viewing at the direction of members of private households.  Nor can

22 | it.  Under the Copyright Act, "[t]o 'transmit' a performance. . .is to communicate it

23 | by any device or process whereby images or sounds are received beyond the place

24 | from which they are sent."  17 U.S.C §101.  "This legislation contemplates that any

25 | altered performances of the motion picture would be made either directly by the

26 | viewer or at the direction of a viewer where the viewer is exercising substantial

27 | choice over the types of content they choose to skip or mute." 150 CONG. REC.

28 | H7654-01 (Sept. 28, 2004).  That unquestionably occurs here, as VidAngel's

1  customers select the filters that they wish to apply to each motion picture
2  transmitted to them for private viewing in the home.  Meldal Dec., ¶¶ 37(b)(xi)-(xii).

3       Tellingly, Disney's papers ignore entirely the one case actually construing the
4  FMA.[4]  In *Huntsman v. Soderbergh*, No. 02-M-1662 (MJW) (D. Colo. filed Aug.
5  29, 2002), all the major studios counter complained against ClearPlay and 11 other
6  small businesses ("ClearPlay") that employed a variety of technologies to allow the
7  public to watch filtered motion pictures.   Disney alleged that:

8       [ClearPlay had found a] profitable business in providing to certain
        audiences, bowdlerized versions of other peoples' movies.  Rather than
9       go to the effort . . . of . . . producing . . . their own movies . . . they
        simply take the Studios' movies and alter them without authorization
10      by removing the material they think this audience will not want.

11 Motion Picture Studio Def. Answer and Counterclaims, *Huntsman v.*
12 *Soderbergh*,  No. 02-M-1662 (MJW), 2005 WL 1993421 (D. Colo. Aug. 17, 2005),
13 2002 WL 1993421, ¶ 23.

14      ClearPlay offered edited versions "of the Hottest Movies." *Id.* at ¶ 62.  Its
15 "editing service and software utilize[d] 'ClearPlay Filters'  and 'ClearPlay Guides'
16 that [we]re created for each motion picture title." *Id.* at ¶ 63.  Disney alleged that
17 ClearPlay "created, duplicated, rented, sold, or otherwise publicly distributed
18 unlawfully edited" copies of movies (*id.* at ¶ 86) and that ClearPlay had additionally
19 "created . . . film specific software files which, when used in conjunction with
20 DVDs containing the Studios' motion pictures, create unlawfully edited or
21 otherwise altered versions of the Studios' motion pictures." *Id.* at ¶ 115.  Like
22 VidAngel's technology, ClearPlay's filtering technology did not create fixed copies
23 of the filtered works.

24      Because the action was still pending when the FMA took effect, the claims
25

26   [4] That omission could not have resulted from oversight in that 3 of the 4
27 plaintiffs herein—Disney, Fox, and Warner Bros.—lost.

28

1   against ClearPlay had to be dismissed.  The court explained:  "the effect of the
2   Family Movie Act is that Congress has made a policy decision that those who
3   provide the technology to enable viewers to edit films for their private viewing
4   should not be liable to the copyright owners *for infringing their copyright*
5   *protections* or to the directors for the Lanham Act claims, and that removes this
6   court's jurisdiction over any further controversy. . . ."  2005 WL 1993421, at *2
7   (emphasis added).

8       The upshot is quite simple:  if a filtering service complies with the FMA, that
9   service need not satisfy any other provisions of the Copyright Act: "The Committee
10  strongly believes that subject to certain conditions, copyright and trademark law
11  should not be used to limit a parent's right to control what their children watch in
12  the privacy of their own home."  H.R. REP. No. 109-33(1) at 5.

13      Those "certain conditions" were spelled out in the House Report (as well as in
14  the text of the statute itself): "This new subsection *ensures* that U.S. copyright law
15  does not prohibit . . . the use of *any filtering service or technolog*y that mutes or
16  skips content, provided the service or technology: 1. 'is confined to private, in-
17  home use; 2. 'for the household of the purchasing consumer only; and 3. 'does not
18  create a fixed copy of the alternate version."  *Id*. at 24 (emphasis added).  Further,
19  "*technology* used to filter certain material out of movies for private viewing would
20  not constitute a violation of copyright or trademark law."  *Id.* at 21 (emphasis
21  added).  The Report explained what was *not* exempted: "The Act does not create an
22  exemption for actions that result in fixed copies of altered works."  *Id.* at 7.

23      Moreover, Disney's argument that "VidAngel's server copy segments are
24  fixed because they are [allegedly] stored for more than a transitory duration" is
25  legally and factually meritless.  MPAS at 22, fn. 11.  The term "fixed copy" in the
26  FMA clearly is distinguishable from intermediate copies made incident to the
27  filtering process, and it cannot be reasonably construed as prohibiting the creation of
28  such copies.  *See* 17 U.S.C. § 110(11); *Alvarez v. Tracy,* 773 F.3d 1011, 1025 (9th

-15-

Cir. 2014) (Kozinski, J., dissenting) (discussing the doctrine of *expressio unius est exclusio alterius*).  Congress' intent was to prohibit third parties from creating and selling a single fixed, altered version of a motion picture to the public at large:

> There is a basic distinction between a viewer choosing to alter what is visible or audible when viewing a film, the focus of this legislation, and a separate entity choosing to create and distribute a single, altered version to members of the public.  The section 110(11) exemption only applies to viewer directed changes to the viewing experience, and not the making or distribution of actual altered copies of the motion picture.

