GLENN D. POMERANTZ (SBN 112503)
*glenn.pomerantz@mto.com*
KELLY M. KLAUS (SBN 161091)
*kelly.klaus@mto.com*
ROSE LEDA EHLER (SBN 296523)
*rose.ehler@mto.com*
ALLYSON R. BENNETT (SBN 302090)
*allyson.bennett@mto.com*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| DISNEY ENTERPRISES, INC., LUCASFILM LTD. LLC, TWENTIETH CENTURY FOX FILM CORPORATION and WARNER BROS. ENTERTAINMENT INC., | Case No. 16-cv-04109-AB (PLAx) |
| | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |
| Plaintiffs and Counterclaim Defendants, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | Judge:  Hon. André Birotte Jr. |
| VIDANGEL, INC., | Date:    October 31, 2016 |
| Defendant and Counter-Claimant. | Time:    10:00 a.m. |
| | Crtrm.: 4 |
| | Filed concurrently herewith:
(1)   Decl. of Allyson Bennett
(2)   Supp. Decl. of Robert Schumann
(3)   Request for Judicial Notice
(4)   App. to File Under Seal
(5)   Resps. to VidAngel's Objections
(6)   Plts' Evid. Objections |
| | Trial Date:      None Set |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.    THE FMA PROVIDES NO DEFENSE FOR VIOLATING THE DMCA OR PLAINTIFFS' EXCLUSIVE REPRODUCTION AND PUBLIC PERFORMANCE RIGHTS ........................................................... 2

    A.    VidAngel's Argument Contradicts The FMA's Clear Language ........... 2

    B.    The FMA's Legislative History Makes Clear That The Statute Does Not Immunize VidAngel's Conduct ................................................ 4

    C.    VidAngel's Interpretation Of The FMA Leads To Absurd Results .................................................................................................... 5

II.    VIDANGEL'S NON-FMA DEFENSES ARE MERITLESS ........................ 6

    A.    VidAngel Has No Defense For Its DMCA Violation ............................ 6

    B.    VidAngel Cannot Defend Its Infringement Of The Reproduction Right By Calling Its Copies "Intermediate" And "Personal" ................. 8

    C.    *Aereo* Provides No Defense To VidAngel's Infringement Of Plaintiffs' Public Performance Right ...................................................... 9

    D.    VidAngel's Unauthorized Conduct Is Not Fair Use ............................ 11

    E.    VidAngel's Antitrust Allegations Provide No Defense ....................... 14

III.    PLAINTIFFS FACE AN IMMINENT AND INCREASING RISK OF IRREPARABLE HARM .............................................................................. 15

    A.    Plaintiffs Filed Suit And Sought An Injunction When It Was Clear VidAngel Posed A Viable Threat Of Harm ............................... 15

    B.    Plaintiffs' Harms Are Not Speculative ................................................ 17

    C.    Money Damages Are Inadequate To Redress Plaintiffs' Harms .......... 18

    D.    VidAngel, Not The FMA, Causes Plaintiffs' Harm ............................ 19

IV.    THE LEGITIMATE HARDSHIPS WEIGH IN PLAINTIFFS' FAVOR ...... 19

V.    THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION ....... 20

VI.    MINIMAL SECURITY SHOULD BE REQUIRED ................................... 20

CONCLUSION ........................................................................................................ 20

-i-

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
   307 F. Supp. 2d 1085 (N.D. Cal. 2004) ............................................... 6, 7

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ................................................................ 13

*Advanced Access Content Licensing Adm'r, LLC v. Shen*,
   No. 14-CV-1112 (VSB), Dkt. No. 87 (S.D.N.Y. Mar. 16, 2015) ......................... 8

*Am. Broad. Cos. v. Aereo, Inc.*
   2012 WL 3854042 (S.D.N.Y. Jul. 11, 2012) ................................................. 15, 16

*Am. Broad. Cos. v. Aereo, Inc.*,
   2014 WL 5393867 (S.D.N.Y. Oct. 23, 2014) ............................................... 1, 15

*Am. Broad. Cos. v. Aereo, Inc.*,
   134 S. Ct. 2498 (2014) ............................................................................ 9, 10

*Arc of Cal. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) .................................................................. 1, 15

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ................................................................................ 13

*Capitol Records, LLC v. ReDigi Inc.*,
   934 F. Supp. 2d 640 (S.D.N.Y. 2013) ........................................................ 4, 8

*Clean Flicks of Colorado, LLC v. Soderbergh*,
   433 F. Supp. 2d 1236 (D. Colo. 2006) ................................................ 11, 13, 20

*Crow Tribe of Indians v. Racicot*,
   87 F.3d 1039 (9th Cir. 1996) .................................................................. 7

*Elvis Presley Enters., Inc. v. Passport Video*,
   349 F.3d 622 (9th Cir. 2003) .................................................................. 12

*Fox Broad. Co. v. Dish Network, L.L.C.*,
   905 F. Supp. 2d 1088 (C.D. Cal. 2012), *aff'd*, 747 F.3d 1060 (9th
   Cir. 2013) ........................................................................................ 18, 19

-ii-

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
  915 F. Supp. 2d 1138 (C.D. Cal. 2012)......................................17, 18, 19, 20

*Fox Television Stations, Inc. v. FilmOn X LLC*,
  966 F. Supp. 2d 30 (D.D.C. 2013).........................................17, 19, 20

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ........................................................5

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ...............................................8

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
  629 F.3d 928 (9th Cir. 2010) ...............................................7

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ......................................18

*Overstreet v. United Brotherhood of Carpenters and Joiners*,
  409 F.3d 1199 (9th Cir. 2005) ..............................................7

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .............................................11

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
  641 F. Supp. 2d 913 (N.D. Cal. 2009)......................................7, 8

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ..............................................19

*Sega Enters. Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ..............................................8

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 1999) ...............................................8

*UMG Recordings, Inc. v. MP3.com, Inc.*,
  92 F. Supp. 2d 349 (S.D.N.Y. 2000) .....................................8, 11, 13

*United States v. Elcom Ltd.*,
  203 F. Supp. 2d 1111 (N.D. Cal. 2002).......................................9

-iii-

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Gonzales*,
520 U.S. 1 (1997) ......................................................... 4

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001) ........................................ 6

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
824 F. Supp. 2d 1003 (C.D. Cal. 2011)..................... passim

