1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11   DISNEY ENTERPRISES, INC.;          Case No. 2:16-cv-04109 – AB (PLAx)
     LUCASFILM LTD. LLC;
12   TWENTIETH CENTURY FOX FILM
     CORPORATION and WARNER
13   BROS. ENTERTAINMENT, INC.,         **ORDER GRANTING PLAINTIFFS'**
                                        **MOTION FOR PRELIMINARY**
14             Plaintiff,               **INJUNCTION**

15   v.

16   VIDANGEL, INC.,

17             Defendant.

18

19        Pending before the Court is Plaintiffs' Disney Enterprises, Inc., Lucasfilm Ltd.
20   LLC, Twentieth Century Fox Film Corporation, and Warner Bros. Entertainment Inc.
21   ("Plaintiffs") Motion for Preliminary Injunction.  ("Mot." Dkt. No. 26-1.)  Plaintiffs
     seek to enjoin Defendant VidAngel Inc. ("VidAngel") from [1] violating Plaintiffs'
22   rights pursuant to § 1201(a) of the Digital Millennium Copyright Act ("DMCA"), 17
23   U.S.C. § 1201(a), by circumventing technological measures that effectively control
     access to Plaintiffs' copyrighted works on DVDs and Blu-ray discs; and [2] infringing
24   by any means, directly or indirectly, Plaintiffs' exclusive rights under § 106 of the
25   Copyright Act, *id*. § 106, including by reproducing or publicly performing Plaintiffs'
     copyrighted works.
26

27        Plaintiffs bring this motion on the grounds that they are likely to succeed on the
     merits of their claims and that they will suffer irreparable harm, absent an injunction.
28

                                       1.

Plaintiffs contend that the balance of equities tips decidedly in their favor, and an injunction is in the public interest.  Furthermore, Plaintiffs contend that VidAngel's defenses to violating Plaintiff's rights are meritless and thus Plaintiffs are entitled to a preliminary injunction against Defendants.  VidAngel filed an opposition and the Plaintiffs filed their reply.  The Court heard oral arguments from the parties on November 14, 2016 and took the matter under submission.  Upon consideration of the parties' arguments, papers and the case file, the court hereby **GRANTS** the motion for preliminary injunction.

## I.    BACKGROUND

### a.  Factual and Procedural Background

#### i.  Plaintiffs and Their Copyrighted Works

Plaintiffs are in the business of producing and distributing motion pictures and television programs.  ("Compl." Dkt. No 1 ¶ 19.)  Plaintiffs invest considerable effort and resources each year to develop, produce, distribute and publicly perform their Copyrighted Works.  (*Id*. at ¶ 25.)  Plaintiffs own and have the exclusive U.S. rights to reproduce and publicly perform their Copyrighted Works, including by means of streaming those works over the internet to the public.  (*Id*. at ¶ 25.)  Plaintiffs distribute and license their content for home entertainment across a number of channels.  (*Id*. at ¶ 27.)  These include, among others: (1) physical Discs; (2) digital download through services like iTunes, VUDU or Amazon Video; (3) on-demand streaming for short-term viewing on a per transaction fee (e.g., iTunes Store or Google Play Store); or (4) subscription on-demand streaming (e.g., Netflix or Hulu). (Cittadine Decl. ¶ 9.)

Plaintiffs strategically release their content across different distribution channels and to different licensees over time, a process called "windowing."  (*Id*.) The value and price for each offering is tailored to the willingness of customers (and licensees) to pay for those offerings.  (*Id*.)  Plaintiffs often negotiate higher licensing fees in exchange for granting a licensee the exclusive right to perform a movie or television show during a particular time period.  (*Id*.)  Plaintiffs assert that online and digital distribution channels have become increasingly important revenue sources.  (*Id*. ¶ 10.)

### i.   VidAngel's Service

VidAngel offers more than 2,500 movies and television episodes for purchase on its website.  Answer/Counterclaim ("CC," Dkt. No. 77 ¶ 59.)  VidAngel purchases physical copies of each of these titles in DVD format.  (*Id*.)  VidAngel enters each DVD it has purchased into an inventory management application database and assigns a unique barcode to each physical disc case.  (*Id*. at ¶ 60.)  VidAngel then uses a commercially available software program to decrypt a copy of each individual title.  (Meldal Dec., ¶ 37(ii).)  After decryption, VidAngel creates "intermediate" files.  (Oppo. at 17.)  VidAngel tags the files for over 80 types of potentially objectionable content.  (Meldal Dec., ¶¶ 33-38.)

Before watching a particular movie or television episode, a customer must purchase a physical DVD containing the title from VidAngel.  (CC ¶ 63.)  The purchase price for each DVD is $20.  (*Id*. ¶ 64.)  To purchase a disc, users must logon to the VidAngel website.  First-time users are required to provide an email address to establish a unique user ID and create a password.  (*Id*.)  Once a purchase transaction has occurred, the disc is removed from available inventory and the title is transferred to that customer's unique user ID.  (*Id*. at 65.)  VidAngel typically maintains possession of the physical DVD on behalf of the purchasers, but purchasers may request that the DVD be sent to them or retrieve the DVD from VidAngel's offices.  (*Id*. ¶ 63.)

After a customer purchases a physical DVD they are shown a listing of the various types of potentially objectionable content identified in the purchased work, as well as the number of occurrences of each such type of content within the work.  (*Id*. ¶ 62.)  The user then selects the types of content he or she wishes to have silenced or deleted.  (*Id*.)  Each user must apply at least one filter in order to view a video.  (*Id*. ¶ 30.)  After selecting filters, a subscriber is able to view the stream instantaneously on any VidAngel-supported device, including Roku, Apple TV, Smart TV, Amazon Fire TV, Android, Chromecast, iPad/iPhone and desktop or laptop computers.  (*Id*. ¶ 66.)