150 Cong. Rec. S11852-01 (Nov. 24, 2004); *see also* 150 Cong. Rec. H7654-01 (Sept. 24, 2004).

## C.   VidAngel's Service Does Not Violate the Copyright Act's Anticircumvention Provisions Found in the DMCA.

Disney contends that VidAngel circumvents access control measures in violation of § 1201(a)(1)(A) of the Copyright Act. 17 U.S.C. § 1201(a)(1)(A).  This statutory provision was added to the Copyright Act as part of the Digital Millennium Copyright Act ("DMCA").  As such, Disney refers to VidAngel's alleged violation of 17 U.S.C. § 1201(a)(1)(A) as its DMCA claim.

The DMCA claim asserted by Disney is specious.  To be sure:  because Disney encrypts DVDs "to prevent unauthorized access to their content on Discs," MPAS at 12:8-9, and VidAngel decrypts them, Disney's argument has superficial appeal.  The argument, however, is based on a fundamental misapprehension of both the DMCA's text and VidAngel's service.

Section 1201(a)(3)(A) of the Copyright Act expressly defines what it means "to circumvent a technological measure" as, *inter alia*, "to decrypt an encrypted work. . . without the authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(A). But VidAngel buys authorized copies of Disney's DVDs.  Harmon Dec., ¶¶ 20, 61; Meldal Dec., ¶ 33.  And it sells them to its customers, who are able to view (with filtering) what they have purchased.  *Id*.  That is not circumvention.

Contrary to Disney's contention, the FMA legislative history does not evince

a clear intent to prohibit VidAngel from decrypting DVDs for the purpose of accessing a disk to filter audio and visual content.  That history merely shows that Congress was aware that "some copy protection technologies rely on matter placed into the audio or video signal" and the FMA "does not allow the skipping of technologies or other copy-protection-related matter *for the purpose of defeating copy protection*."  150 CONG. REC. S11852-01 (Nov. 24, 2004) (emphasis added).  On the other hand, "it is expected that skipping and muting of content in the actual motion picture will be skipped or muted at the direction of the viewer based on that viewer's desire to avoid seeing or hearing the action or sound in the motion picture."  *Id*.  Thus, in balancing the legitimate interests of the viewer and the copyright holder, Congress expressed its intention that the FMA's safe harbor not be misused for the purpose of thwarting "copy protection technologies."  *Id*.

At most, what VidAngel does could be considered as decrypting content for the purpose of allowing it to be viewed in another way, a procedure known as re-formatting or "space shifting."  VidAngel does so at the request of disc purchasers who elect to have their DVD content streamed to them rather than receiving the physical discs.  As former Solicitor General Don Verrilli assured the Supreme Court in *Grokster* while representing the major record labels and movie studios, his clients agreed that space shifting is legal.  Transcript of Oral Argument at 12, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 545 U.S. 913 (2005) (No. 04-480).

Moreover, the DMCA should not be construed so broadly as to gut the FMA of its effectiveness.  It is undisputed that, when the FMA was enacted in April 2005, the *only* existing technology capable of allowing consumers to receive filtered content streamed to them required that DVDs be decrypted and intermediate copies be made.  Marquart Dec., Ex A at Tr. 79:7-80:24, 80:19-82:14; Meldal Dec., ¶¶ 19-23.)  While Disney argues this is "irrelevant as a legal matter" (MPAS at 13:7), Congress surely did not intend to enact an impotent statute that would have no practical effect.  To the contrary, "[t]he plain meaning of [the FMA] *exempts* from

1   actions brought under U.S. copyright and trademark law the 'making imperceptible

2   . . . of limited portions of audio or video content provided no fixed copy is created."

3   H.R. REP 109-33(I) at 6-7 (emphasis added).  That exemption is limited only in that

4   "[t]he Act does not create an exemption for actions that result in fixed copies of

5   altered works."  *Id.* The Chair of the House Judiciary Committee explained that,

6   "this legislation, the Family Movie Act, clarifies that existing copyright and

7   trademark law cannot be used to prevent a parent from utilizing available

8   technology to skip over portions of a movie they may find objectionable."  151

9   CONG. REC. H2114-01 (Apr. 10, 2005) (statement of Rep. Sensenbrenner).

10   Tellingly, Disney defends its DMCA claim based principally on *MDY*

11   *Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 952-55 (9th Cir.

12   2010) ("*MDY*").  But MDY simply did not turn on 17 U.S.C. § 1201(a)(1)(A).  And,

13   perhaps more importantly, the *MDY* court noted the tension between antitrust law

14   and the doctrine of copyright misuse; indeed, it expressly cautioned against DMCA

15   application when, as here, antitrust issues are present.  *Id*. at 951.[5]

16   In any event, the remedies section of the DMCA portion of the Copyright Act

17   makes clear that to redress violations, courts "may not impose a prior restraint on

18   free speech," 17 U.S.C. § 1203(b)(1), which is essentially what Disney seeks, and

19   courts should be especially wary of imposing such a restraint at a preliminary stage.

20   *Cf. Overstreet v. United Bros. of Carpenters and Joiners*, 409 F.3d 1199, 1218 (9th

21   Cir. 2005).  Even if this provision is ultimately (and incorrectly) found to support an

22   award of damages, the DMCA ought not to serve as the basis for enjoining

23   VidAngel's service.

24   _____

25   [5] The Court should act with restraint for the additional reason that the Electronic
    Frontier Foundation recently filed suit in the District of Columbia challenging the
26   constitutionality of the precise DMCA provision, 17 U.S.C. § 1201(a)(1)(A), at
    issue herein.  Ex. A to Request for Judicial Notice ("RJN"), *Green v. U.S. Dep't of*
27   *Justice*, Case No. 1:16-cv-01492-EGS, (D.D.C. filed on July 21, 2016).