*WPIX, Inc. v. ivi, Inc.*,
691 F.3d 275 (2d Cir. 2012) ................................... 1, 15

**FEDERAL STATUTES**

17 U.S.C. § 106.................................................... 1, 3, 4

17 U.S.C. § 110(11)...............................................passim

17 U.S.C. § 504(c) ................................................... 18

17 U.S.C. § 1201(a)(1)(A) ...................................... 6, 8

17 U.S.C. § 1203(b)(1) ............................................. 7

17 U.S.C. § 1203(c)(3) ............................................ 18

**FEDERAL REGULATIONS**

80 Fed. Reg. 65944-01 (Oct. 28, 2015) ....................... 7

**LEGISLATIVE MATERIALS**

150 Cong. Rec. S.11852-01 ....................................... 5

H.R. 4586, Serial No. 94 (June 17, 2014) ............... 3, 11

H.R. Rep. 109-33(1) .............................................. 3, 6

## INTRODUCTION

VidAngel's overarching defense is that it should be entirely exempt from "liability under any provisions of the Copyright Act" because it filters.  Opp. 15. That is absurd.  VidAngel's tortured reading of the Family Movie Act ("FMA") contradicts the law's plain language and on-point legislative history, and requires a finding that Congress, in passing a narrow exemption, intended to upend the Copyright Act entirely.  If VidAngel were right, then any service could rip, copy and stream content from DVDs and Blu-ray discs ("Discs") with impunity—simply by offering users the option to filter out mere seconds of that content.  Relying on its sweeping interpretation of the FMA, VidAngel argues the Court should allow it to continue to rip Discs, and then copy and stream Plaintiffs' works to an active user base of nearly ▮▮▮▮▮ (and growing).

The case for injunctive relief is overwhelming.  VidAngel's violations of §§ 106 and 1201 are clear, and its legal defenses are meritless.[1]  All of the equitable factors weigh decisively for an injunction.  Courts consistently hold that unauthorized streaming services like VidAngel cause immediate and irreparable harm to copyright owners.  *See, e.g., WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 286 (2d Cir. 2012); *Am. Broad. Cos. v. Aereo, Inc.*, 2014 WL 5393867, at *27-28 (S.D.N.Y. Oct. 23, 2014); *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012-14 (C.D. Cal. 2011) ("*Zediva*").  VidAngel's argument that Plaintiffs waited too long to sue for an injunction contradicts Ninth Circuit authority and the facts. *Arc of Cal. v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014).

VidAngel's attempt to portray itself as a victim is belied by VidAngel's strategy of seeking forgiveness instead of permission.  VidAngel ripped and infringed content, in the words of its CEO, Mr. Harmon, to get "a lot bigger" before trying to "get licensing from Hollywood."  Ehler Decl. Ex. DD at 366.  In other

---

[1] Unless otherwise noted, all statutory cites are to 17 U.S.C.; all emphases are added; and quotations and citations within quotations are omitted.

words, VidAngel deliberately violated Plaintiffs' rights to have better leverage in negotiating for licenses.  Moreover, despite VidAngel's contrary insinuations, VidAngel *did not* ask Plaintiffs to discuss a streaming license until *after* this lawsuit. And even that request was a transparent attempt to create evidence for opposing this motion or supporting VidAngel's baseless antitrust counterclaim.  In arguing against an injunction, VidAngel asks the Court to reward its deceitful tactics.

Contrary to VidAngel's rhetoric, Plaintiffs are not trying to stop lawful filtering.  This case simply is not about filtering.  Plaintiffs' claims are aimed at VidAngel's unauthorized and illegal ripping, copying and streaming to the public of Plaintiff's copyrighted works.  The legitimate streaming services with which VidAngel claims to compete all have licenses from copyright owners for the works they stream.  VidAngel does not, and the fact that it offers filtering in connection with its streaming service does nothing to excuse the need to obtain such licenses. Notably, VidAngel omits to tell the Court that another filtering service, ClearPlay, has continued to operate for more than a decade since the FMA was passed, or that it offers filtering to Google Play users who access authorized streams from Google Play's licensed service.[2]  A company that wants to filter lawfully does not have to violate the DMCA and infringe copyright to do so.

## ARGUMENT

## I.   THE FMA PROVIDES NO DEFENSE FOR VIOLATING THE DMCA OR PLAINTIFFS' EXCLUSIVE REPRODUCTION AND PUBLIC PERFORMANCE RIGHTS

### A.   VidAngel's Argument Contradicts The FMA's Clear Language

The FMA does not authorize a party that filters to circumvent access controls, to copy movies and TV shows, or to stream them.  Rather, the FMA exempts only

---

[2] Bennett Decl. Ex. A (ClearPlay users can apply filters to content streamed on computers or on their televisions, using Google's Chromecast, Apple's Air Play or an HDMI cable).  VidAngel distinguishes ClearPlay in part because it offers only standard definition (SD) and not high definition (HD) resolution, but over ███ of VidAngel's users choose SD over HD.  *See* Ehler Decl. Ex. Z at 296.

1   the act of "making imperceptible . . . limited portions of audio or video content."

2   § 110(11).[3]   VidAngel's argument is impossible to square with the FMA's text.

3          First, the FMA does not address DMCA violations or create an exemption

4   through silence.  The FMA is clear that it provides a defense only to § 106 rights,

5   which are different from § 1201 rights.  The latter impose a prohibition on

6   circumvention of access control measures.  If Congress intended the FMA to excuse

7   a DMCA violation, it would have said so.  In fact, Congress considered explicitly

8   stating that the FMA would not be a defense to an anti-circumvention claim, but the

9   Register of Copyrights told it that doing so was unnecessary since, as a rule,

10  statutory exceptions to § 106 rights do not apply to § 1201.  *See* Hearing on H.R.

11  4586, Serial No. 94 at 84, 89 (June 17, 2014) (RJN Ex. E at 236, 241).