Once a user has viewed a stream, the user may re-sell the DVD back to VidAngel for a partial credit of the $20 purchase price.  (*Id*. ¶ 68.)  The sellback price decreases $1 per night for standard definition (SD) purchases and $2 per night for high-definition (HD) purchases.  (*Id*.)  Once a user sells the movie back to VidAngel, the user's access to the title is terminated and the remaining balance is credited back to the user's VidAngel account.  (*Id*.)  For example: A $20 SD disk is owned for 2 nights at $1 per night and sold back for $18 in sell-back credit.  (*Id*.)  If a VidAngel customer keeps a DVD for more than 20 days, he or she can either view it

through the VidAngel platform in perpetuity, sell it back for $1 or $2 in credit, or VidAngel will send the DVD to the customer, if requested.  (*Id.*)

At the time of this motion, VidAngel offered over 80 of Plaintiff's copyrighted works on their website.  (Compl. Ex. A.; Ehler Decl. Ex. EE at Tr. 27:19-29:14.)  Plaintiffs have not provided authorization, permission or consent to VidAngel to copy or publicly perform the Copyrighted Works, or to exercise any other rights affecting their copyrights with respect to the Copyrighted Works.  (Compl. ¶ 29.)

On June 9, 2016, Plaintiffs commenced this action by filing a complaint against Defendants.  (Complaint, Dkt. No. 1.)  On July 5, 2016, Defendants filed an answer and counterclaim.  (Dkt. No. 11.)  On August 22, 2016, Plaintiffs filed a Motion for Preliminary Injunction.  (Dkt. No. 27)  On September 16, 2016, Defendants filed an Amended Answer and Affirmative Defenses, as well as First Amended Counterclaims.  (Dkt. No. 77.)

## II.    LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be issued upon a clear showing that plaintiff is entitled to such relief."  *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008).  The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered.  *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).  A party seeking preliminary injunctive relief must establish that they are (1) likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor and (4) that an injunction is in the public interest.  *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support the issuance of an injunction," provided that the plaintiff also shows irreparable harm and that the injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011); A "serious question" is one on which the movant "has a fair chance of success on the merits."  *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

The elements of this test are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 622

F.3d 1045, 1049–50 (9th Cir. 2010), rev'd on other grounds, 632 F.3d 1127 (9th Cir. 2011).  However, the applicant must demonstrate that immediate or imminent irreparable harm is likely: "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original) (internal citations omitted); see also *Fin. & Sec. Prods. Ass'n v. Diebold, Inc*., Case No. C 04-04347 WHA, 2005 WL 1629813, *6 (N.D. Cal. July 8, 2005) ("Irreparable harm must not be speculative or merely alleged to be imminent . . . .").

  "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Therefore, the Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings.  *See, e.g.*, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  The Court is permitted to consider inadmissible evidence in deciding a motion for a preliminary injunction.  *Id*.  This flexibility exists because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial.  *Id*. "While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding.  Such issues, however, properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015) [1]

---

[1] Both sides make numerous evidentiary objections.   In light of the relaxed evidentiary standard for preliminary injunction proceedings, the Court need not rule on admissibility.   However, the Court has considered the likely admissibility of the evidence in determining whether the Plaintiff demonstrated a likelihood of success on the merits, for purposes of the preliminary injunction.   Where the Court has expressly relied on evidence that is subject to an evidentiary objection, the Court has overruled the objection.

### III.   DISCUSSION

#### a.   Plaintiffs Have Demonstrated A Likelihood of Success on the Merits.

##### i.   Plaintiffs' DMCA Claim

Section 1201(a)(1)(A) of the Digital Millennium Copyright Act provides that "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." A technological measure effectively controls access to a copyrighted work if, "the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). Plaintiffs use Content Scramble System technology ("CSS"), among other technologies[2], in order to prevent unauthorized access to the content on DVDs. (Schumann Decl. ¶¶ 20, 27). "CSS is a technological measure that effectively controls access to copyrighted works, namely, copyrighted DVD content." *Realnetworks, Inc. v. DVD Copy Control Ass'n,* 641 F. Supp. 2d 913, 933 (N.D. Cal. 2009).

Plaintiffs contend that VidAngel circumvents the technological protection measures on Plaintiffs DVDs. The DMCA specifies that "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). VidAngel admits that it "uses a commercially available software program to automatically allow read-access for the purpose of mounting the DVD [and Blu-ray] files for uploading onto a computer, in the process removing restrictions on DVD [and Blu-ray] encryption." (Dkt. No. 77, ¶ 120(b)). VidAngel argues that this activity doesn't amount to circumvention because they are only decrypting DVDs to allow them to be viewed in another way, a procedure known as re-formatting or "space shifting." (Oppo at 17.) VidAngel asserts that the practice of "space-shifting" is legal when it is performed for disc purchasers who elect to have their DVD content streamed to them rather than receiving the physical discs. (*Id.*) The Court finds no support for VidAngel's position.

Multiple courts have declined to adopt an exemption for space-shifting. In *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1096 (N.D. Cal. 2004), the court held that the purchase of a DVD does not give to the purchaser the authority of the copyright holder to decrypt CSS. The court in *321 Studios* cited a Second Circuit

---

[2] The TPMs that protect Plaintiffs' content on DVDs and Blu-ray discs include the CSS (for DVDs) and the Advanced Access Content System ("AACS") and/or BD+ (for Blu-ray discs). (Compl. ¶ 32.)

decision that directly addressed issues of DVD copying and the DMCA.  In *Universal City Studios v. Corley*, 273 F.3d 429, 444 (2d Cir. 2001), the defendants argued "that an individual who buys a DVD has the 'authority of the copyright owner' to view the DVD, and therefore is exempted from the DMCA pursuant to subsection 1201(a)(3)(A) when the buyer circumvents an encryption technology in order to view the DVD on a competing platform."  The court responded that Section 1201(a)(3)(A) only exempts from liability those "who would 'decrypt' an encrypted DVD with the authority of a copyright owner, not those who would 'view' a DVD with the authority of a copyright owner."  *Id.*  The purchase of a DVD only conveys the authority to view the DVD, not to decrypt it.[3]  VidAngel has not offered any evidence that the Plaintiffs have either explicitly or implicitly authorized DVD buyers to circumvent encryption technology in order to view the DVD on a different platform such as VidAngel's streaming service.