28

**D.** **Even if VidAngel Is in Technical Violation of the Law, Its Service Is a Protected Fair Use.**

If VidAngel's service is found to be in technical violation of the FMA, it is nonetheless entitled to protection as a "fair use."  As the Supreme Court recently explained, "[t]he ultimate goal of copyright is to expand public knowledge and understanding. . .. [W]hile authors are undoubtedly important intended beneficiaries of copyright, the ultimate, primary intended beneficiary is the public, whose access to knowledge copyright seeks to advance by providing rewards for authorship." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015), *cert. denied* 136 S. Ct. 1658 (2016); *see also Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 575 (1994) (Fair Use furthers "copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'").  To determine whether a particular use of a work is fair, the factors considered: (1) the purpose and character of the use, including whether it is of a commercial nature[6] or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  *Campbell* at 576-77; 17 U.S.C. § 107.  The Court should also consider the clear legislative intent to make filtering services such as VidAngel's service available to the public and the public interest in allowing children to be protected from inappropriate content.

### 1.     VidAngel's Service Is Highly Transformative.

The central inquiry in evaluating the purpose and character of the use of a copyrighted work is to determine whether and to what extent the new work is "transformative." *Campbell,* 510 U.S. at 579. A work is "transformative" when it does not "merely supersede the objects of the original creation" but rather serves a

---

[6] Under the FMA, it is irrelevant that VidAngel is a for-profit business.  *See* H.R. REP. No. 109-33(1) at 69-74; 17 U.S.C. § 110(11).

new and different function.  *Id.*; *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164 (9th Cir. 2007).

VidAngel's filtering service transforms films that many people find offensive or inappropriate for children into family-friendly content as judged by each viewer. By its very nature, VidAngel's service is transformative in that it alters the content of the works as seen by different viewers in different ways.  Each user is privately streamed a customized version of the work that no longer contains the content the viewer finds objectionable.  The vast majority of VidAngel users would not watch the content streamed to them without filters.  Harmon Dec., ¶¶ 37-40.  VidAngel makes the unwatchable watchable, thus furthering congressional intent to provide families with access to content they otherwise would not consume, and creates a new audience for the filtered works. VidAngel's highly transformative service weighs heavily in favor of finding fair use.

### 2.   Plaintiffs' Works Are Especially Amenable to Fair Use

"Published works are more likely to qualify as fair use [than unpublished works] because the first appearance of the artist's expression has already occurred." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003).

VidAngel filters exclusively published works.  Because the copyright owner's expression of those works occurs before VidAngel's use, this factor favors fair use.

### 3.   VidAngel's Users May Access Plaintiffs' Works Only for Transformative Purposes

In determining whether a use is fair, courts assess the amount and substantiality of the copyrighted work that is "made accessible to the public for which it may serve as a competing substitute." *Authors Guild*, 804 F.3d at 221-222. VidAngel's service allows individual users to control how much of a film is made imperceptible.  Each user is required to apply at least one (substantive) filter, and VidAngel's system never allows the public to access any original, unaltered work. VidAngel's data show that the overwhelming majority of users (96 percent) apply

multiple filters.  Harmon Dec., ¶ 37. Thus, the amount of Plaintiffs' works made accessible is determined by each user and is always limited to the amount necessary to create that particular user's desired filtered work.  VidAngel users *never* watch exact copies of the original films.  Moreover, VidAngel's filtered content is not a substitute for Plaintiffs' original works.

### 4. VidAngel's Lawful Filtering Service Increases Disney's Disc Sales.

The "single most important element of fair use" is the impact of the use on the traditional market for the copyrighted work.  *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 566 (1986).  To defeat a claim of fair use, the copyright holder must point to the market harms that result from secondary use substituting for the original work. *See Campbell*, 510 U.S. at 591 ("cognizable market harm" is limited to "market substitution").  This factor "requires the Court to strike a balance between the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *Columbia Pictures Indus., Inc. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179, 1189 (C.D. Cal. 1998) (quoting *MCA, Inc. v. Wilson*, 667 F.2d 180, 183 (2d Cir. 1981)).

VidAngel does not harm the market for unfiltered movies because filtered movies are not a substitute for them.  As a rule, VidAngel cannot offer filtered movies until *after* the unfiltered originals have been shown in theaters, released on collector's edition discs, and streamed to audiences.  *See* Harmon Dec., ¶¶ 29-30. Because VidAngel does not make fixed copies of filtered works, it cannot compete in the pay or free television market.  VidAngel's filtering service *increases* the market for Disney's works.  Over 92 percent of VidAngel customers would not watch those movies without filtering.  Harmon Dec., ¶¶ 37-40.  VidAngel lawfully purchases thousands of discs to resell to these unique customers.  In fact, VidAngel has spent over one-third of its capital contributions -- $1,200,000 to date – to purchase discs. *Id.*, ¶ 61.

### 5.     The *Clean Flicks* Fair Use Analysis Is Inapposite

Disney's reliance on *Clean Flicks of Colo., LLC v. Soderbergh*, 433 F. Supp. 2d 1236 (D. Colo. 2006) is inapposite because it was not decided under the FMA. Clean Flicks made *fixed* copies of edited films, which is expressly prohibited by the FMA. *Id.* at 1240.  The FMA was also inapplicable because CleanFlicks, rather than its customers, decided what to filter.  Here, no fixed copy of the filtered work is ever made and each user chooses what to filter.  Accordingly, VidAngel's service is clearly fair use to the extent it is not exempted by the FMA.