12         Second, VidAngel is wrong that the FMA *expressly provides* that VidAngel

13  can *transmit* performances of movies as long as "a fixed copy of the altered

14  content is not created."[4]  Opp. 12 (emphasis VidAngel's).  The FMA provides an

15  exemption only for the narrow act of "making imperceptible" portions of an

16  audiovisual work during a performance of such work.  Nothing in the language

17  authorizes the performance itself or the copying of those works.  The acts of

18  publicly performing (transmitting) and copying copyrighted works are different (and

19  fundamental) rights of a copyright owner.  If Congress had intended to limit the

20  reproduction or public performance rights, it would have said expressly that copying

---

21

22  [3] Congress intended the FMA to resolve disputes in then-pending litigation about
    whether filtering that did not result in the creation of a fixed copy infringed the

23  exclusive rights to create derivative works and distribute copies.  H.R. Rep. 109-
    33(1) at 6-7, 69-72 (Minority Views) (Apr. 12, 2005) (RJN Ex. K at 483-85, 500-

24  02).  This case, in contrast, does not involve either of those rights.

25  [4] VidAngel does not comply with the FMA requirement that no altered copy be
    fixed.  As Plaintiffs demonstrated, and VidAngel does not dispute, altered portions

26  of Plaintiffs' movies are ███████████████████████████████████████

27  ███████.  Schumann Decl. ¶¶ 11-12; Mot. 22 n.11.  VidAngel argues that it does
    not fix "complete" copies, Opp. 15-16, but the FMA forbids the copying of any

28  "altered version," which does not have to be the entirety of the work.

-3-

and transmitting works are exempt when done by a service that filters.

VidAngel argues that it streams from "authorized copies" because it uses "authorized (not bootlegged) copies of physical discs" from "the legal market." Opp. 13.  This is irrelevant because VidAngel has no right to stream Plaintiffs' content at all.  In any event, VidAngel's argument is wordplay.  The Disc that VidAngel acquires contains an authorized copy.  When VidAngel illegally circumvents access-controls and copies content from the Disc to a computer or server, VidAngel creates a new copy.  This copying violates the reproduction right. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 649-50 (S.D.N.Y. 2013) ("the reproduction right is necessarily implicated when a copyrighted work is embodied in a new material object").  And the new copy that VidAngel makes, and "from" which it streams to thousands of users, is *not* authorized.

Third, VidAngel's interpretation of the FMA is foreclosed by the statute's savings clause, which directs that courts shall not construe the FMA "to imply further rights under section 106 . . . or to have any effect on defenses or limitations on rights granted under any other section" of Title 17.  § 110 (last sentence).

### B. The FMA's Legislative History Makes Clear That The Statute Does Not Immunize VidAngel's Conduct

Recognizing that the FMA's text does not support its argument, VidAngel relies overwhelmingly on selected portions of the FMA's legislative history that speak generally about filtering.  (VidAngel cites to the history 39 times, while citing the text just four times.)  There is no reason to resort to legislative history when statutory language is unambiguous.  *United States v. Gonzales*, 520 U.S. 1, 6 (1997). The FMA is unambiguous:  it exempts filtering, but not circumventing, copying or publicly performing.  But even if the Court finds the FMA ambiguous, the history proves VidAngel's reading of the FMA is wrong.

First, the on-point legislative history could not be more direct in addressing the concrete claims at issue and showing the FMA is not a defense here:

- **DMCA Violation**:  The FMA "does not provide any exemption from the anti-circumvention provisions of section 1201 of title 17."  150 Cong. Rec. S.11852-01 at S11853 (Sen. Hatch) (RJN Ex. G at 269).  VidAngel asserts the history "does not evince a clear intent to prohibit VidAngel from decrypting DVDs for the purpose of accessing a disk to filter."  Opp. 16-17.  The history in fact shows VidAngel's defense to the DMCA violation is meritless:  "It would not be a defense to a claim of violation of section 1201 that the circumvention is for the purpose of engaging in the conduct covered by this new exemption in section 110(11)."  150 Cong. Rec. at S11853 (RJN Ex. G at 269).

- **Public Performance Violation**:  "[A]n infringing transmission of a performance to a household [is] not rendered non-infringing by section 110(11) by virtue of the fact that limited portions of audio or video content of the motion picture being performed are made imperceptible."  *Id.*

Plaintiffs pointed to these and similar quotations from the legislative history.  Mot. 14-15, 22.  VidAngel ignores them.  The legislative history that VidAngel quotes simply does not address the issues that actually matter in this case.

Second, VidAngel argues that because movie streaming services such as iTunes, Netflix and Hulu did not exist in 2005, Congress must have intended for the FMA to allow filtering services to circumvent DVD protections in order to copy movies to computer servers and make filtered streams to users.  Opp. 17.  Nothing in the statute or legislative history supports this position.  And the history makes clear that FMA does not protect a service that circumvents in order to filter.

**C.      VidAngel's Interpretation Of The FMA Leads To Absurd Results**

"[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).  If VidAngel were right that the FMA completely exempts a party from liability under

-5-

Title 17, *see* Opp. 12, practically *any* streaming service could avoid *all* liability for infringement and circumvention merely by following VidAngel's sham "buy-sellback" model and allowing its customers to choose to filter out a snippet of content. A service need not even filter "sex, violence, [or] profanity" to qualify for the FMA. *See* Opp. 5. The statute is "content-neutral." H.R. Rep. 109-33(1) at 6 (RJN Ex. K at 483). Thus, under VidAngel's interpretation, a service could filter only a movie's credits (as VidAngel did pre-litigation, and says it will do again, Mot. 11), or an even smaller portion of content, and circumvent, copy and stream at will. Congress, in creating a limited exemption for making content imperceptible, did not intend to create such a massive loophole in the law.

## II.   VIDANGEL'S NON-FMA DEFENSES ARE MERITLESS

### A.   VidAngel Has No Defense For Its DMCA Violation

VidAngel admits that it bypasses and removes the technological protection measures on Plaintiffs' Discs. Opp. 16; Meldal Decl. ¶ 40. VidAngel euphemistically calls this "re-formatting." Opp. 17. The DMCA calls it circumvention, and the statute makes it illegal. § 1201(a)(1)(A) (prohibition), (a)(3)(A) (definition). VidAngel cannot excuse its DMCA violation.

First, VidAngel is wrong that the purported purchase of a Disc conveys authority to decrypt the Disc to view it on another platform. Opp. 17. Courts have repeatedly rejected this argument: "[T]he purchase of a DVD does not give the purchaser the authority of the copyright holder to decrypt CSS." *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1096 (N.D. Cal. 2004); *see Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 444 (2d Cir. 2001) (same).