The Librarian of Congress, and the Register of Copyrights, also recently declined to adopt an exemption that would allow circumvention of access controls on lawfully made and acquired audiovisual works for the purpose of noncommercial space-shifting or format-shifting.  Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 80 Fed. Reg. 65944 (Oct. 28, 2015) (to be codified at 37 C.F.R. pt. 201).

VidAngel also argues that the Family Home Movie Act of 2005 ("FMA") provides an exemption for decrypting DVDs for the purpose of accessing a disk to filter audio and visual content.  VidAngel asserts that the provisions of the FMA render their circumvention lawful because "the making of a decrypted copy [is] the necessary first step in making a lawfully purchased DVD capable of being filtered." (Dkt. 11 ¶ 61.) (Counter-Complaint).  The FMA, codified in 17 U.S.C. § 110(11), specifically carves out an exemption from copyright infringement for:

> "the making imperceptible, by or at the direction of a member of a private household, of limited portions of audio or video content of a motion picture, during a performance in or transmitted to that household for private home viewing, from an authorized copy of the motion picture, or the creation or provision of a computer program or other technology that enables such making imperceptible and that is designed and

---

[3] VidAngel asserts that former Solicitor General Don Verrilli, "while representing the major record labels *and movie studios*" in *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, 545 U.S. 913 (2005),* assured the Supreme Court that his clients agreed that space shifting is legal.  (Oppo. at 17.) (emphasis added).  However, Don Verrilli specifically stated that "*The record companies*, my clients, have said, for some time now…that it's perfectly lawful to take a CD that you've purchased, upload it onto your computer, put it onto your iPod. (RJN Ex. B at 53. (Tr. of *MGM v. Grokster* Oral Argument at 12.)) (emphasis added).  This statement did not involve movie studios, nor did it address space-shifting in the context of copying DVDs.

marketed to be used, at the direction of a member of a private household, for such making imperceptible, if no fixed copy of the altered version of the motion picture is created by such computer program or other technology"

17 U.S.C. § 110(11). Neither the plain language nor the legislative history of the FMA support VidAngel's position. In fact, the legislative history directly contradicts VidAngel's assertion that the FMA provides an exemption to the anti-circumvention provisions of the DMCA. Senator Orrin Hatch, who introduced the FMA to the U.S. Senate, stated that the FMA "does not provide any exemption from the anti-circumvention provisions of section 1201 of title 17." 150 Cong. Rec. S.11852-01 at S11853 (Statement of Senator Hatch) (RJN Ex. G at 269).[4] Senator Hatch further stated that "It would not be a defense to a claim of violation of section 1201 that the circumvention is for the purpose of engaging in the conduct covered by this new exemption in section 110(11)." *Id.*

Finally, VidAngel states that in *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 951 (9th Cir. 2010) the Ninth Circuit court expressly cautioned against DMCA application when, as here, antitrust issues are present. (Oppo at 18.) A close reading of the *MDY Indus.* decision shows that the court actually declined to consider the interplay between the anti-circumvention right and antitrust. *MDY Indus.*, 629 F.3d at 950. The court advised that they would consider this issue "If a § 1201(a)(2) defendant in a future case claims that a plaintiff is attempting to enforce its DMCA anti-circumvention right in a manner that violates antitrust law." VidAngel is not alleged to have violated § 1201(a)(2) of the DMCA, which prohibits trafficking in circumvention technology, and thus is not the type of defendant contemplated by the court in *MDY Indus*. VidAngel's remaining arguments also fail.[5]

For the foregoing reasons, Plaintiffs have shown a strong likelihood of success on the merits of their claim that VidAngel has violated, and continues to violate, section 1201(a)(1)(A) of the Digital Millenium Copyright Act by circumventing technological measures that effectively control access to Plaintiffs' copyrighted works on DVDs and Blu-ray discs.

---

[4] Because legislative history is a matter of public record, which is not subject to reasonable dispute, the court will take judicial notice of this item. *See* FED.R.EVID. 201(b). *See also Palmer v. Stassinos*, 348 F.Supp.2d 1070, 1077 (C.D. Cal. 2004) (taking judicial notice of legislative history materials…because they "constitute judicial facts sufficiently capable of accurate and ready determination.")
[5] VidAngel makes a very brief assertion that the remedies section of the DMCA makes clear that to redress violations, courts "may not impose a prior restraint on free speech," 17 U.S.C. § 1203(b)(1). (Oppo. at 18.) VidAngel has not sufficiently briefed this issue nor otherwise argued it before the court. Therefore the Court will not reach this argument.

## ii.  Plaintiffs' Copyright Infringement Claims

Plaintiffs must satisfy two requirements to present a prima facie case of direct infringement: (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106.  Plaintiffs have sufficiently demonstrated ownership of the copyrighted works identified in the complaint by providing certificates of registration issued by the Copyright Office.  (Klaus Decl. Exs. A-RR.)  A certificate of registration is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c).  VidAngel has not disputed that it currently offers all of the works listed in Exhibit A to the complaint and states that it will continue to offer these works and other future releases, unless enjoined.  (Ehler Decl. Ex. EE at Tr. 27:19-29:14; 30:3-20; 31:6-37:4.)  VidAngel also does not dispute the validity of Plaintiffs' copyrights. Therefore, the only factor at issue in this case is whether Defendants have violated at least one exclusive right granted to Plaintiffs as copyright holders.