## II.     DISNEY CANNOT DEMONSTRATE IRREPARABLE HARM.

### A.     <u>Disney's Year-and-a-Quarter Delay Demonstrates That an Injunction Is Unnecessary to Prevent Immediate and Irreparable Harm.</u>

Disney relies heavily on *Warner Bros. Entertainment Inc. v. WTV Systems,* 824 F. Supp. 2d 1003 (C.D. Cal. 2011), to support its irreparable harm argument. But in that case, the plaintiffs – who were represented by Disney's counsel herein, Glenn Pomerantz and Kelly Klaus – brought suit against an online DVD rental service called Zediva within 18 days of Zediva's launch. Even so, counsel took pains to explain their delay in seeking an injunction.[7]  Significantly, they alleged that because Zediva had 137 titles available for rent, it posed an imminent threat. By comparison, VidAngel had over 750 titles available when it notified 16 studios and networks, including Disney, of its service with not one but *two* letters in July and August of 2015.  VidAngel explained that it: (1) "purchases the DVD or Blu-ray disc for the customer and stores it in a physical vault;" (2) "streams" the contents of the disc to the customer in a filtered format chosen by the customer; and (3) then

---

[7] In *WTV Systems*, plaintiffs' counsel submitted a declaration emphasizing the speed with which plaintiffs filed suit. RJN Ex. B.  When the parties stipulated to expedited discovery, the stipulation recited that the additional time required for discovery would not evidence any delay.  Here, however, the parties stipulated only that the continuance of the preliminary injunction hearing from October 24 to October 31, 2016, would not constitute evidence of delay.

"re-purchase[s] the disc at a discount from the sale price. . .based on the length of time the customer has owned the disc."  Harmon Dec., ¶ 22, Ex. B. VidAngel added that it had grown from 43 to 4848 users in just under six months (a 10,000% growth rate) and wished to buy directly from studios "to scale its business."  *Id*.  The letters invited Disney to access its service, ask questions, and express any objections. Notwithstanding that the harm alleged Disney alleges herein is the same as in *WTV Systems*, Disney took almost a year and a quarter longer to seek an injunction.

Delay in requesting a preliminary injunction is inconsistent with a claim of irreparable harm.  *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 14.06[A][3][c] (unreasonable delay can defeat irreparable injury and the delay "need not be great").  Denying an unreasonably delayed request for injunctive relief furthers the purpose of such relief – to maintain the *status quo*. *See, e.g., Citibank N.A. v. Citytrust,* 756 F.2d 273 (2d Cir. 1985) (10-week delay following notice of infringement was unreasonable); *Hanginout, Inc. v. Google, Inc.,* 54 F. Supp. 3d 1109, 1132–33 (S.D. Cal. 2014) (seven-month delay in filing suit, and even more before seeking preliminary injunction, was inexcusable); *Valeo Intell. Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (three-month delay belied claims of irreparable harm).

Disney seemingly learned of VidAngel in December 2014, when it apparently called provisions in its agreements with Google to Google's attention, thus causing Google to alter the Chromecast technology to render VidAngel's service unworkable.  Harmon Dec., ¶¶ 10-13.  Evidently to hide evidence of that, Plaintiffs refused to search for or produce any e-mail communications related to VidAngel sent before late July 2015.  Marquart Dec., Ex. E.  Disney's further year-and-a-quarter delay in scheduling a preliminary injunction hearing after receiving VidAngel's July 2015 letter negates its claims of irreparable harm. After receiving

-23-

VidAngel's first letter, Disney opened a VidAngel account on August 6, 2015. Harmon Dec., ¶ 22, Ex. C.  Also on August 6, 2015, 18 mostly legal employees of Plaintiffs and other MPAA studios and 7 MPAA lawyers exchanged e-mails and messages about VidAngel.  Marquart Dec., Ex. D.  On August 20, 2015, Plaintiffs e-mailed renowned litigation counsel, Tom Nolan of Skadden Arps, about VidAngel. *Id*. On August 28, 2015, Plaintiffs e-mailed Kelly Klaus, Glen Pomerantz and Jonathan Blavin of Munger Tolles, about VidAngel.  *Id*.  In all, 59 employees of Plaintiffs, the MPAA, or other MPAA studios exchanged 124 messages concerning VidAngel in August 2015 alone.  *Id*.  Plaintiffs' in-house counsel and outside counsel discussed VidAngel over 1,300 times by e-mail alone before filing suit.  *Id.* Yet, Plaintiffs failed to send any cease-and-desist letter or other objection to VidAngel prior to filing.  Harmon Dec., ¶ 22.  Their delay prejudiced VidAngel and it users.   Hundreds of thousands of families now rely on VidAngel's filtering service, and VidAngel invested millions in its distribution model (and enriched Plaintiffs by doing so), in reliance upon the studios' silence.  Harmon Dec., ¶ 30.

The authority Disney cites to justify its delay is inapposite.  The primary case Disney quotes to explain its delay – *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962 (2014) – did not involve a preliminary injunction and did not address irreparable harm.  At issue was whether asserting a laches defense precluded the issuance of a *permanent* injunction.  Particularly after *eBay* and *Winter* – which require a showing of imminent actual harm – Plaintiffs' delay negates any claim of irreparable harm.[8]

---

[8] Disney will likely rely upon another case in which they were involved, *American Broad. Cos.*, 2012 WL 3854042 (S.D.N.Y. 2012), in which delay of roughly one year was excused, but  only because defendant's business relied on an untested technology perceived as not viable.  Further, (1) most of the delay occurred while Aereo operated in "stealth" mode before its public announcement; (2) when it finally announced itself, the plaintiffs were unsure whether Aereo was viable; (3) Aereo operated in an invitation only, beta-testing phase for much of the delay; (4) Aereo loomed large only after it announced the commercial launch of its service in
   (footnote continued)