Second, VidAngel is wrong that it has an exemption from the DMCA because VidAngel enables "space shifting." Opp. 17. There is no DMCA exemption for space shifting—a point that VidAngel itself admits only six pages earlier. *Id*. at 10-11. VidAngel's argument is particularly disingenuous because the Librarian of

Congress and the Copyright Office have repeatedly *declined* to adopt the exemption VidAngel's seeks.  Only last year, the Register again "recommended *against* the adoption of a proposed exemption, on the ground *that the law of fair use, as it stands today, does not sanction broad-based space-shifting* or format-shifting." [5]  80 Fed. Reg. 65944-01 at 65960 (Oct. 28, 2015).

Third, VidAngel is wrong that a DMCA injunction "essentially" operates as a prior restraint.  Opp. 18.  The DMCA authorizes, and courts routinely grant, injunctions to halt circumvention violations.  § 1203(b)(1); *MDY Indus., LLC v. Blizzard Entm't, Inc*., 629 F.3d 928, 953-54 (9th Cir. 2010); *321 Studios*, 307 F. Supp. 2d at 1105.  *Overstreet v. United Brotherhood of Carpenters and Joiners*, 409 F.3d 1199 (9th Cir. 2005), which VidAngel cites as "*cf.*" authority, Opp. 18, has nothing to do with the DMCA or this case.

Fourth, VidAngel's expert, Sigurd Meldal argues that CSS, AACS and BD+ are not effective access-control measures because illegal software—such as the AnyDVD HD software VidAngel uses—to rip Discs is readily available on the Internet.  *See* Meldal Decl. ¶ 12.  Dr. Meldal is not permitted to make legal arguments, *Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("[e]xpert testimony is not proper for issues of law"), and in any event, courts have uniformly rejected this argument, *321 Studios*, 307 F. Supp. 2d at 1095 ("this is equivalent to a claim that, since it is easy to find skeleton keys on the black market, a deadbolt is not an effective lock to a door"); *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 932 (N.D. Cal. 2009) (same).  CSS, AACS and

---

[5] VidAngel incorrectly asserts that Don Verrilli told the Supreme Court at the *Grokster* argument that his movie studio *and* record company clients "agreed that space shifting is legal."  Opp. 17.  He actually said that "[*t*]*he record companies*, my clients, have said, for some time now … that it's perfectly lawful to take a CD that you've purchased, upload it onto your computer, put it onto your iPod."  RJN Ex. B at 53 (Tr. of *MGM v. Grokster* Oral Argument at 12).  CDs are not protected by technological protection measures; DVDs and Blu-ray discs are, and thus are subject to the protections of the DMCA's anti-circumvention prohibition.

BD+ all effectively control access "in the ordinary course of [their] operation," which is all the DMCA requires.  § 1201(a)(3)(B); *Realnetworks*, 641 F. Supp. 2d at 932 (CSS); *Adv. Access Content Licensing Adm'r, LLC v. Shen*, No. 14-CV-1112 (VSB), Dkt. No. 87 at 4-5 (S.D.N.Y. Mar. 16, 2015) (AACS) (RJN Ex. A at 9-10).

## B. VidAngel Cannot Defend Its Infringement Of The Reproduction Right By Calling Its Copies "Intermediate" And "Personal"

VidAngel does not dispute that it copies Plaintiffs' movies from Discs to computer servers.  Ehler Decl. Ex. EE Tr. 58:1-4; Schumann Decl. ¶¶ 40-42.  That violates Plaintiffs' reproduction right.  *ReDigi*, 934 F. Supp. 2d 640, 649-50.

VidAngel instead tries to defend its copying by calling it "intermediate," a concept that has no application here.  Opp. 10.  VidAngel uses its unauthorized copies to make unauthorized streams.  Schumann Decl. ¶¶ 40-42; Supp. Schumann Decl. ¶ 21.  There is nothing "intermediate" about VidAngel's copies.  The cases on which it relies are completely inapposite.  Two of them hold that a defendant may have a defense of fair use to an infringement claim when it makes copies of another party's copyrighted computer software for the sole purpose of discovering functional, non-copyrightable elements of that software that are required for the defendant's product to interoperate with that software.[6]  *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 606 (9th Cir. 1999); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992).  *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 n.2 (S.D.N.Y. 2000), makes clear that *Sony* and *Sega* provide no defense for making permanent copies of works to servers in order to stream performances to customers.  *See also ReDigi*, 934 F. Supp. 2d at 650 (rejecting ReDigi's argument that it simply "migrates a file" when it creates new copies of works upon upload and download).

VidAngel also insists it makes "personal copies" and says such copies are

---

[6] The third case VidAngel cites—*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003)—has nothing to do with such "intermediate" copying.

immune from infringement.  No case holds that making "personal copies" of movies is fair use or otherwise lawful.  And one of the cases that VidAngel cites holds exactly the opposite:  "there is as yet no generally recognized right to make a copy of a protected work, regardless of its format, for personal noncommercial use." *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1135 (N.D. Cal. 2002) (cited Opp. 11).  And, there is nothing "personal" about the copies VidAngel makes. VidAngel makes four master copies of files (differing in resolution) from a single Disc, and then streams from those master files to thousands of different paying users.  Supp. Schumann Decl. ¶¶ 21, 24-28; Ehler Decl. Ex. EE Tr. 90:18-22.

## C.   *Aereo* Provides No Defense To VidAngel's Infringement Of Plaintiffs' Public Performance Right

VidAngel ignores on-point precedent establishing its infringement of the public performance right.  *See* Mot. 17-18.  VidAngel instead misreads *American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014), to argue that VidAngel makes private performances because its users "purchase[]" Discs.  Opp. 11.

VidAngel's *Aereo* defense fails because it is based on gimmickry—calling what obviously is a rental service a "buy-sellback" service—and *Aereo* makes it clear that a service like VidAngel cannot use gimmickry to create loopholes in copyright law.  The Supreme Court rejected Aereo's arguments that it transmitted "private" performances because it transmitted broadcast programs from separate copies captured from thousands of individual antennae.  The Court held that Aereo's "behind-the-scenes" mechanisms made no difference to "Congress' regulatory objectives," "Aereo's commercial objective," or "the viewing experience."  *See Aereo*, 134 S. Ct. at 2508-09.