### 1.  VidAngel Violates Plaintiffs' Exclusive Right To Reproduce Their Works By Making Copies

One of the rights granted by Section 106 of the Copyright Act is the exclusive right "to reproduce the copyrighted work in copies." 17 U.S.C. § 106(1).  VidAngel admits to making copies of Plaintiffs' works onto a computer system and third-party servers. (Ehler Decl. Ex. EE at Tr. 58:1-4.)  The Ninth Circuit in *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) stated that transferring digital work "from a permanent storage device to a computer's RAM [or storage]" infringes the reproduction right."  Although, the *MAI Sys. Corp.* decision addressed the infringement of computer software, the same analysis applies to the digital transfer other types of copyrighted work. *Tiffany Design, Inc. v. Reno-Tahoe Specialty, Inc.* 55 F. Supp. 2d 1113, 1121 (D. Nev. 1999)(" the digitization or input of any copyrighted material, whether it be computer code or visual imagery, may support a finding of infringement notwithstanding only the briefest of existence in a computer's RAM.")

VidAngel claims that their copies of Plaintiffs' works are only "intermediate" copies and not "copies" as defined by the Copyright Act.  VidAngel's process of copying involves several steps.  First, VidAngel decrypts the DVDs.  (Oppo. at 17.) After decryption, VidAngel creates "intermediate" files.  (*Id*.)  VidAngel tags the files for over 80 types of content, and breaks them into approximately 1,300 fragments that contain no more than 10 seconds of content, then encrypts those fragments, and stores them in a secure, access-controlled location in the cloud.  (Meldal Dec., ¶¶ 33-38.)

VidAngel asserts that these fragments are not capable of being watched until "VidAngel software assembles the segments in sequence, and for each segment decrypts the content, displays it and then discards the segment." (Meldal Dec., ¶ 37(xiii)).

VidAngel contends that case law regarding the reproduction right under § 106(1) draws a clear distinction between unlawful copies, which can be viewed by consumers, and lawful "intermediate" copies, which cannot be viewed. (Oppo. at 10.) VidAngel argues that since their intermediate copies are unable to be viewed by consumers, they are not "copies" as defined by the Copyright Act and, as a matter of law, do not give rise to infringement claims. (*Id.*) Defendants cite the Ninth Circuit's decision in *Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) as support for their proposition that "intermediate" copying does not violate the Copyright Act. However, the court in *Sega* stated that "on its face, the language of 17 U.S.C. § 106(1) unambiguously encompasses and proscribes 'intermediate copying'" *Id*. at 1518. 17 U.S.C. § 101 provides that "in order to constitute a "copy" for purposes of the Copyright Act, the allegedly infringing work must be fixed in some tangible form, "from which the work can be perceived, reproduced, or otherwise communicated, *either directly or with the aid of a machine or device*." (emphasis added). VidAngel's fragmented copies may not be able to be perceived directly by consumers, however they are able to be perceived with the aid of VidAngel's software. Thus the copying performed by Defendants falls within the category of acts that are proscribed by the statute.

### 2. VidAngel Violates Plaintiffs' Exclusive Right To Publicly Perform Their Copyrighted Works

Another of the rights granted by Section 106 of the Copyright Act is the exclusive right "in the case of . . . motion pictures and other audiovisual works, to perform the copyrighted work publicly." 17 U.S.C. § 106(4). What constitutes a public performance for purposes of Section 106(4) is defined by the Copyright Act in Section 101. "Under Section 101(2), the "transmit" clause, a performance is public if someone: transmits or otherwise communicates a performance or display of the work…to the public, by means of any device or process." *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1009 (C.D. Cal. 2011). A transmission is made "to the public" if "the relationship between …the transmitter of the performance, and the audience…is a commercial, 'public' relationship regardless of where the viewing takes place." *Id*. at 1010;

Plaintiffs assert that services like VidAngel's violate the public performance right, despite the fact that the performances are transmitted privately for in home

viewing. The court in *On Command Video Corporation v. Columbia Pictures Industries*, 777 F. Supp. 787 (N.D. Cal. 1991), held that a hotel's "electronic rental" system infringed the public performance right, despite the fact that the hotel's service transmitted performances from the main office to individual hotel rooms. The court held that the "relationship between the transmitter of the performance…and the audience," was "a commercial, 'public' one regardless of where the viewing takes place." *Id*. at 788. Likewise, the court in *Warner Bros. Entertainment Inc. v. WTV Systems, Inc.,* held that a service which streamed the contents of DVDs from DVD players purportedly assigned to individual users also violated the public performance right. 824 F. Supp. 2d at 1006-07, 1010. The Supreme Court in *Am. Broad. Cos. v. Aereo*, Inc., 134 S. Ct. 2498 (2014) ("Aereo".), held that internet streaming of copyrighted material captured from over-the-air broadcast signals by thousands of separate antennae, each of which was purportedly assigned separately to individual subscribers, infringed the public performance right.

VidAngel argues that their service does not engage in public performances because VidAngel streams filtered versions of motion pictures created at the direction of and owned by its customers. (Oppo. at 11.) VidAngel cites the *Aereo* decision as support. There, the Supreme Court declared that a transmission of a copyrighted program is not made to "the public" when it is made "to those who act as owners or possessors of the relevant product." *Am. Broad. Cos. v. Aereo, Inc*., 134 S. Ct. at 2510. Assuming *arguendo* that VidAngel's buy/sellback service creates a valid ownership interest in a DVD, this ownership would only apply to the physical DVD, not the digital content that VidAngel streams to paying subscribers. Subscribers view a stream from a master copy stored on a server, not a DVD temporarily "owned" by the user. Furthermore, lawful ownership of a DVD only conveys authorization to view the DVD, not to decrypt it for the purpose of viewing it on an alternative platform. *See* discussion *supra* Section III.A.i. Therefore, VidAngel's customers are not lawful "owners or possessors" of the digital content that is streamed via VidAngel's service. Finally, VidAngel's argument that *Aereo* holds that the public performance right is not infringed when the user pays for something other than the transmission of copyrighted works, is unsupported. (Oppo. at 11.) In *Aereo*, the Supreme Court specifically stated that they had "not considered whether the public performance right is infringed when the user of a service pays primarily for something other than the transmission of copyrighted works." For the foregoing reasons, the Court holds that Plaintiffs have shown a strong likelihood of success on the merits of their claims that VidAngel has violated, and continues to violate, 17 U.S.C. § 106(1) and 17 U.S.C. § 106(4), by creating copies of Plaintiff's copyrighted material, and publicly performing Plaintiff's copyrighted material.