### B.    Disney's Alleged Harms Are Caused by the FMA, Not VidAngel.

A plaintiff must also present evidence of actual harm suffered as a direct result of the defendant's actions. *Fox Broadcasting Co.  v. Dish Network, L.L.C.*, 905 F. Supp. 2d 1088, 1110 (C.D. Cal. 2012), *aff'd* 747 F.3d 1060 (9th Cir. 2013); *see also Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011) (Perfect 10 did not prove a sufficient causal connection between irreparable harm to its business and Google's search service).  If there is not a sufficient causal nexus between the alleged irreparable injury and the alleged wrongdoing, an injunction will not issue.  *Garcia v. Google, Inc.*, 786 F.3d 733, 748 (9th Cir. 2015) (citing *Perfect 10*, 653 F.3d at 982); *Bird-B-Gone, Inc. v. Bird Barrier Am., Inc.*, 2013 WL 11730662, at *6 (C.D. Cal. Mar. 20, 2013).

In *Dish*, Fox alleged that Dish's "Autohop" service, which allowed subscribers to skip commercials in recorded Fox television shows, infringed.  905 F. Supp. 2d at 1095.  To ensure Autohop functioned properly, Dish made "quality assurance" ("QA") copies of Fox's shows.  *Id*.  Fox sought a preliminary injunction, arguing that the QA copies resulted in irreparable harm by causing a "loss of control" of Fox's copyrights.  The court found that Fox did not establish irreparable harm *caused by Dish*.  *Id* at 1110.  It held that the alleged harms flowed from the *non-infringing* ad-skipping function the copies facilitated.  *Id*.  The Ninth Circuit affirmed: "[i]n refusing to enjoin Dish from creating these [QA] copies, the district court correctly concluded that the harms Fox identified—including 'loss of control over its copyrighted works and loss of advertising revenue'—did not 'flow from' the quality assurance copies themselves, but from the entire Autohop program."  *Fox Broad. Co. v. Dish Network LLC*, 747 F.3d at 1072.  It concluded, "the market harm

New York City, one month before suit; and (5) Aereo admitted that it would not have changed its business plan if it had received a cease-and-desist letter and was gearing up for litigation. *Id*. at 28.  Here, VidAngel was publicly launched in July 2015 and had considerably more subscribers than even Aereo had when ABC sued it.

1  that Fox and its *amici* allege results from the automatic commercial-skipping, not
2  the recording of programs …..”  *Id*. at 1069.

3      Here, legitimate filtering under the FMA, not infringement by VidAngel,
4  causes the “harms” alleged by Disney.  First, Disney alleges harm to its right to
5  control how, when and through which channels consumers view its works.  By
6  definition, filtering under the FMA occurs without Disney’s consent, and Disney
7  may not control how others view those works.  Second, Disney alleges that
8  VidAngel undermines its ability to license unfiltered content for streaming, but the
9  FMA does not require a license to stream filtered content.  Third, Disney claims
10  VidAngel disrupts its ability to secure and protect its content, but the FMA allows
11  the transmission of filtered content. Thus, Disney does not have any right to review
12  and approve VidAngel’s service (which is very secure in any event).  Meldal Dec.
13  ¶¶ 34, 38-39.  Fourth, Disney argues that VidAngel could prevent the development
14  of the online streaming market through inferior user-viewing experiences.  Again,
15  the FMA allows filtered transmissions without Disney’s consent.  Moreover,
16  VidAngel’s streaming service is independently rated as superior to Disney’s (and to
17  that of any other third party streaming service).  Harmon Dec., ¶ 27.

18      **C.    Disney’s Alleged Harms Are Speculative.**

19      Disney’s irreparable injury analysis depends on a premise invalidated by the
20  Supreme Court: that a presumption of irreparable harm applies to copyright
21  infringement claims.  *See eBay Inc.*, 547 U.S. at 392-3; *Flexible Lifeline Sys.*, 654
22  F.3d at 995-996 (9th Cir. 2011); *Dish Network*, 905 F. Supp. 2d at 1109 (requiring
23  an “independent showing” that plaintiff was likely to suffer irreparable harm).  A
24  threatened loss of prospective customers, goodwill or reputation supports irreparable
25  harm only if it is not speculative.  *Rent-A-Center v. Canyon Television & Appliance
26  Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991); *Goldie’s Bookstore*, Inc. v. Super.
27  Ct., 739 F.2d 466, 472 (9th Cir. 1984) (rejecting the plaintiff’s claimed lost goodwill
28  and “untold” customers as too speculative).

Disney's "evidence" in support of its four alleged irreparable harms is supplied only by Tedd Cittadine who at his deposition could offer no evidence that VidAngel was actually causing *any* of the hypothetical harms to which he testified. VidAngel has provided its disc-based filtered streaming service since the beginning of 2015 and over 500,000 families have now used it.   Harmon Dec., ¶¶ 25, 30. Logic suggests that if any of the speculated harms were real, there would now be evidence of actual injury.   Yet, Cittadine had no evidence:   (1) of *actual* harm caused by VidAngel to Disney's "control of its copyrights" (Marquart Dec., Ex. A at Tr. 196:8-13, 197:18-25); (2) ██████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████   (3) that VidAngel undermined Disney's ability to secure and protect its content online (*id*., Ex. A at Tr. 240:14-24); or (4) that VidAngel hindered Disney's development of the on-demand streaming market through inferior user experiences.   *Id*. at 263:11-18.[9]   Cittadine also acknowledged that the four hypothetical "harms" existed when Disney received VidAngel's July 2015 letter.[10]

Cittadine's hypotheticals are based upon a false assumption that VidAngel is a copyright pirate, like the filing-sharing networks shut down by courts.   When

---

[9]   Owing to the admission that Plaintiffs have no evidence of inferior viewer experience, Disney cites to the Ehler declaration, Ex. L, for the proposition that VidAngel's social media pages reflect a few consumer complaints of "poor streaming quality."   Exhibit L reflects just 9 complaints from January 2016 through July 2016.   In almost all the screen captures, VidAngel responds to the consumer issue and promises to quickly resolve it, which is not "evidence" of any widespread consumer issue with VidAngel.   To the contrary, VidAngel's service is growing precisely because it provides a quality viewing experience. Harmon Dec., ¶¶ 26-28.