The same substance-over-form analysis compels the conclusion that "buy-sellback" is a sham:  the alleged "buyer" does not control the Disc that VidAngel supposedly "sells" him or her; VidAngel does not stream a performance to the user from his or her "copy"; VidAngel actively encourages users to treat the service as a

1  rental; and VidAngel's users treat it as a rental, with only ███ of out of more than

2  █████████ purported "sales" resulting in the transfer of a Disc. Mot. 7-9, 20. Mr.

3  Harmon himself admitted that "buy-sellback" is just VidAngel's "creative way" to

4  offer "the value of a Redbox while staying buttoned up legally," and that

5  ████████████████████████████████████████████████████████████

6  █████████████ Ehler Decl. Ex. DD at 366; *id.* Ex. W at 234. Tellingly,

7  VidAngel does not respond to *any* of this evidence in its Opposition.

8      VidAngel insists that its service falls within the Court's dicta stating that the

9  analysis of the public performance right might be different with a different type of

10  service, such as one that allows users to "receive performances in their capacities as

11  owners or possessors of the underlying works," analogous to a car owner getting its

12  keys back from a valet parker. *Aereo*, 134 S. Ct. at 2510. The Court explained that

13  the valet analogy would not apply to a service, like Aereo's, where the users lacked

14  a "relationship to the work[]" prior to dealing with the service. *Id.* VidAngel

15  likewise falls outside the dicta because its users also have no "prior relationship" to

16  the movies before coming to VidAngel's service to stream them.

17      VidAngel also argues that *Aereo* holds it is not infringement if "the user of a

18  service pays primarily for something other than the transmission of copyrighted

19  works." Opp. 11. The Supreme Court actually said that it "ha[d] not considered"

20  that question. *Aereo*, 134 S. Ct. at 2511. And, in any event, VidAngel's users do

21  not pay "primarily" for something other than streaming Plaintiffs' works. Without

22  the streamed *content*, VidAngel's service has no value. *See* Ehler Decl. Exs. A, B.[7]

23  ────────────────────

24  [7] VidAngel incorrectly accuses Plaintiffs of trying to force users to "be charged
   twice"—once for the sale of a Disc, a second time for a stream—in order "to watch

25  a movie once." Opp. 11. Plaintiffs ask for no such thing. VidAngel decided to run
   its service by buying copies of movies on Discs and then streaming performances

26  from server copies. Reproduction and public performance are two different rights
   under the Copyright Act, and copyright owners are entitled to compensation for the

27  exercise of each right. (That is why, for example, Netflix pays for the DVDs it uses

28  for its mail-order business, and separately for the right to stream the same movies.)

### D.     VidAngel's Unauthorized Conduct Is Not Fair Use

It is settled law, and VidAngel does not dispute, that fair use is not a defense to a DMCA violation.  *See* Mot. 15-16.  VidAngel does not meet its burden of showing the fair use defense likely will excuse VidAngel's copying and streaming of Plaintiffs' works.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007); *see MP3.com,* 92 F. Supp. 2d at 351 (service's conduct, not that of its users, must meet burden for fair use defense).  Indeed, VidAngel does not show that any fair use factor weighs in its favor.

*Factor One:  VidAngel's use is not transformative.*  VidAngel argues that, because its users must select at least one filter, VidAngel's copying and streaming are transformative.  Opp. 19-20.  Not so.  VidAngel uses Plaintiffs' movies and TV shows for their intrinsic purpose, just like airlines and networks do when they show edited versions of Plaintiffs' works.  VidAngel's customers recognize they can watch a full work with minimal filtering.  *See* Bennett Decl. Ex. C; *id* at 20 ("Even a single word is good enough to then watch the movie.  Beats Redbox all day.").

Numerous cases (discussed in Plaintiffs' Motion) make it clear that VidAngel uses Plaintiffs' works for their intrinsic purpose, not for transformative use.  Mot. 23-24.  VidAngel ignores all of these except for *Clean Flicks of Colorado, LLC v. Soderbergh*, 433 F. Supp. 2d 1236, 1241 (D. Colo. 2006), which rejected a filtering service's fair use defense where "the edits are a small percentage of most of the films copied and the use is clearly for commercial gain."  VidAngel calls *Clean Flicks* "inapposite" because that service had no FMA defense.  Opp. 22.  That is a

_____

Customers of legitimate streaming services, however, pay one charge to watch the movie through that service.  ClearPlay customers who want to use filters on top of an authorized stream pay only once—to Google Play—to watch the movie; they pay ClearPlay separately for filtering.  *See* ClearPlay, "Filtering & Streaming Together" *available at* https://try.clearplay.com/streaming-sign-up/.  VidAngel is wrong that Congress did not intend for users to pay to filter:  ClearPlay, whose service the legislative history expressly cited, charged users for its filtering service, while users paid separately for DVDs they wished to watch.  *See* Hearing on H.R. 4586 at 2 (RJN Ex. E at 154).

distinction without a difference.  The FMA has no effect on the fair use defense, *see* § 110 (last sentence), and in any event VidAngel has no FMA defense either.  *Clean Flicks* and Plaintiffs' other authority show factor one weighs for Plaintiffs.

> **Factor Two:  Plaintiffs' works are at the core of copyright protection.** VidAngel's argument that "this factor favors fair use" because Plaintiffs already published their works, Opp. 20, is wrong.  The law is clear that motion picture content—whether or not published—is "creative in nature and thus fit[s] squarely within the core of copyright protection." *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003).

> **Factor Three:  VidAngel copies all, and publicly performs nearly all, of Plaintiffs' works.**  Even with filters, VidAngel is copying entire works and streaming nearly complete versions—the heart of Plaintiffs' works by any measure. *Id*. at 630.  This factor weighs for Plaintiffs.

> **Factor Four:  VidAngel directly interferes with the market for Plaintiffs' works.**  VidAngel argues that it does not harm the market for Plaintiffs' works because "filtered movies are not a substitute" for Plaintiffs' works.  Opp. 21. VidAngel is wrong because the evidence shows its offerings are substituting for authorized streams of Plaintiffs' works.  Ehler Decl. Ex. I; Bennett Decl. Ex. D. VidAngel originally asserted that "[o]ver 92 percent of VidAngel customers would not watch those movies without filtering," Opp. 21, but later filed an errata dropping that number to *51%*.  Dkt. 76.  Taking VidAngel at its (unexamined) word on this (VidAngel refused Plaintiffs' repeated requests for the actual survey data), VidAngel admits that nearly *half* of its customers would watch the exact same movie without filters.[8]  Moreover, these numbers only account for VidAngel.  The relevant question on factor four is "whether unrestricted and widespread" streaming

---

[8] Even VidAngel's errata is erroneous.  The errata states that "[o]ver 51% of its users would not watch unfiltered content under any circumstances."  Dkt. 76 at 1, 21.  In fact, the survey instrument (like VidAngel's Opposition) asked whether the user would have watched the particular movie without filters.  Bennett Decl. Ex. E.