### 3.  VidAngel's FMA Defense for  Copyright Infringement

The Family Home Movie Act is codified in 17 U.S.C § 110(11).  It provides an exemption from copyright infringement for:

> the making imperceptible, by or at the direction of a member of a private household, of limited portions of audio or video content of a motion picture, during a performance in or transmitted to that household for private home viewing, from an authorized copy of the motion picture, or the creation or provision of a computer program or other technology that enables such making imperceptible and that is designed and marketed to be used, at the direction of a member of a private household, for such making imperceptible, if no fixed copy of the altered version of the motion picture is created by such computer program or other technology.

Plaintiffs assert, and the Court agrees that the FMA exempts only (1) "the making imperceptible" of limited portions of a motion picture; and (2) "the creation or provision of a computer program or other technology that enables such making imperceptible."  17 U.S.C § 110(11).  VidAngel's FMA expressly provides that a third party may filter and transmit content as specified by a lawful owner of a copy so long as a fixed copy of the altered content is not created.  However, this assertion is unsupported by the clear language of the statute.  (Oppo. at 12.)  The statute clearly requires that a performance or transmission of filtered content must come from an "authorized copy" of the motion picture.  The digital content that VidAngel streams to its customers is not from an authorized copy.  VidAngel streams from a digital copy that it acquires by circumventing technological protection measures on Plaintiff's DVDs in violation of § 1201(a) of the DMCA.  *See* discussion *supra* Sections III.A.i, III.A.ii.2.  Furthermore, the requirement that the filtered content come "from an authorized copy" is a clear indication that the FMA is not intended to displace a copyright holder's exclusive reproduction right under section 106(1) of the Copyright Act.  The last sentence of the FMA also provides that: "Nothing in paragraph (11) shall be construed to imply further rights under section 106 of this title, or to have any effect on defenses or limitations on rights granted under any other section of this title or under any other paragraph of this section."  17 U.S.C § 110(11).  This language directly contradicts VidAngel's argument that a filtering service that complies with the FMA, need not satisfy any other provisions of the Copyright Act.  (Oppo. at 15.)  The evidence in the record and the unambiguous language of the FMA show that (1) VidAngel's service does not comply with the express language of the FMA, and (2) The FMA does not provide a defense to VidAngel's violations of sections 106(1) and 106(4) of the Copyright Act.

### iii.  VidAngel's "Fair Use" Defense

VidAngel asserts that they are making "fair use" of the copyrighted works as provided in 17 U.S.C. § 107 of the Copyright Act. The pertinent language of that section reads as follows:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of a copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

### 1.  Purpose and Character of the Use.

The "purpose and character of use" factor in the fair use inquiry asks "to what extent the new work is transformative" and does not simply "supplant" the original work and whether the work's purpose was for or not-for-profit. *Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, (9th Cir. 2003) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  VidAngel does not dispute that they profit from the use of Plaintiffs' works.  Commercial use of copyrighted material is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 545 (9th Cir. 2008) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)).

VidAngel argues that their filtering service is transformative in that it alters the content of the works as seen by different viewers in different ways.  (Oppo. at 20.) The Supreme Court has said that a use is transformative if it "adds something new,

with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell*, 510 U.S. at 579.  VidAngel's service does not add anything to Plaintiff's works.  It simply omits portions that viewers find objectionable. The court in *Clean Flicks of Colo. v. LLC v. Soderbergh*, 433 F. Supp. 2d 1236 (D. Colo. 2006), rejected a fair use defense from defendants that provided a service which is similar to that of VidAngel.  In *Clean Flicks*, the court ruled that defendants' editing of objectionable content was not transformative because it added nothing to the copyrighted works, and only removed "a small percentage of most of the films."  *Id*. at 1241.  Furthermore, the Ninth Circuit has held that works are transformative when "the works use copy-righted material for purposes distinct from the purpose of the original material." *Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003).  Notwithstanding the edits made by users, VidAngel's use of plaintiff's works serves the "same intrinsic entertainment value that is protected by Plaintiffs' copyrights", and is thus not transformative.  *Id.*   VidAngel's commercial use of the copyrighted works, coupled with non-transformative nature of the edited copies weigh heavily in favor of the Plaintiffs under the first statutory factor in the fair use analysis.

## 2.  Nature of the Copyrighted Work

"The second statutory factor, 'the nature of the copyrighted work,' § 107(2), draws on Justice Story's expression, the 'value of the materials used.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994) (citing *Folsom v. Marsh*,  9 F. Cas. 342, 348 (C.C.D. Mass. 1841))  "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.  For example, the Ninth Circuit has held that "works such as original songs, motion pictures, and photographs taken for aesthetic purposes, are creative in nature and thus fit squarely within the core of copyright protection." *Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (citing *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)).  This factor also weighs in favor of the Plaintiffs.

## 3.  Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole

The third factor in the fair use analysis evaluates both the quantity of the work taken and the quality and importance of the portion taken.  *Campbell*, 510 U.S. at 586. "This factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too."  *Id*. at 577.  The evidence in this case shows that VidAngel copies Plaintiff's works in their entirety.  (Ehler Decl. Ex. EE at Tr. 112:19-113:2.)  The Supreme Court in *Campbell* advised that the verbatim copying of

14.