[10]   Cittadine admitted that Fox would have had the same concern about VidAngel's security in July 2015 that it did in June 2016, when it applied for a preliminary injunction.   Marquart Dec., Ex. A at Tr. 245:18-246:21. Cittadine admitted that VidAngel offered to allow Fox to look at its security architecture in July of 2015.   *Id*. at 244:13-18.   Cittadine also admitted that he did not know whether Fox ever took VidAngel up on that offer (in fact, Fox did not).   *Id*. at 244:25-245:7.

asked for Disney's evidence that VidAngel was causing harm to its right to control its intellectual property, Cittadine referenced "piracy that costs our business billions of dollars."   Marquart Dec., Ex. A at Tr. 195:19-23.   Cittadine stated that: (1) "piracy obviously encourages people to watch consumer content without paying for it" (*id.* at 198:17-19); (2) "piracy undermines our ability to try and build a legitimate marketplace" (*id.* at 199:9-12); and (3) piracy "challenges us when we're trying to negotiate business deals with our clients." *Id.* at 200:16-20.

Plaintiffs have now demonstrated that the claimed irreparable injuries are purely pretextual.  After Cittadine declared that VidAngel's "out-of-stock" notices harmed Disney by creating a poor user experience (Cittadine Dec., at ¶¶ 29-30), VidAngel offered to negotiate a reasonable license fee to stream filtered content in lieu of sending out-of-stock notices pending resolution of this action.  Quinto Dec., ¶¶ 2-4 and Ex. A.  Plaintiffs' counsel responded: "my clients absolutely will not engage in any joint licensing discussions."  *Id.*, ¶ 3.  Counsel for VidAngel then offered to abandon its FMA exemption defense (and with it the requirement that consumers must purchase copies of discs) and instead pay a license fee to stream filtered content, noting that such arrangement would resolve Disney's DMCA and infringement claims.[11]  Plaintiffs never responded to the offer. *Id.*, ¶ 4.

### D.   Disney's Alleged Harms Are Economic.

Economic injury alone will not support a finding of irreparable harm because it can generally be remedied by money damages.  *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp.2d 1079, 1092 (E.D. Cal. 2012) (citing *Rent-A-Center,* 944 F.2d at 603).  A preliminary injunction is appropriate only if the record establishes that

---

[11] VidAngel's counsel described the many reasons why VidAngel would prefer to license content for streaming from Plaintiffs rather than continue its current physical DVD-based model, including that the studios will someday stop selling DVDs and that movies are usually released for streaming prior to their DVD release, requiring VidAngel customers to wait for this content.  Quinto Dec., Ex. E.

1  the harm is not economic.  *Id*.  If a defendant in a copyright infringement action
2  maintains accurate records from which damages can be calculated, the harms are not
3  irreparable.  *See Capitol Records v. Redigi*, No. 1:12-cv-00095, Order Denying
4  Motion for Preliminary Injunction (S.D.N.Y. Feb. 6, 2012) and transcript of ruling
5  on preliminary injunction.  RJN., Ex. C.

6      In *Dish*, 905 F. Supp. 2d at 1110–11, the Central District denied a preliminary
7  injunction because the damages were calculable.  Fox accused Dish of copying its
8  programs, which could be purchased from services like iTunes, without paying for
9  them.  The fact that "Fox has licensing agreements with other companies shows that
10  the *copies* of Fox Programs have a market value that other companies already pay in
11  exchange for the right to use the copies."  *Id*. So too here.  The *same* VOD market is
12  at issue and any damages are both economic and easily calculable.  The Ninth
13  Circuit agreed that monetary damages could compensate Fox for the loss of its
14  copies, reasoning that Fox's existing VOD licenses could "at the very least"
15  constitute a starting point or aid in calculating damages.  *Fox Broad. Co.*, 747 F.3d
16  at 1073.  It also found that the appropriate market to consider was that for Fox's
17  VOD licenses (iTunes, Hulu, etc.).  *Id*. at 1070, 1073.

18      As in *Dish* and *Redigi*, the value of VidAngel's sales can be calculated.
19  VidAngel has records of every transaction – including purchase date, sell-back date,
20  amount paid, and filters selected – for every title it has ever filtered and streamed.
21  Harmon Dec., ¶ 62.  Thus, any damages caused by VidAngel are easily calculable.

22  **III.   THE BALANCE OF HARDSHIPS WEIGHS AGAINST A
        PRELIMINARY INJUNCTION.**

23
24      If its service is enjoined, VidAngel, whose only business is providing the
25  filtering service at issue, would suffer an unimaginable financial hardship that could
26  impair its ability to defend this action before the merits are decided. Where there are
27  no more than "serious questions going to the merits," the moving party must show
28  that "the balance of hardships tips sharply in [its] favor."  *All for the Wild Rockies v.*

1    *Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *Lopez v. Brewer*, 680 F.3d 1068,

2    1072 (9th Cir. 2012).