1   by other services mimicking VidAngel would "substantially adverse[ly] impact"

2   Plaintiffs' potential market opportunities.  *Campbell v. Acuff-Rose Music, Inc.*, 510

3   U.S. 569, 590 (1994).  The answer obviously is yes.

4        VidAngel also is off-base arguing that its unauthorized use "[i]ncreases

5   [Plaintiffs'] [s]ales."  Opp. 21.  To be clear, VidAngel does *not* purchase a Disc for

6   every individual customer to whom it streams.  VidAngel instead purports to have in

7   its vault a Disc for every user who, at a particular moment, has obtained access to

8   the content.  Once a user "sells back" their access (i.e., returns the rental), the Disc

9   becomes "available" again in VidAngel's system for a different user.  On average,

10  for every ███ users to whom VidAngel streams a new release title, VidAngel buys

11  one Disc containing that title.[9]  Harmon Decl. ¶ 61.  This means if VidAngel buys

12  100 Discs of new releases, VidAngel will use those 100 Discs to justify streams of

13  the same title to ████ different users.  Buying one Disc for multiple users helps

14  VidAngel's bottom line, not Plaintiffs'.

15       More important, VidAngel's purported "help" to Plaintiffs is entirely

16  irrelevant as a legal matter.  Courts have roundly rejected the argument that an

17  infringing use is "fair" because the use allegedly generates incremental income for

18  the copyright owner:  "'Any allegedly positive impact of defendant's activities on

19  plaintiffs' prior market in no way frees defendant to usurp a further market that

20  directly derives from reproduction of the plaintiffs' copyrighted works.'"  *A&M*

21  *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1017 (9th Cir. 2001) (quoting

22  *MP3.com*, 92 F. Supp. 2d at 352); *Clean Flicks*, 433 F. Supp. 2d at 1242 (same).

23       VidAngel fails to show it likely will prevail on any fair use factor, much less

24  that its defense likely will succeed.  All factors weigh decisively for Plaintiffs.

25

26

27  [9] Mr. Harmon's declaration provides this ratio only for new releases.  Based on the
    limited discovery thus far, a conservative estimate of the ratio for all VidAngel

28  offerings is, for every Disc, around ██████████████.  Bennett Decl. ¶ 7.

-13-

### E.   VidAngel's Antitrust Allegations Provide No Defense

VidAngel asserts that Plaintiffs have conspired to put it out of business.  Opp. 18; Harmon Decl. ¶¶ 14-16, 45-60.  This is a smokescreen to divert attention from VidAngel's unlawful conduct.[10]

First, VidAngel incorrectly asserts that Plaintiffs (and other motion picture studios) are parties to an agreement with the Directors Guild of America ("DGA") that prohibits any studio from licensing any service through which users could apply filters.  Opp. 7; Harmon Decl. ¶ 48.  The DGA Agreement is publicly available, and it does not set forth any such prohibition.

Second, VidAngel alleges that Plaintiffs and other "studios" directed Google and other licensees not to do business with VidAngel.  Opp. 7; Harmon Decl. ¶ 49.  Mr. Harmon, however, admitted at his deposition that VidAngel has *no* evidence that any Plaintiff directed Google or anyone else not to work with VidAngel.  Bennett Decl. M Tr. 273:14-277:11, 301:15-20; *see id.* Ex. J at 51 (Google expressing it might ██████████ ).

Third, VidAngel argues that Plaintiffs refused when asked to license VidAngel.  Opp. 7-8; Harmon Decl. ¶ 59.  Notably, Mr. Quinto did not make his license "offer" until after Plaintiffs filed this Motion.  Quinto Decl. ¶¶ 2-4 Ex. A. Mr. Quinto's "offer," moreover, was a transparent attempt to gain litigation advantage.  Mr. Quinto invited all Plaintiffs—who are competitors in licensing their works—collectively "to discuss[] a license."  *Id.*  Had Plaintiffs accepted the offer, VidAngel presumably would have used that as evidence of joint licensing to support its antitrust counterclaim.  Because Plaintiffs refused to engage in joint licensing discussions, VidAngel has cited this as evidence of a purported group boycott.

---

[10] Plaintiffs will move to dismiss the antitrust counterclaims before the hearing on this Motion.  Plaintiffs moved to dismiss VidAngel's original counterclaim. Dkt. 35.  VidAngel mooted the first motion to dismiss by amending the counterclaim the day its opposition was due.  Dkt. 77.

-14-

1  VidAngel's Catch 22 litigation tactics provide no basis for denying this Motion.[11]

2  ## III.  PLAINTIFFS FACE AN IMMINENT AND INCREASING RISK OF IRREPARABLE HARM

3

4  VidAngel admits it intends to increase exponentially its unlawful streaming of

5  Plaintiffs' works.  VidAngel currently claims to have more than a ▉▉▉▉▉▉

6  monthly streams spread across nearly ▉▉▉▉▉▉ monthly active users.  Ehler Decl.

7  Ex. EE Tr. 190:2-8; *id.* Ex. AA at 317.  Absent an injunction, VidAngel will try to

8  grow that user base to ▉▉▉▉▉▉ within a year, and ▉▉▉▉▉▉ in two years.  *Id.*

9  Ex. Y at 283.  The law is clear that such conduct causes immediate and irreparable

10  harm to copyright owners' exclusive rights to control their works.  *ivi*, 691 F.3d at

11  286; *Aereo*, 2014 WL 5393867, at *7; *Zediva*, 824 F. Supp. 2d at 1012-14.