"a substantial portion of the infringing work" is a relevant inquiry in the fair use analysis. *Id*. at 588.  VidAngel does not dispute that they copy a substantial portion of the Plaintiff's copyrighted works.  Instead VidAngel simply states that their viewers never watch exact copies of the original films, due to the requirement that each user must apply at least one filter.  Defendants also assert that the filtered versions of the movies are not substitutes for the Plaintiff's works.  However, the Supreme Court in *Campbell* held that "a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original.  *Id.*  The heart of a copyrighted work is the portion that is the "most likely to be newsworthy and important in licensing serialization." *Campbell*, 510 U.S. at 586.  Despite the fact that VidAngel's service omits portions of each work, the essential storyline, cinematography, and acting portrayals remain unchanged.  These elements are the heart of the movie.  Courts consistently find that the performance of the "heart" of a copyrighted work weighs against a fair use determination.  *See Campbell*, 510 U.S. at 586; *Elvis Presley Enters.*, 349 F.3d at 630; *L.A. News Serv. v. Tullo*, 973 F.2d 791, 798 (9th Cir. 1992).  *Arista Records LLC v. Myxer Inc*., 2011 U.S. Dist. LEXIS 109668 (C.D. Cal. Apr. 1, 2011).  Accordingly, the Court finds that this factor weighs in favor of the Plaintiffs.

### 4.  Effect of the Use Upon the Potential Market For or Value of the Copyrighted Work

The fourth factor in the fair use analysis considers current market harm and "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (citations omitted).  As discussed above, Plaintiff's use of Plaintiff's copyrighted works is commercial and non-transformative.  The Ninth Circuit has held that when "the intended use is for commercial gain," the likelihood of market harm "may be presumed." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 531. (9th Cir. Cal. 2008).

VidAngel argues that their service does not harm the market for Plaintiff's copyrighted works because filtered movies are not a substitute for Plaintiff's unfiltered movies.  (Oppo. at 21.)  VidAngel also asserts that their filtering service actually increases the market for Disney's works.  (*Id.*)  VidAngel attempts to support their arguments by offering customer survey results that indicate that over 51% of VidAngel customers would not watch their offerings without filtering.  The survey results are ultimately detrimental to VidAngel's arguments.  The fact that 49% of VidAngel's customers would view movies without filters shows that VidAngel's service does serve as an effective substitute for Plaintiff's unfiltered works, for approximately half of VidAngels users.  Furthermore, the fact that VidAngel's

streams are "composed primarily" of Plaintiff's works, including the heart of the work, "with little added or changed" makes the streams "more likely to be a merely superseding use, fulfilling demand for the original." *Campbell*, 510 U.S. at 586. Therefore, the Court finds that this factor also weighs in favor of the Plaintiffs.

At trial, the defendant in an infringement action bears the burden of proving fair use. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). "Because 'the burdens at the preliminary injunction stage track the burdens at trial,' once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the nonmoving party to show a likelihood that its affirmative defense will succeed." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Plaintiffs have shown a likelihood of success on their DMCA and Copyright Infringement claims, therefore VidAngel bears the burden of showing that they are making fair use of the Plaintiffs Copyrighted works. Based on the analysis of the aforementioned factors, the Court finds that VidAngel has not met this burden.

## b. Plaintiffs Have Demonstrated A Likelihood of Imminent Irreparable Injury.

Following the Supreme Court's decisions in *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006), and *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2006), the Ninth Circuit concluded that it is no longer appropriate to apply a presumption of irreparable harm in trademark and copyright cases. *See, e.g., Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1249 (9th Cir. 2013) ("Following eBay and Winter, we held that likely irreparable harm must be demonstrated to obtain a preliminary injunction in a copyright infringement case. . . ." It is not enough, moreover, that the claimed harm be irreparable; it must be imminent as well. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Amylin Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 456 Fed. Appx. 676, 679 (9th Cir. Cal. 2011) ("[E]stablishing a threat of irreparable harm in the indefinite future is not enough"). Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. *Caribbean Marine Servs.*, 844 F.2d at 674 (citing *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)). Applying these standards, a party seeking injunctive relief must adduce evidence of likely irreparable harm and may not rely on "unsupported and conclusory statements regarding harm [the plaintiff] might suffer." *Herb Reed Enterprises*, 736 F.3d at 1250. "Those seeking injunctive relief must proffer evidence

1    sufficient to establish a likelihood of irreparable harm." *Id.* at 1251.

2         Plaintiffs argue that they will suffer irreparable harm in the absence of a
3    preliminary injunction.  First, Plaintiffs argue that VidAngel's service interferes with
4    their basic right to control how, when and through which channels consumers can
5    view their copyrighted works. (Mot. at 27.)  Where defendants operate an "infringing
6    service without the normal licensing restrictions imposed by Plaintiffs, [it] interfere[s]
7    with Plaintiffs' ability to control the use and transmission of their Copyrighted works,
8    thereby, causing irreparable injury." *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F.
9    Supp. 2d 1003, 1012 (C.D. Cal. 2011).  Plaintiffs' provided a declaration from Tedd
10   Cittadine, Senior Vice President of Digital Distribution at 20th Century Fox Home
11   Entertainment.  Cittadine testified that Plaintiffs' exclusive rights under copyright are
12   critical to providing Plaintiffs the opportunity to earn a return on their substantial
13   investments. (Cittadine Decl. ¶¶ 7-8.)  Plaintiffs exercise their rights through
14   agreements with authorized distributors.  Some licenses grant the licensee an
15   exclusive time window for performing a title. (*Id.* ¶ 15.)  The price for such a license
16   is based, in part, on the promise and scope of exclusivity. (*Id.*)  Plaintiffs often
     negotiate higher licensing fees in exchange for granting a licensee the exclusive right
     to perform a movie or television show during a particular time period. (*Id.*)  Because
     VidAngel operates without any license and performs Plaintiffs' works during
     negotiated exclusivity periods it interferes with Plaintiffs' exercise of their exclusive
     rights and frustrates Plaintiffs' ability to negotiate for similar rights in the future. (*Id.*
     ¶¶ 17, 36.)[6]