3        "In evaluating the balance of hardships a court must consider the impact

4    granting or denying a motion for a preliminary injunction will have on the

5    respective enterprises. Thus the relative size and strength of each enterprise may be

6    pertinent to this inquiry." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,* 4 F.3d 819,

7    827 (9th Cir. 1993).  When a larger, established corporation seeks a preliminary

8    injunction against a start-up, courts consistently refuse to enjoin the start-up's

9    business operations.  *See, e.g., LucasArts Entm't Co. v. Humongous Entm't Co.*, 815

10   F. Supp. 332, 338 (N.D. Cal. 1993) (refusing to enjoin "a start-up company with

11   limited financial resources" because it "depends to a large extent on sales of its

12   products to pay its employees and operating expenses" and its "customers may lose

13   their trust and confidence in the young company's ability to deliver goods on time");

14   *OG Int'l, Ltd. v. Ubisoft Entm't*, No. C 11-04980 CRB, 2011 WL 5079552, at *11

15   (N.D. Cal. Oct. 26, 2011); *Ossur Holdings, Inc. v. Bellacure, Inc.*, No. C05-

16   1552JLR, 2005 WL 3434440, at *9 (W.D. Wash. Dec. 14, 2005).

17        The hardships strongly favor VidAngel, which has but 20 full-time

18   employees.  Harmon Dec., ¶ 63.  This injunction would prevent it from filtering any

19   motion pictures owned or licensed by Disney, and would cast doubt on the legality

20   of its entire business enterprise.  Additionally, VidAngel's goodwill would be

21   seriously damaged as customers could not reliably depend upon VidAngel to filter

22   many popular motion pictures.  In contrast, Disney are four of the world's largest

23   movie studios and have "presented little evidence regarding the harm [they]

24   allegedly [are] suffering, other than the harm presumptively caused by copyright

25   infringement."[12]  *See Activant Sols., Inc. v. Wrenchead, Inc.*, No. C 03-3376 VRW,

26  

27   [12] Plaintiffs do not attempt to balance the hardships, but dismiss VidAngel's
hardships as legally irrelevant based on the assumption that they have demonstrated

28       (footnote continued)

1 | 2004 WL 1887529, at *9 (N.D. Cal. Aug. 23, 2004).

2 | **IV.   THE PUBLIC INTEREST STRONGLY FAVORS ALLOWING FAMILIES TO USE VIDANGEL'S FILTERING SERVICE.**

"The public interest analysis for the issuance of a preliminary injunction requires [the court] to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" *Indep. Living Ctr. v. Maxwell–Jolly,* 572 F.3d 644, 659 (9th Cir. 2009) (quoting *Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1458 (Fed. Cir. 1988)). "If. . .the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138-39 (9th Cir. 2009) (citing *Sammartano v. First Judicial Dist. Ct.,* 303 F.3d 959, 965 (9th Cir. 2002)). *See also Sierra Forest Legacy,* 577 F.3d at 1022 ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction"). Further, when "an injunction is asked which will adversely affect a public interest ... the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312–13 (1982).

**A.   The Supreme Court Has Repeatedly Protected the Public from Offensive Content.**

The courts and Congress have frequently protected families from offensive content while in the privacy of their homes. The following are but a few examples. In *Rowan v. United States Post Office Dept.*, 397 U.S. 728 (1970), the

---

a likelihood of success. (Mot. at 31-32.) That is not the case. In any event, where, as here, the balance of hardships tips strongly in the defendant's favor, the plaintiff is required to demonstrate a stronger likelihood of success on the merits. *MacDonald v. Chicago Park Dist.,* 132 F.3d 355, 357 (7th Cir. 1997).

Supreme Court upheld a statute allowing anyone who received material that he or she perceived as erotically arousing or sexually provocative to request that the Postmaster General order the sender not to send further mailings because there is no constitutional right to send unwanted materials into someone's home.  It was irrelevant that the recipient could simply choose to throw the unwanted mail away: "[T]he asserted right of a mailer . . . stops at the outer boundary of every person's domain." *Id*. at 738.  In *FCC v. Pacifica Foundation,* 438 U.S. 726 (1978), the Court noted that "broadcasting is uniquely accessible to children, even those too young to read," *id*. at 749, and held that the FCC has the power to regulate indecent radio broadcasts. *Id.* at 731, 738.  The Supreme Court also upheld the issuance of notices of liability to Fox Television Stations for permitting "fleeting" expletives during nationally broadcast awards shows (although a later decision excused the fines). *See FCC v. Fox Television Stations, Inc.,* 556 U.S. 502 (2009). In *Reno v. ACLU*, 521 U.S. 844 (1997), the Supreme Court noted that it has "repeatedly recognized the governmental interest in protecting children from harmful materials." *Id.* at 875 (citing cases).  Of especial significance here, it noted that a less restrictive alternative to banning all indecent speech on the Internet would be to "require[e] that indecent material be 'tagged' in a way that facilitates parental control of material coming into their homes." *Id*. at 879.

## B.    VidAngel Serves an Important Public Interest.

The public interest in protecting every person's right to watch filtered content in private would be severely undercut by the issuance of a preliminary injunction. Consumers are rapidly shifting their viewing preferences toward mobile devices, tablets, and SmartTVs.  VidAngel is the only entity that provides a filtering service under the FMA for those viewing methods.  Meldal Dec., ¶¶ 8, 24, Harmon Dec., ¶¶ 52-53.   An injunction would affect the largest and fasting growing segment of filtered content viewers.  As reflected by the overwhelming support of countless families and community leaders, VidAngel serves an important public interest. *See*

1   Declarations of Timothy F. Winter; Donna Rice Hughes; Harry Jackson; Connor
2   Boyack; Matt Kibbe; David Bozell; L Brent Bozell III; David Barton; Gary Bauer;
3   Gary Marx; George E. Roller; Patrick Trueman; Rebecca Hagelin; Rick Green;
4   Andrea Lafferty; Theodore Baehr; Tim Barton; Bryan and Diane Schwartz; Bob
5   Waliszwewski; and Tim Wildmon.