### A.  Plaintiffs Filed Suit And Sought An Injunction When It Was Clear VidAngel Posed A Viable Threat Of Harm

13  In an effort to avoid an injunction and continue its illegal streaming for profit,

14  VidAngel argues that Plaintiffs waited too long to sue and so forfeited the right to a

15  preliminary injunction.  Opp. 22-24.  If accepted, VidAngel's argument would

16  require plaintiffs to "rush to court at the first sign of potential infringement, even if

17  the prospect of harm is remote."  *Am. Broadcasting Cos. v. Aereo Inc.* ("*Aereo I*"),

18  2012 WL 3854042, at *27-28 (S.D.N.Y. Jul. 11, 2012).  That is why the law is to

19  the contrary.  *Id; Arc of Cal.*, 757 F.3d at 990.

20  VidAngel argues that because Plaintiffs knew about and investigated

21  VidAngel's service before filing suit, any harm may be reparable.  Opp. 21-22.

22  *Aereo I* expressly rejected the same type of argument.  There, as here, plaintiffs

23  "were aware of [the service's] existence for roughly a full year before seeking [an]

24  injunction," *Aereo I*, 2012 WL 3854042 at *27.  Indeed, Aereo had received

25

26  [11] VidAngel also relies on confidential agreements of a non-party (Sony Pictures) that VidAngel admits it obtained trolling WikiLeaks for documents stolen during the

27  massive criminal cyber-attack on Sony.  Opp. 7; Harmon Decl. ¶¶ 48-50.  Plaintiffs will not respond in kind by quoting from stolen documents, but simply note that the

28  materials VidAngel cites do not support its claim.

-15-

1   substantial press attention and $4.5 million in funding a year before plaintiffs filed

2   suit.  *Id*. at *28.  The court held that plaintiffs "did not unduly sleep on their rights"

3   but brought suit once it was clear that Aereo "posed a substantial and imminent

4   threat of irreparable harm."  *Id*. at *27-28.  The same is true here.  Plaintiffs learned

5   of VidAngel when it was in "limited beta" and had fewer than 5,000 users—which

6   would not lead legitimate streaming licensees to "notice (let alone complain)."

7   Cittadine Decl. ¶¶ 35-36.  Plaintiffs monitored VidAngel and investigated their

8   claims.  *Id*.  Once VidAngel started marketing itself more aggressively, expanded its

9   content offering, and posed a more significant threat of harm, Plaintiffs filed this

10  action and sought a preliminary injunction.[12]  That is not undue delay.  *Aereo I*,

11  2012 WL 3854042 at *27.

12          VidAngel asserts that it detrimentally relied on the lack of a response to Mr.

13  Quinto's letters.  Opp. 24.  Mr. Harmon admitted under oath, however, that if

14  Plaintiffs had sued VidAngel earlier, the company would have behaved just as it has

15  since June 2016.  Bennett Decl. Ex. M Tr. 313:5-20.  VidAngel was not lulled into

16  complacency but was actively preparing for litigation.  It hired (in its own words)

17  ███████████████ counsel in fall 2015 so it could present the ██████████

18  ████████████████████.  Ehler Decl. Ex. Y at 286.  As Mr. Harmon

19  concedes, if Plaintiffs (or someone else) had objected in response to Mr. Quinto's

20  letters, VidAngel could have instituted a potentially unnecessary declaratory

21  judgment action.  Harmon Decl. ¶ 24.  Plaintiffs were entitled to wait until the harm

22  ─────────────────────

[12]  Contrary to VidAngel's claim that Plaintiffs waited a "year-and-a-quarter" to

23  seek a preliminary injunction, Opp. 22, Plaintiffs sought a stipulated preliminary
    injunction from VidAngel on June 10, 2016.  Bennett Decl. ¶ 13, Ex. K at 53-54.

24  VidAngel also asserts that Plaintiffs "seemingly learned of VidAngel in December
    2014," when, VidAngel says, Plaintiffs "apparently . . . caus[ed] Google to"

25  withdraw support for a *different* VidAngel service.  Opp. 23.  This is pure conjecture
    that has no basis in fact.  *See* pp. 14-15 *supra*.  And VidAngel's accusation that

26  Plaintiffs are "hid[ing] evidence" by refusing VidAngel's demand to conduct a
    *company-wide* email search is not true.  Opp. 23.  As Plaintiffs explained (and

27  VidAngel does not dispute) searching the emails of many thousands of employees is
    infeasible and unnecessary.  Marquart Decl. Ex. E.

28

from VidAngel's service was imminent before bringing suit.

### B.   Plaintiffs' Harms Are Not Speculative

Mr. Cittadine testified, among other things, that VidAngel's service threatens to undermine content owners' legitimate digital business and dealings with third parties.  Cittadine Decl. ¶¶ 14-34.  He specifically explained that as of August 22, VidAngel was directly interfering with the exclusive window Fox had granted HBO for *The Martian* and *Brooklyn*.  *Id.* ¶ 32.  These and other harms that Mr. Cittadine describes are fact, not speculation.  Opp. 26.

That harm continues to grow as VidAngel adds more users and encourages them to stream through VidAngel rather than a licensed service.  The evidence since Plaintiffs' filing shows this harm only continues to grow.  For example, one VidAngel user posted a review to Facebook on September 7:  "Far and away the best video streaming service out there . . . Even if you don't want to filter much or anything, take out one swear word or even the credits.  You'll live and so will Spielberg, Disney, and the others."  Bennett Decl. Ex. C at 15.  *See also id*. Ex. D at 28 (Sept. 13:  "#CivilWar is already on @VidAngel great job, can't wait to watch it tonight.  I even use VA when I don't need filtering, cheaper than Amazon."); *id.* at 29 (Sept. 20:  "I will never watch a movie at home through another service.  Simply amazing in every way.").  VidAngel thus undermines Plaintiffs' relationships with authorized streaming services—harm that courts have repeatedly held is irreparable. *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012) ("pressure on [] licensing relationships" is irreparable); *Zediva*, 824 F. Supp. 2d at 1013 (same); *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013) (same).

VidAngel's growth has exacerbated the harm to Plaintiffs' business and will continue to do so.  Cittadine Decl. ¶ 34.  VidAngel continues to add Plaintiffs' popular titles as they are released to Disc.  Bennett Decl. Ex. F (*Captain America:*

1   *Civil War* (2016), posted September 13); Ehler Decl. Ex. EE Tr. 36:19-37:5.  The

2   Opposition says VidAngel projects growth to █████████████████████████████

3   ███████████████████████████████, Harmon Decl. ¶ 63; its internal

4   projections predict even more aggressive growth to ████████████████████████

5   ████████████████████████, Ehler Decl. Ex. Y at 283.