17        Second, Plaintiffs argue that VidAngel threatens harm to Plaintiffs'
18   relationships and goodwill with authorized distributors by undermining their ability to
19   provide licensed offerings. (Mot. at 28.)  Plaintiffs assert that this harm continues to
20   grow as VidAngel adds more users and encourages them to stream through VidAngel
21   rather than a licensed service.  Plaintiffs assert that this poses a threat to the businesses
22   of Plaintiffs' legitimate licensees and, in turn, to Plaintiffs' relationships with them
23   and the goodwill Plaintiffs have worked to create. (Cittadine Decl. ¶¶ 18-22.)  Tedd
24   Cittadine states that Plaintiffs' clients worry about unlicensed services in the market
25   that compete with their business on unfair terms. (*Id.* ¶ 19.)  He also states that
     licensees have complained in partnership meetings, and especially in negotiations, that
     it is difficult to compete with services like VidAngel who do not act pursuant to
     licensing restrictions. (*Id.*)  Cittadine states that licensees specifically complain that it
     is difficult to compete with unlicensed services' low-cost offerings. (*Id.*)

26

27   _____
     [6] Cittadine declared that at the time of his declaration VidAngel was offering (at least) two of
28   Plaintiffs' works—The Martian and Brooklyn—during periods these works are exclusive to an
     authorized licensee, HBO. (Cittadine Decl. ¶ 30.)

                                          17.

1

2      VidAngel argues that Plaintiff's alleged harms are speculative and that there is
3  no evidence of actual harm to Plaintiffs other than the declaration of Tedd Cittadine.
   (Oppo. at 27.)  In *Fox TV Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30 (D.D.C.
4  2013), the court considered a similar argument in an analogous case.  There, the
5  defendants, like VidAngel, operated an unlicensed service that transmitted the
   plaintiff's copyrighted performances over the internet.  The plaintiffs argued that
6  defendant's service caused several types of irreparable harm including "undermining
7  Plaintiff's positions in negotiations" and damaging "Plaintiff's goodwill with their
   licensees." *Id.* at 49.  The defendants argued that plaintiff's alleged harms were
8  "insufficiently speculative and 'unsupported by any evidence.'" *Id.* at 50.  The court
9  found that Plaintiffs had sufficiently supported their alleged harms "with evidence that
   Defendant had not controverted, including a sworn declaration from a senior executive
10 who states that cable companies have already referenced businesses like [Defendant's
11 business] in seeking to negotiate lower fees." *Id.*  Similarly, in *ABC v. AEREO, Inc.,*
   874 F. Supp. 2d 373, (S.D.N.Y. 2012) the court held that harm to a plaintiff's
12 negotiating position was not speculative where senior executives had provided sworn
13 statements indicating that licensees had expressed concerns about unlicensed service
   providers in negotiations. (*Id*. at 388-89).  Here, the Plaintiffs have provided
14 uncontroverted evidence that VidAngel operates their service without a license, and
15 offers Plaintiff's works during exclusivity periods that Plaintiff negotiated with
   licensees.  Furthermore, Plaintiffs have offered Tedd Cittadine's sworn declaration
16 stating that unlicensed services like VidAngel's had been specifically referenced as a
17 concern during negotiation meetings with licensees.  The Court finds that this is a
   sufficient showing that VidAngel's service undermines Plaintiffs negotiating position
18 with licensees and also damages goodwill with licensees.

19      VidAngel also contends that any damage their service might cause to Plaintiffs
20 is economic in nature and thus doesn't qualify as irreparable harm.  (Oppo. at 28-29.)
   However, harm to one's negotiating position and/or goodwill with licensees is
21 difficult to quantify.  In *Fox Television Stations, Inc. v. BarryDriller Content Sys.,*
22 *PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012) the court held that harm to a
   plaintiff's negotiating position was irreparable because it was "neither easily
23 calculable, nor easily compensable."(quoting *Warner Bros. Entm't, Inc. v. WTV Sys.*,
24 824 F. Supp. 2d at 1013)).  "And it is well-established that harm to one's reputation,
   goodwill, or relationships-all of which may result from future copyright infringement
25 may constitute irreparable harm." *Kelly v. Primco Mgmt.*, 2015 U.S. Dist. LEXIS
26 181288 *, 2015 WL 10990368 (C.D. Cal. Jan. 12, 2015); *See, e.g.*, *Rent-A-Center,*
   *Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)
27 (noting that damage to one's reputation or goodwill, because it is difficult to calculate,
28 qualifies as irreparable harm).

VidAngel also asserts that Plaintiff's delay in filing an injunction belies their claims of irreparable harm.  VidAngel states that they notified the Plaintiffs about their service with two letters in July and August 2015.  (Oppo. at 22.)  VidAngel asserts that these letters described their business model, including the fact that VidAngel: (1) "purchases the DVD or Blu-ray disc for the customer and stores it in a physical vault;" (2) "streams" the contents of the disc to the customer in a filtered format chosen by the customer; and (3) then "re-purchase[s] the disc at a discount from the sale price. . .based on the length of time the customer has owned the disc." (*Id*.)  VidAngel added that it had grown from 43 to 4848 users in just under six months.  (*Id*.)  Plaintiffs filed for a preliminary injunction on August 22, 2016.  (Dkt. No. 27.)  VidAngel contends that Plaintiff's delay of more than one year before requesting a preliminary injunction is inconsistent with a claim of irreparable harm.

Courts have held that "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."  *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).  However, "delay is but a single factor to consider in evaluating irreparable injury" and "courts are 'loath to withhold relief solely on that ground.'"  *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (citing *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)).  Furthermore, "tardiness is not particularly probative in the context of ongoing, worsening injuries."