6       An injunction would also reach far beyond the parties by destroying the
7   market for filtered films. *See Stormans*, 586 F.3d at 1139 (overturning a preliminary
8   injunction in part because it "clearly reached non-parties and implicated issues of
9   broader public concern that could have public consequences."). Moreover, due to
10  Disney's unreasonable delay in bringing its motion, over 500,000 families have used
11  VidAngel's service to provide family-friendly entertainment options. Harmon Dec.,
12  ¶ 30. The Court should not end the public's ability to watch filtered movies before a
13  final determination of the parties' rights. *See Weinberger*, 456 U.S. at 312.

14  **V.   ANY INJUNCTION SHOULD BE CONDITIONED ON THE POSTING
15       OF A BOND OF NOT LESS THAN $50 MILLION.**

16      A preliminary injunction may issue "only if the movant gives security in an
17  amount that the court considers proper to pay the costs and damages sustained by
18  any party wrongfully enjoined or restrained." F.R.C.P. § 65(c); *Squaxin Island
19  Tribe v. Washington*, 781 F. 2d 715, 724 (9th Cir. 1986). A party that is wrongfully
20  enjoined may be limited to the amount of the bond as its recovery. *Buddy Sys., Inc.
21  v. Exer-Genie, Inc.*, 545 F. 2d 1164, 1168 (9th Cir. 1976). Thus, "[w]hen setting the
22  amount of security, district courts should err on the high side," because "an error in
23  the other direction produces irreparable injury." *Mead Johnson & Co. v. Abbott
24  Labs.*, 201 F.3d 883, 888 (7th Cir. 2000). In analogous circumstances, courts in this
25  circuit typically require multi-million dollar bonds.[13]

---

26      [13] *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001)
27  ($5 million); *MGM v. Honda Motor Co.*, 900 F. Supp. 1287, 1290 (C.D. Cal. 1995)
    ($6 million); *see also Design Furnishings, Inc. v. Zen Path, LLC*, 2010 WL
28      (footnote continued)

-33-

1  VidAngel occupies a uniquely advantageous market position.  It developed its

2  filter-and-stream technology just as consumer preferences were beginning to shift

3  from viewing physical discs on a home television to streaming content on all sorts of

4  devices.  Consumers increasingly want the freedom to watch content wherever they

5  may be, on tablet, laptop, smart telephones, and other devices.   As consumer

6  preferences involving digital technologies always do, the change in preference for

7  streamed content is happening rapidly and will likely be complete in under three

8  years.  VidAngel enjoys a unique market position as the only company currently

9  streaming filtered content to customers.  (The only other content filtering service on

10 the market sells devices that consumers may use at home to filter the content of

11 physical DVDs being watched on a television set.)  As the sole company offering to

12 provide filtered streaming content, VidAngel enjoys a significant head start over

13 potential competitors in developing its technology, patenting its break-throughs, and

14 increasing its know-how.  VidAngel would lose this enormous head start if it were

15 enjoined.  Loss of market share, especially during a critical period in a company's

16 growth, is, of course, an irreparable injury.  *See Credit Bureau Connection, Inc. v.*

17 *Pardini*, 726 F. Supp. 2d 1107, 1123 (E.D. Cal. 2010).  Further, VidAngel owes a

18 large portion of its success to the highly capable and competent employees and

19 independent contractors it has attracted, trained, and retained.  Were VidAngel to be

20 enjoined during the pendency of this action, it would lose all the advantages

21 described above.

22  The injunction threatens to put VidAngel out of business before any

23 resolution on the merits and would cause it serious financial loss.   To date,

24 _____

25 5418893, at *9 (E.D. Cal. 2010) ($1 million); *Topline Corp. v. 4273371 Canada,*

26 *Inc.*, 2007 WL 2332471 at *15 (W.D. Wash. Aug. 13, 2007) ($1 million);

27 *Cybermedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1081 (N.D. Cal. 1998)
($1.6 million).

28

1   VidAngel has been capitalized with over $3.6 million. Harmon Dec., ¶ 63.

2

3

4

5

6       The devastating financial repercussions of an injunction also would severely

7 hamper VidAngel's ability to properly fund the litigation of its antitrust claims

8 against the counterclaim defendants, which are well-funded and established giants in

9 the entertainment industry. Disney, the DGA, and others have entered into written

10 agreements that are clearly designed to prohibit the lawful provision of online

11 filtering services. These agreements unreasonably restrain the market for licensed

12 VOD filtered streaming. An injunction would jeopardize the pursuit of these

13 legitimate claims on behalf of this suppressed market. Thus, VidAngel requests a

14 bond of not less than $50,000,000.

15 **<u>CONCLUSION</u>**

16       For the reasons explained above, Disney's motion should be denied.

17

18 DATED: September 12, 2016     Respectfully submitted,

19

20                       By: /s/ Jaime W. Marquart

21                       Jaime W. Marquart
                        BAKER MARQUART LLP

22                       2029 Century Park East, Sixteenth Floor
                      Los Angeles, California 90067

23                       (424) 652-7800
                      (424) 652-7850 (facsimile)

24                       Attorneys for Defendant and

25                       Counterclaimant VidAngel, Inc.

26

27

28