6   **C.   Money Damages Are Inadequate To Redress Plaintiffs' Harms**

7   VidAngel is wrong that money damages are adequate to compensate

8   Plaintiffs' harms.  Opp. 28-29.  First, VidAngel will not be able to pay a final

9   judgment, making an injunction appropriate.  *BarryDriller*, 915 F. Supp. 2d at 1147;

10  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1217

11  (C.D. Cal. 2007).  The statutory damages for each work VidAngel has infringed

12  may be as much as $150,000, § 504(c); and statutory damages will be as high as

13  $2,500 for each act of circumvention (i.e., for each of the "thousand[s]" of titles

14  VidAngel has ripped from Discs, Harmon Decl. ¶ 30), § 1203(c)(3).  VidAngel

15  pleads financial hardship, Harmon Decl. ¶ 63, and will not be able to pay.

16  Second, infringement like VidAngel's directly undermines Plaintiffs'

17  "exclusive right to decide when, where, to whom, and for how much they will"

18  license their copyrighted works.  *Zediva*, 824 F. Supp. 2d at 1012.  Money damages

19  cannot compensate this harm.  Citing *Fox Broadcasting Co. v. Dish Network,*

20  *L.L.C.*, 905 F. Supp. 2d 1088, 1110 (C.D. Cal. 2012), VidAngel urges that

21  Plaintiffs' licenses can be used to calculate money damages.  Opp. 29.  But

22  VidAngel's large-scale infringement "eviscerate[s] Plaintiffs' ability to protect and

23  enforce their statutorily-created property rights," which cannot be compensated with

24  payment for lost sales.  *Grokster*, 518 F. Supp. 2d at 1218.  *Dish* also is inapposite

25  because the court there said it was the skipping of commercials rather than the

26  infringing copying that was the real source of  harm.  905 F. Supp. 2d at 1011.

27  Here, VidAngel's circumvention and copyright infringement, if not enjoined, will

28

-18-

1  undermine Plaintiffs' legitimate licensing and goodwill.

2        Third, the law is clear that harm to goodwill and relationships with consumers

3  and licensees is non-quantifiable and thus irreparable.  *See Rent-A-Ctr., Inc. v.*

4  *Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)

5  ("intangible injuries . . . qualify as irreparable harm").

6        **D.**    **VidAngel, Not The FMA, Causes Plaintiffs' Harm**

7        VidAngel is wrong that Plaintiffs' harm flows from the FMA rather than

8  VidAngel's conduct.  Opp. 25-26.  This argument rests on VidAngel's FMA

9  defense, and thus collapses along with that defense.

10  **IV.**   **THE LEGITIMATE HARDSHIPS ALL WEIGH IN PLAINTIFFS'
    FAVOR**

11        VidAngel's claimed hardships must be disregarded.  First, the fact that

12  VidAngel will have to stop violating Plaintiffs' rights, Opp. 29, is not hardship as a

13  matter of law.  Mot. 31-32 (citing cases).

14        Second, VidAngel is wrong that its status as a start-up entitles it to an

15  exemption from the law of injunctive relief.  Opp. 29.  Courts regularly enjoin

16  infringing startups.  *BarryDriller*, 915 F. Supp. 2d at 1147 (enjoining "start-up" in

17  part *because* it would not be able to satisfy damages); *FilmOn X*, 966 F. Supp. 2d at

18  50; *Zediva*, 824 F. Supp. 2d at 1014-15.

19        Third, VidAngel's appeal to equity ignores the fact that its revenues are

20  primarily enriching VidAngel's owners.  In just the first five months of 2016,

21  VidAngel spent ███████████ on sales and marketing—where the main services are

22  provided by ██████████████, which is owned by Neal Harmon and his

23  brothers (who also are VidAngel's principals).  Ehler Decl. Ex. AA at 319; *id.* Ex. Z

24  at 306 ████████████████████████████ Bennett Decl. Ex. M Tr.

25  19:7-20:19, *id.* Ex. G.  VidAngel's owners have no right to profit from illegal

26  activity.

27

28

## V.     THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION

The public interest is served by upholding Plaintiffs' rights.  Mot. 32-33 (citing cases).  VidAngel cites cases involving individuals' interest in not being *involuntarily* subjected to speech or conduct they do not want to hear.  Opp. 31-32. These cases are inapposite because enjoining VidAngel will not force anyone to see or hear anything.  VidAngel's multiple declarations from individuals who say the "public" wants to be able to view filtered content does not change any of this.  There are other market alternatives for filtering that do not depend on circumvention or copyright infringement.  Bennett Decl. Ex. A, B; *see also Clean Flicks*, 433 F. Supp. 2d at 1240 (finding similar declarations "inconsequential to copyright law and [] addressed in the wrong forum," in part because the court's role was not "to determine the social value of copyrighted works").

## VI.    MINIMAL SECURITY SHOULD BE REQUIRED

VidAngel's request for a $50 million bond is excessive and unsupported.  In analogous cases, the required security has been well below $1 million.  *See, e.g.*, *BarryDriller*, 915 F. Supp. 2d at 1149 (rejecting request for $15 million bond in favor of $250,000); *Zediva*, 824 F. Supp. 2d at 1015 ($50,000); *FilmOn X*, 966 F. Supp. 2d at 50 ($150,000).  VidAngel also argues that a massive bond is necessary so its lawyers will have the incentive to continue litigating its antitrust counterclaim. VidAngel provides no legal or factual support for this perplexing argument.

**CONCLUSION**

Plaintiffs respectfully request that the Court grant their motion.

DATED:  October 3, 2016                    MUNGER, TOLLES & OLSON LLP


                                          By:  _____*/s/ Kelly M. Klaus*_____
                                               KELLY M. KLAUS
                                               Attorneys for Plaintiffs

-20-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send e-mail notification of such filing to all registered parties.  I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  October 3, 2016          MUNGER, TOLLES & OLSON LLP


By:   _*/s/ Kelly M. Klaus*_____
         Kelly M. Klaus

REPLY IN SUPPORT OF PRELIMINARY INJUNCTION
16-CV-04109-AB (PLAX)