Plaintiffs assert that when they first learned of VidAngel, it was in "limited beta" and had fewer than 5,000 users—which would not lead legitimate streaming licensees to "notice (let alone complain)."  (Cittadine Decl. ¶¶ 35-36.)  Plaintiffs state that they monitored VidAngel and investigated their claims, and once VidAngel started marketing itself more aggressively, expanded its content offering, and posed a more significant threat of harm, Plaintiffs filed this action and sought a preliminary injunction.  *Id.*  In, *ABC v. AEREO, Inc.,* the court found no undue delay under analogous circumstances.  There, the plaintiffs "were aware of [the service's] existence for roughly a full year before seeking [an] injunction," 874 F. Supp. 2d at 401.  The court ruled that the plaintiffs' delay, which was "based on the limited availability of Aereo's service, its status in beta testing, and the prospect that litigation was unnecessary until it became clear that Aereo posed a viable threat of harm," was reasonable and did not suggest that plaintiff's harms were reparable.  *Id.*  Additionally, VidAngel admits it intends to continue to stream Plaintiff's works and add other future releases, unless enjoined.  (Ehler Decl. Ex. EE at Tr. 27:19-29:14; 30:3-20; 31:6-37:4.)  Plaintiffs' delay in seeking an injunction was reasonable under the circumstances, their alleged irreparable harms are ongoing, and will likely only increase absent an injunction.

Based on the foregoing, the Court holds that Plaintiffs have sufficiently shown that they will suffer irreparable harm in the absence of an injunction.

### c.  Balance of Hardships Weighs in Favor of the Plaintiffs

An injunction may not issue unless the balance of hardships tips sharply in favor of the moving party. *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993). In this case, Plaintiffs have demonstrated that the balance of hardships tips sharply in their favor. Defendants claim that an injunction would cause them to suffer an unimaginable financial hardship. However, the Ninth Circuit has held that "[Defendants] cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Triad Sys. Corp. v. Southeastern Express Co*., 64 F.3d 1330, 1338 (9th Cir. 1995). "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration [on an appeal from a preliminary injunction].'" *Id*. (citing *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 612 (1st Cir. 1988); *accord Apple Computer, Inc. v. Formula Int'l, Inc*., 725 F.2d 521, 523 (9th Cir. 1984) (in motion for preliminary injunction, district court should not consider the "devastating effect" of the injunction on the infringer's business.)

Accordingly, the Court concludes that the balance of hardships tips sharply in favor of Plaintiffs.

### d.  A Preliminary Injunction is in the Public Interest

VidAngel argues that the public interest in protecting every person's right to watch filtered content in private would be severely undercut by the issuance of a preliminary injunction. This argument strongly relies on VidAngel's characterization of its service as the only filtering service under the FMA that supports streaming digital content to mobile devices, tablets, and Smart TV's. However, the evidence in the record shows that another filtering service, ClearPlay, offers filtering to Google Play users who access authorized streams from GooglePlay's licensed service. (Bennett Decl. Ex. A. at 5-6.) An injunction in this case would not prevent VidAngel or any other company from providing a filtering service similar to ClearPlay's, and thus wouldn't negatively impact the public interest in watching filtered content in private.

On the other hand, "it is virtually axiomatic that the public interest can only be

served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1015 (C.D. Cal. 2011) (citing *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983)).   Accordingly, the Court concludes that a preliminary injunction is in the public interest.

## IV.   AMOUNT OF SECURITY

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Ninth Circuit has recognized that Rule 65(c) invests the district court "with discretion as to the amount of security required, if any." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (citing *Doctor's Assoc., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

VidAngel asks the court to impose a substantial bond of $50,000,000 because an injunction threatens to put VidAngel out of business before any resolution on the merits and would cause it serious financial loss.  VidAngel contends that this substantial bond is required because, "A party that is wrongfully enjoined may be limited to the amount of the bond as its recovery. *Buddy Sys., Inc. v. Exer-Genie, Inc.*, 545 F. 2d 1164, 1168 (9th Cir. 1976).  However, Defendants also admit that Plaintiffs are well funded and established giants in the entertainment industry.  (Oppo. at 35.) Plaintiffs have considerable assets to respond in damages if VidAngel is found to have been wrongfully enjoined.

Plaintiffs contend that analogous cases have required security bonds well below $1 million. *See, e.g.*, *BarryDriller*, 915 F. Supp. 2d at 1149 (rejecting request for $15 million bond in favor of $250,000); *Zediva*, 824 F. Supp. 2d at 1015 ($50,000); *FilmOn X*, 966 F. Supp. 2d at 50 ($150,000).  The Court finds no substantial distinctions between this case and the cases cited by Plaintiffs.  Based on the Court's findings regarding Plaintiffs' likelihood of success on the merits, irreparable harm, the balance of hardships and public interest, and considering the bond amounts in analogous cases, the Court finds that a bond in the amount of two hundred and fifty thousand dollars ($250,000.00) is satisfactory.

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Preliminary Injunction. (Dkt. No. 27.) Defendants, as well as their officers, employees, attorneys, and those acting in concert with them are temporarily enjoined from:

(1) circumventing technological measures protecting Plaintiffs' copyrighted works on DVDs, Blu-ray discs, or any other medium;

(2) copying Plaintiffs' copyrighted works, including but not limited to copying the works onto computers or servers;

(3) streaming, transmitting or otherwise publicly performing or displaying any of Plaintiffs' copyrighted works over the Internet (through such websites as VidAngel.com), via web applications (available through platforms such as the Windows App Store, Apple's App Store, the Amazon App Store, Facebook or Google Play), via portable devices (such as through applications on devices such as iPhones, iPads, Android devices, smart phones or tablets), via media streaming devices (such as Roku, Chromecast or Apple TV), or by means of any other device or process; or

(4) engaging in any other activity that violates, directly or indirectly, Plaintiffs anti-circumvention right under § 1201 of the Copyright Act, 17 U.S.C. §1201(a), or infringing by any means, directly or indirectly, Plaintiffs' exclusive rights under § 106 of the Copyright Act, 17 U.S.C. § 106.

Plaintiff is ordered to post a bond in the amount of $250,000.

**IT IS SO ORDERED.**

Dated:  December 12, 2016    _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

cc: FISCAL

22.