1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16
17

| | |
|---|---|
| DISNEY ENTERPRISES, INC.; LUCASFILM LTD. LLC; TWENTIETH CENTURY FOX FILM CORPORATION and WARNER BROS. ENTERTAINMENT, INC.,<br><br>Plaintiff,<br><br>v.<br><br>VIDANGEL, INC.,<br><br>Defendant. | Case No. 2:16-cv-04109 – AB (PLAx)<br><br><br>**ORDER GRANTING PLAINTIFFS' MOTION TO DISMISS DEFENDANT'S FIRST AMENDED COUNTERCLAIMS AND STRIKE DEFENDANT'S AFFIRMATIVE DEFENSE OF COPYRIGHT MISUSE (DKT. NO. 103)** |

18
19
20
21
22
23

    Pending before the Court is Plaintiffs Disney Enterprises, Inc., Lucasfilm Ltd. LLC, Twentieth Century Fox Film Corporation, and Warner Bros. Entertainment Inc.'s ("Plaintiffs") Motion to (i) Dismiss Defendant and Counter-Claimant VidAngel, Inc.'s ("VidAngel") First Amended Counterclaims ("FACC") pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Declaratory Judgment Act, 17 U.S.C. § 2201; and (ii) Strike VidAngel's affirmative defense of Copyright misuse pursuant to Federal Rule of Civil Procedure 12(f).

24
25
26
27
28

    Plaintiffs bring this motion on the grounds that VidAngel fails to plead a plausible Sherman Act § 1 claim based on any alleged vertical or horizontal conspiracy (First Counterclaim). Plaintiffs also assert that VidAngel fails to plead claims for intentional interference with prospective economic advantage (Second Counterclaim) and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

Code §§ 1700 *et seq*. (Third Counterclaim).  Additionally, Plaintiffs contend that VidAngel's declaratory judgment counterclaims (Fourth through Seventh Counterclaims) are duplicative of Plaintiffs' Digital Millennium Copyright Act ("DMCA") and copyright infringement claims and VidAngel's defenses to those claims, and the Court should exercise its discretion to dismiss those counterclaims. Finally, Plaintiffs argue that VidAngel's copyright misuse affirmative defense (Seventeenth Affirmative Defense) should be stricken because VidAngel bases this defense on its antitrust counterclaims, and thus the defense fails along with those claims.  VidAngel filed an opposition to the instant motion (Dkt. No. 132), and Plaintiffs filed a reply (Dkt. No. 142).  The Court heard oral arguments from the parties and took Plaintiffs' motion under submission.  Upon consideration of the parties' arguments, papers and the case file, the court hereby GRANTS Plaintiffs' motion.

## I.     BACKGROUND

### a.  Factual and Procedural Background

VidAngel is a filtering company that provides technology which enables viewers to eliminate objectionable material from motion pictures and television programs.  (FACC, ¶ 9).  In their first amended answer and counterclaims, VidAngel alleges that major motion picture studios and directors have historically been hostile to any alterations made to the director's final cut.  (FACC, ¶ 20).  In 2014, several major motion picture and television studios, including Plaintiffs, entered into a written agreement with the Director's Guild of America (the "DGA Agreement").  (*Id*., ¶¶ 26-27).  VidAngel contends that Section 7-509 of the DGA Agreement, entitled "Editing Theatrical Motion Pictures," prohibits any alteration to a motion picture, without the involvement, consultation or final approval of the director.  (*Id*., ¶ 23).  VidAngel also alleges that Section 7-509 of the DGA Agreement has been understood and enforced by the studios as prohibiting all filtering.  (*Id*., ¶ 24).  VidAngel avers that the studios entered the DGA Agreement as part of a concerted effort to prohibit the lawful provision of online filtering services and the provisions of section 7-509 of the DGA Agreement are an unreasonable restraint on trade in violation of Section 1 of the Sherman Act.  (*Id*., ¶¶ 23, 27).

2.

VidAngel also alleges that Plaintiffs only license film content pursuant to anticompetitive agreements which include terms and conditions that restrict content editing and filtering of any kind without their prior written consent.  (*Id.*, ¶ 24). VidAngel asserts that Plaintiffs refused to enter into licensing agreements with VidAngel and also rejected VidAngel's offers to buy DVDs directly from Plaintiffs. (*Id.*, ¶¶ 40, 41).  VidAngel contends that these actions run counter to each individual Plaintiff's best interests, and therefore are evidence of collusion.  (*Id.*, ¶ 41).  Finally, VidAngel alleges that Plaintiffs induced and persuaded Google and other major digital content distributors to refuse to support VidAngel's filtering service.  (*Id.*, ¶¶ 46, 47). VidAngel contends that Plaintiffs' actions have seriously diminished the ability of VidAngel and other filtering services to function in the market.  (*Id.*, ¶ 9).

On June 9, 2016, Plaintiffs commenced this action by filing a complaint against VidAngel.  (Complaint, Dkt. No. 1).  On July 5, 2016, VidAngel filed an answer and counterclaim.  (Dkt. No. 11).  On September 16, 2016, VidAngel filed an Amended Answer and Affirmative Defenses, as well as First Amended Counterclaims.  (Dkt. No. 77).  On October 8, 2016, Plaintiffs filed the instant motion.  (Dkt. No. 119).

## II.    LEGAL STANDARD

Rule 8 requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The statement must provide enough detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted).  The complaint must also be "plausible on its face," allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do."  *Id.* (quoting *Twombly*, 550 U.S. at 555).

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a pleading for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint."  *Erickson*

*v. Pardus*, 551 U.S. 89, 94 (2007).  But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Furthermore, courts are not bound to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001) (citation omitted), *amended on other grounds,* 275 F.3d 1187 (9th Cir. 2001).  The complaint is properly dismissed if it fails to "plead 'enough facts to state a claim to relief that is plausible on its face.'" *Weber v. Dep't of Veterans Affairs,* 521 F.3d 1061, 1065 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 544).

## III.   JUDICIAL NOTICE

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.  However, a court may consider judicially noticeable documents, such as documents attached to a complaint, documents incorporated by reference in the complaint, or documents that form the basis of the complaint. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).  Additionally, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Moreover, under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. South Bay Beer Distributors*, 798 F.2d 1279, 1282 (9th Cir. 1986). *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

Plaintiffs request that the Court take Judicial Notice of the following documents: (1) Directors Guild of America, 2014 Basic Agreement, Section 7-509; (2) Directors Guild of America, 1978 Basic Agreement, Section 7-509; (3) Directors Guild of America, 2014 Side Letter 15; (4) December 15, 2014 email exchange between Mark Fleming and Neal Harmon; (5) 2014 email from Neal Harmon to Jeffrey Harmon; (6) Exhibit A to the Declaration of David Quinto (Dkt. 46-1); and (7) Declaration of Neal Harmon and Exhibit A thereto (Dkt. 43 and 43-1).  The Court grants judicial notice with respect to documents 1-4, 6 and 7, because they are either incorporated by

reference in the First Amended Counterclaims or are publically available on the Director's Guild's website.  The Court declines to take judicial notice of the 2014 email from Neal Harmon to Jeffrey Harmon, because it is not incorporated by reference into the complaint, and the Court is not aware of any legal authority permitting the Court to take notice of this type of document in connection with a 12(b)(6) motion.  The email at issue includes what Plaintiffs allege is a near-contemporaneous account of Harmon's conversation with Google executive Mark Fleming.  The conversation with Fleming forms the basis of one of VidAngel's claims. Plaintiffs contend that the email is analogous to a phone transcript which was the subject of a request for judicial notice in *Hoffman v. Cenlar Agency, Inc.*, No. 12-CV-414-L (NLS), 2013 WL 1285126, at *1-2 (S.D. Cal. Mar. 27, 2013).  However, in *Hoffman*, the plaintiff alleged that the defendant wrongfully recorded a telephone conversation in violation of California's eavesdropping statute, Cal. Penal Code § 632.  *Id*. at *2.  Because the recording of the phone call itself was the subject of the claim, the court took judicial notice of the recording and a transcript of the recording. Here, it is not the email itself which forms the basis of VidAngel's claims, rather it is the conversation referenced in the email that forms the basis of a claim.  Therefore, the Court declines to take judicial notice of the aforementioned email.  The remaining documents are either incorporated by reference in the First Amended Counterclaims or are publically available.  Moreover, VidAngel does not genuinely dispute the facts Plaintiffs seek to judicially notice.  Accordingly, judicial notice of the requested documents is proper.  (*See* Plaintiffs' Request for Judicial Notice ("RJN") Dkt. No. 119).

## IV.   DISCUSSION

### a. Whether VidAngel has plausibly alleged a violation of  Section 1 of the Sherman Act (First Counterclaim)

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  Under Rule 8(a)(2), a party asserting a claim under section 1 "must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce

among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989)); *see also Twombly*, 550 U.S. at 544.

VidAngel alleges that Plaintiffs are parties to two different types of agreements in restraint of trade.  First, VidAngel contends that the Plaintiffs have entered into horizontal agreements among themselves and other studios which have eliminated companies like VidAngel from participating in online filtering.  VidAngel also alleges that each individual Plaintiff has entered into vertical agreements that prohibit streaming licensees from doing business with filtering companies.  The Court analyzes each allegation in turn.

### i.  Whether VidAngel has plausibly alleged a horizontal conspiracy

As discussed above, VidAngel alleges that each of the Plaintiffs entered the 2014 DGA Agreement as part of a concerted effort to prohibit the lawful provision of online filtering services.  (FACC, ¶ 27).  Specifically, VidAngel asserts that section 7-509 of the 2014 DGA Agreement, entitled "Editing Theatrical Motion Pictures," prohibits any alteration to a motion picture without the approval of the director.  (*Id., ¶¶* 23–24, 26).  VidAngel argues that the terms of section 7-509 operate as an unreasonable restraint on trade in violation of Section 1 of the Sherman Act.  (Oppo. at 5).  Section 7-509 of the 2014 DGA Agreement establishes an obligation for the studios to consult with directors when editing motion pictures.  The studios' obligation to consult with directors varies based on the media platform upon which the movie is to be broadcast.  While the terms of section 7-509 certainly limit the studios' ability to edit films without initially consulting the director, the language of this provision does not support VidAngel's contention that the studios must obtain the approval of the director.  The Ninth Circuit addressed a related issue in *Tristar Pictures v. Dir.'s Guild of Am.*, 160 F.3d 537 (9th Cir. 1998).  There, the appellant movie studio edited a 118 minute film down to 90 minutes for exhibition on network television.  The director was initially consulted with regard to the edits but ultimately refused to participate.  The studio then proceeded to perform the edits over the objection of the director.  While the studio's right to unilaterally make edits to a movie was not at issue in the *Tristar Pictures* decision, the Ninth Circuit observed that

section 7-509 of the DGA Agreement arguably grants a studio the right "to edit the film as it sees fit." *Id.* at 541.

Plaintiffs contend that the DGA Basic Agreement is typically negotiated at three year intervals, with some provisions of the agreement remaining unchanged for decades. (Mot. at 8). Plaintiffs also assert, and VidAngel does not dispute that the current version of section 7-509 has remained materially unchanged since 1978, which predates the creation of movie filters by decades. Thus, VidAngel argues that section 7-509 does not prohibit, nor even address filtering. (*Id.*) It is clear that section 7-509 does not prohibit secondary editing by companies like VidAngel. The only subsection of section 7-509 that even addresses streaming services such as VidAngel is 7-509(g). (*See* RJN, Ex. 1 § 7-509(g)). Section 7-509(g) addresses a director's right to edit motion pictures which are to be exhibited on basic cable television and "New Media" which includes streaming services.[1] However, this subsection only applies if the studio "edits the motion picture at its own facilities in the United States." (RJN, Ex. 1 § 7-509(g)). The circumstances required for section 7-509(g) to apply are not presented by secondary editing services such as VidAngel's. VidAngel argues that the Court cannot interpret the provisions of a contract on a 12(b)(6) motion. However, the case they cite, *FT Travel--N.Y., LLC v. Your Travel Ctr., Inc.,* clearly states that "[w]here a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *FT Travel - N.Y., LLC v. Your Travel Ctr., Inc.*, 112 F. Supp. 3d 1063, 1090 n.134 (C.D. Cal. 2015) (citing *Maniolos v. United States*, 741 F.Supp.2d 555, 567 (S.D.N.Y. 2010)). The language of section 7-509 of the DGA agreement is clear and unambiguous with regard to the fact that it does not prohibit editing nor does it prohibit or even address filtering services like VidAngel's service. Indeed, even VidAngel concedes that the terms of section 7-509 do not explicitly forbid filtering. (Oppo. at 9).

Despite their concession that section 7-509 doesn't prohibit filtering, VidAngel contends that the terms have nonetheless been "understood and implemented" by the parties to prohibit studios from entering into agreements that allow secondary editing or filtering of movies or television programs. (*Id.*) This argument fails for multiple reasons. First, the Ninth Circuit has held that allegations that "[an] anticompetitive agreement [is] a secret term of an otherwise public agreement" are insufficient to state

---

[1] *See* DGA Basic Agreement Side Letter 15 (RJN, Ex. 3)

a claim for a violation of section 1 of the Sherman Act.  *PharmaRX Pharm., Inc. v. GE Healthcare, Inc.*, 596 Fed. Appx. 580, 580-81 (9th Cir. 2015) (citing *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 665 (9th Cir. 2009)).  Second, VidAngel's allegations that they have been advised by several potential business partners that no agreement would be possible without director or DGA approval, are either implausible or are contradicted by evidence in the record.

VidAngel makes two primary allegations in support of their contention that the DGA agreement has been "understood and enforced" as prohibiting filtering.  First, VidAngel alleges that non-party Lionsgate Entertainment, Inc. advised VidAngel that in order to enter into a licensing agreement to stream filtered movies, VidAngel would first need to obtain the permission of the DGA.  However, there is no indication that Lionsgate's position stems from the DGA Agreement.  In fact, the explicit language of section 7-509 does not prohibit filtering, nor provide that DGA approval is required in order to edit or filter a movie.  Therefore, the Court finds the inference that Lionsgate's requirement of DGA approval stems from section 7-509 implausible.  In fact, VidAngel itself asserts that major motion picture studios and directors have historically been hostile to any alterations made to a director's final cut.  (FACC, ¶ 20).  Plaintiffs argue that this evidences an independent motivation for each studio to not allow their movies to be filtered.  (Mot. at 15-16).  It is inherently clear that movie directors are integral to a studio's production of motion pictures.  Therefore, the Court finds it plausible that a movie studio such as Lionsgate might independently employ a rational business strategy that would require DGA approval before entering into a licensing agreement which might upset directors.  VidAngel argues the Court cannot choose between competing inferences at this stage of the proceedings.  VidAngel cites *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), for the proposition that "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, ***both of which are plausible***, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."  *Id.* (emphasis added).  Given the fact that Defendant's inference is unsupported by the plain language of the DGA agreement, the Court finds it implausible.  Moreover, "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008).  Lionsgate is not a party to this action, and there is no indication that Plaintiffs share Lionsgate's position with regard

to DGA approval.  The Supreme Court in *Twombly* emphasized the "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement." *Twombly* 550 U.S. at 557.  VidAngel's allegation with regard to non-party Lionsgate does not plausibly suggest that Plaintiffs are a party to a conspiracy to prohibit filtering, or that this conspiracy stems from the DGA agreement.

VidAngel also alleges that Google representative Mark Fleming informed VidAngel that Google was concerned that a "blocker" to a potential licensing deal was that "the directors won't let this happen" and that the studios' "existing deals with the production companies/directors/etc. may not allow for it and therefore those [contracts] will need to get renegotiated first."  (FACC, ¶ 24).  VidAngel misrepresents these statements which were contained in an email dated December 15, 2014.  In the email Fleming is responding to specific questions set forth in a December 11, 2014 email from VidAngel CEO Neal Harmon.  In response to Harmon's question about whether Google's licensing would allow them to partner with VidAngel, Fleming responds, "I need to work w/ our legal and biz dev teams to see if there's any language in our current contracts that may block this."  (RJN, Ex. 4).  Fleming further states that he will receive this information "after our initial pitch, at which point they review our deals to see if any terms exist to halt this."   Harmon also asked Fleming to speculate whether the studios would "redo the Google Play licensing" to permit them to license VidAngel, if there was indeed a current block to such an agreement.  (*Id.*)  Fleming replies "If there is a block on this w/ the current contracts" they would need to get "an amendment to allow it."  He also states that "it can get a bit more complicated" and the studios "existing deals with production companies/directors/etc. may not allow for it" and thus would "need to get renegotiated first."  He ends his answer with "hopefully this isn't the case."  Contrary to VidAngel's contention that Fleming expressed concerns that there were "blockers" to a potential deal, Fleming did not purport to know whether there were any "blockers" and only addressed that issue in response to specific questions in Harmon's email.

VidAngel alleges that several months later Harmon met with executives from non-party Sony in order to discuss the option of partnering with VidAngel.  (FACC, ¶ 52).  After the meeting, Fleming allegedly told VidAngel that the MPAA studios and Sony refused to allow Google to partner with VidAngel.  (*Id.*)  Non-party Sony's alleged refusal to allow Google to partner with VidAngel does not lead to the

plausible inference that section 7-509 of the DGA Agreement, as "understood and enforced" by the parties thereto prohibits filtering.  As discussed above, the explicit language of 7-509 doesn't prohibit filtering, and Defendant's attempts to argue that there is a "secret term", or private understanding of the publically available DGA Agreement is unavailing.  Additionally, Plaintiffs persuasively argue that it is plausible to infer that studios have an independent motivation not to allow filtering due to the fact that directors have historically been hostile to such changes to motion pictures.  VidAngel does not allege that either Sony or Fleming stated that the basis of Sony's refusal was the DGA Agreement or some other unstated agreement between the studios.

Defendant's allegation that Fleming informed them that "the rest of the MPAA member studios refused to allow Google to partner with VidAngel" is also insufficient.  "To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin."  *Kendall* 518 F.3d at 1042 (citing *Twombly*, 550 U.S. at 565 n.10).  VidAngel only alleges that executives of non-plaintiff Sony were present at the meeting with Fleming.  There is no allegation that any other MPAA studios were present, nor is there any indication which of the studios, if any, communicated with Fleming.  Based on the lack of necessary detail with regard to this allegation, the Court cannot find that Fleming's statement supports a plausible inference that the Plaintiff studios conspired to prohibit a partnership between Google and Vidangel, or to prohibit the licensing of filtering in general.  In a footnote on page 5 of their opposition, VidAngel argues that *Kendall* doesn't impose a heightened pleading standard in antitrust claims, and also doesn't apply in cases where discovery has not been conducted.  However, the court in *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins.Co.*, 166 F. Supp. 3d 988 (N.D. Cal. 2015) rejected an identical argument, in part due to the Ninth Circuit's statement that the *Kendall* decision specifically "concern[ed] the pleading requirements to state a claim for antitrust violations under Section 1 of the Sherman Act following the Supreme Court's recent pronouncement in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-66, 167 L. Ed. 2d 929 (May 21, 2007)."  *Id*. at 995 n.2 (citing *Kendall*, 518 F.3d at 1044).  While the Court in *Kendall* did allow discovery, nowhere in the decision do they state that this is required, and district courts in the Ninth Circuit have applied *Kendall* to cases at the pleading stage where no discovery has been conducted.

10.

*See generally PharmaRX Pharm., Inc.v. GE Healthcare, Inc.*, 596 Fed. Appx. 580 (9th Cir. 2015) *see also Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-CV-05847-WHO, 2013 WL 5694452, (N.D. Cal. Oct. 18, 2013).  All of VidAngel's allegations with regard to Plaintiff studios' understanding and implementation of section 7-509 of the DGA agreement suffer from the same lack of specificity, and thus do not meet the pleading requirements to state a claim for a violation of Section 1 of the Sherman Act.

VidAngel also alleges Plaintiffs have engaged in other coordinated exclusionary conduct that constitutes a concerted refusal to deal.  (Oppo. at 12).  Specifically, VidAngel alleges that Plaintiff studios have uniformly: (1) rejected VidAngel's attempts to obtain licensing agreements; (2) refused to sell VidAngel DVDs directly without the use of an intermediate wholesaler; (3) declined VidAngel's offers to negotiate a mutually agreeable solution concerning the studios' copyright concerns; and (4) prevented distributors and third-party services from using VidAngel's services by including the restrictive anti-filtering terms of the DGA Agreement into distribution agreements and by threatening or coercing parties not to do business with VidAngel.  (*Id.*)  VidAngel argues that these actions all run counter to each Plaintiff's economic self-interest and were undertaken in furtherance of their conspiracy to eliminate filtering.  (*Id*. at 2).

With regard to Plaintiffs' refusal to negotiate a licensing agreement, VidAngel contends that absent an agreement to eliminate filtering, Plaintiffs would not each reject negotiating a licensing agreement with VidAngel because such an agreement would provide additional revenue and could expand their motion picture and television audiences.  (*Id. at* 12).  However Plaintiffs contend, and VidAngel does not dispute, that VidAngel first approached Plaintiffs to negotiate a license after litigation was initiated in this action. (Mot. at 15).   Moreover, Plaintiffs assert that VidAngel attempted to negotiate with Plaintiffs jointly, and was not rebuffed by "each" individual Plaintiff as the countercomplaint seems to suggest.  (*Id*. at 16).  Plaintiffs' refusal to engage in joint licensing discussions with a company that they allege is operating an infringing service is a rational business decision and does not support a plausible inference of an agreement to eliminate filtering.

VidAngel also argues that Plaintiffs' refusal to sell them DVDs runs counter to Plaintiff's economic self-interest because Plaintiffs could eliminate payments to intermediate retailers by selling directly to VidAngel.  (FACC, ¶ 41.)  However, in paragraph 77 of their countercomplaint, VidAngel states that the studios have economic motives "to subvert VidAngel's business because VidAngel's DVDs are re-sold and streamed to a new customer an average of 16 times each in the first four weeks of the new release" and Plaintiffs "do not receive a profit from each instance a title is re-sold and streamed" on VidAngel's website.  (FACC, ¶ 77.)   VidAngel seemingly concedes that Plaintiffs have rational economic motives not to deal with VidAngel.  While Plaintiffs might reap some profit by avoiding intermediate retailers, the evidence in the record shows that VidAngel would buy and resell these discs to multiple customers in short time frames.  VidAngel would likely contend that these customers would not otherwise buy the unfiltered DVD's from Plaintiffs, however there is no indication that Plaintiffs shared this belief.  Thus, Plaintiffs could reasonably contend that the sale of DVDs to VidAngel might ultimately be detrimental to their economic interests, and their refusal to sell to VidAngel could constitute rational independent business behavior.  Moreover, as described above, the fact that directors oppose filtering could also be a legitimate business reason for Plaintiff studios' refusal to do business with VidAngel.  Because all of the aforementioned allegations could just as easily constitute rational, legal business behavior as they could suggest an illegal agreement, they are insufficient to plead a violation of section 1 of the Sherman Act.

VidAngel finally argues that Plaintiffs induced a group boycott of VidAngel's services by distributors and third-party services by injecting the restrictive anti-filtering terms of the DGA Agreement into distribution agreements and by threatening or otherwise coercing third parties not to do business with VidAngel.  The Court will later address the distribution agreements in relation to VidAngel's allegations of vertical conspiracies.  VidAngel specifically alleges that the studios "induced and persuaded other major digital content distributors (*e.g.*, Google Play, Netflix, Amazon, and Hulu) to refuse to support VidAngel's online filtering service."  (FACC, ¶ 47.)  As discussed above, VidAngel's lack of specific details renders this allegation insufficient under *Kendall*.  VidAngel does not allege which Plaintiffs engaged in this action, when it occurred, nor do they allege that they ever sought to partner with Netflix, Amazon, or Hulu.  VidAngel also fails to specify what these distributors did

that constituted a refusal to support VidAngel.  VidAngel's only specific allegations are with regard to their efforts to work with Google.  Specifically VidAngel alleges that: (1) on December 5, 2013, VidAngel received a notice from YouTube's legal department which stated that VidAngel's content filtering violated YouTube's terms of use (FACC, ¶ 47); and (2) in February 2014, Google removed technology from Chromecast that enabled Plaintiff's filtering technology to work with the Chromecast Device (*Id.*, ¶ 45).  VidAngel alleges that the Plaintiffs conspired to pressure Google to take these actions.  However, VidAngel does not offer any facts that would render this allegation plausible.  VidAngel does not allege or otherwise offer evidence that Plaintiffs were aware of their service prior to VidAngel's letter to general counsel for each Plaintiff in July 2015.  VidAngel states that the letters introduced VidAngel's business model and invited the Plaintiffs to meet and discuss the distribution of content for filtering pursuant to the Family Movie Act.  (*Id.*, ¶ 70).  Moreover, VidAngel CEO Neal Harmon's email correspondence with Mark Fleming of Google contradicts VidAngel's allegations.  The email correspondence occurred in December 2014, several months after VidAngel alleges that Plaintiffs pressured Google to remove support for VidAngel.  At the time of the email correspondence, Fleming stated that he had been talking about VidAngel's filtering service to the internal teams at Google and had gotten a fairly positive response.  (RJN, Ex 4).  Harmon also stated that he did not know whether Google's licensing agreements or the MPAA studios' agreements would prohibit Google from partnering with VidAngel.  (*Id.*)  These statements are inconsistent with Google having been pressured by the MPAA studios to remove support for VidAngel just months earlier.  VidAngel's failure to allege facts in support of their assertion that Plaintiffs pressured Google to withdraw its support is fatal to its claims.  "It is not enough merely to include conclusory allegations that certain actions were the result of a conspiracy; the plaintiff must allege facts that make the conclusion plausible."  *See Kendall* 518 F.3d at 1047-48.

The aforementioned allegations are either insufficient pursuant to *Kendall*, or contradicted by evidence which is properly subject to judicial notice.  For the foregoing reasons, the Court finds that VidAngel has not sufficiently alleged that Plaintiffs were party to a horizontal conspiracy to prohibit filtering in violation of Section 1 of the Sherman Act.

1

2            **ii.  Whether VidAngel has plausibly alleged a vertical conspiracy.**

3        VidAngel's vertical conspiracy claims are based on their allegation that each

4    Plaintiff's license agreements with its licensees violate antitrust law.  Defendants

5    contend, and Plaintiffs acknowledge that non-price, vertical restraints, like the

     licensing agreements at issue, are analyzed under the rule of reason.[2]  Under the rule

6    of reason, VidAngel must allege: "(1) a contract, combination or conspiracy among

7    two or more persons or distinct business entities; (2) by which the persons or entities

8    intended to harm or restrain trade or commerce among the several States, or with

9    foreign nations; (3) which actually injures competition."  *Brantley v. NBC Universal*

10   *Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  Additionally, "[i]n order to state a valid

     claim under the Sherman Act, a plaintiff must allege that the defendant has market

11   power within a 'relevant market.'  That is, the plaintiff must allege both that a

12   'relevant market' exists and that the defendant has power within that market."  *Newcal*

13   *Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008)

14       Market power may be demonstrated through either "direct evidence of the

15   injurious exercise of market power," or by "circumstantial evidence pertaining to the

     structure of the market."  *Top Rank, Inc. v. Haymon*, No. CV 15-4961-JFW (MRWx),

16   2015 U.S. Dist. LEXIS 164676, at *21-22 (C.D. Cal. Oct. 16, 2015) (citing *Rebel Oil*

17   *Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)).  "To demonstrate

18   market power circumstantially, a plaintiff must: (1) define the relevant market, (2)

19   show that the defendant owns a dominant share of that market, and (3) show that there

     are significant barriers to entry and show that existing competitors lack the capacity to

20   increase their output in the short run."  *Id.*  Finally, "[a]lthough market power need not

21   be pled with specificity, the allegations must be sufficiently detailed "to raise a right to

22   relief above the speculative level."  *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532

     F.3d 963, 973 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

23

24       VidAngel alleges that the individual Plaintiffs have the following respective

25   market shares: Fox - 14.1%; Warner Brothers - 16.5%; and Disney - 26.2%.  (FACC,

26   ¶ 85).  Courts generally hold that these individual market shares are insufficient as a

27   _____
     [2] Although VidAngel does not address the rule of reason in their opposition, Defense
28   conceded at oral argument that the vertical agreements at issue are analyzed under the
     rule of reason.

                                            14.

matter of law to confer market power. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26 & n.43 (1984) (30 percent market share insufficient); *Pilch v. French Hosp.*, No. CV 98-9470 CAS(CWX), 2000 WL 33223382, at *7 (C.D. Cal. Apr. 28, 2000) (33.2 percent market share insufficient). VidAngel argues that Plaintiffs' levels of market power may be aggregated with one another as well as the unnamed co-conspirator studios because they have combined to sign and enforce the DGA Agreement. (Oppo. at 18). However the cases they cite hold that "[t]he aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize." *Rebel Oil Co.*, 51 F.3d at 1437 (9th Cir. 1995); *see also United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1115–1122 (5th Cir. 1984). However, as discussed above, VidAngel has not sufficiently alleged that the Plaintiffs engaged in a horizontal conspiracy. Therefore, VidAngel's allegation that Plaintiffs own a dominant share fails as a matter of law, because each individual Plaintiff's market share is insufficient to confer market power. Due to their failure to show that Plaintiffs have market power, VidAngel's allegations that Plaintiffs engaged in a vertical conspiracy also fail as a matter of law.

### b. VidAngel's Claim for Intentional Interference with Prospective Economic Advantage (Second Counterclaim)

In order to state a claim for intentional interference with prospective economic advantage, VidAngel must allege "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *See CRST Van Expedited, Inc. v. Werner Enters., Inc*, 479 F.3d 1099, 1108 (9th Cir. 2007). Plaintiffs argue that VidAngel fails to allege that Plaintiffs interfered with an existing economic relationship that was "reasonably probable" to result in an economic benefit to VidAngel. (Mot at 21). In *Pardi v. Kaiser Permanente Hosp., Inc.,* 389 F.3d 840, 852 (9th Cir. 2004), the Ninth Circuit held that a mere "speculative expectation that a potentially beneficial relationship will arise" is insufficient to demonstrate an economic relationship between the plaintiff and some third party." Moreover, the Court finds that VidAngel only engaged in preliminary discussions with Google as evidenced by the communications with Mark Fleming.

1
2
3
4
5

Allegations of "preliminary discussions . . .concern[ing] only the possibility of a licens[e] agreement" are insufficient to state a tortious interference claim. *Cal. Expanded Metal Prods. Co. v. ClarkWestern Dietrich Bldg. Sys. LLC*, No. CV 12-10791 DDP (MRWx), 2014 WL 5475214, at *4 (C.D. Cal. Oct. 29, 2014)(citing *Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 243, 26 Cal. Rptr. 3d 798 (2005)).

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

VidAngel also alleges that they have developed advantageous prospective business and economic relationships with business partners to expand VidAngel's business, visibility and availability to consumers, and that these relationships promise a continuing probability of future economic benefit to VidAngel. (FACC, ¶ 104). VidAngel contends that Plaintiffs knew, or reasonably should have known, of the existence of those prospective economic advantages. (*Id.*) This is a conclusory allegation that merely recites the elements of an intentional interference claim. The California Supreme Court in *Youst v. Longo*, 43 Cal. 3d 64, 71, 233 Cal. Rptr. 294, 298, 729 P.2d 728, 733 (1987) held that "as a matter of law, a threshold causation requirement exists for maintaining a cause of action for [intentional interference with prospective economic advantage], namely, proof that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference." *Id.* (emphasis in original). VidAngel falls woefully short of this threshold by simply alleging the existence of advantageous prospective economic relationship with unidentified partners. Moreover, there are no factual allegations which would permit the Court to determine whether it is reasonably probable that these relationships would have resulted in an economic benefit to VidAngel. Finally, as discussed above, the Court finds that VidAngel's allegation that Plaintiffs pressured Google to remove their support for VidAngel is contradicted by the email correspondence with Mark Fleming, as well as VidAngel's other allegations which tend to show that Plaintiffs became aware of VidAngel's service in July 2015, well after the alleged claims of interference. For the foregoing reasons, the Court finds that VidAngel does not sufficiently plead a claim for intentional interference with prospective economic advantage.

26
27
28

1

2

### c. VidAngel's UCL Claims (Third Counterclaim)

3

4

California's Unfair Competition Law ("UCL"), prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. VidAngel asserts that Plaintiffs' alleged anticompetitive actions constitute both "unlawful" and "unfair" conduct for the purposes of the UCL. (FACC, ¶¶ 112-115). "Under its "unlawful" prong, 'the UCL borrows violations of other laws … and makes those unlawful practices actionable under the UCL.'" *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554, 62 Cal. Rptr. 3d 177, 185 (2007) (quoting *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505, 82 Cal. Rptr. 2d 368 (1999)). "Thus, a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." *Id.* VidAngel's claim under the "unlawful" prong is premised on VidAngel's allegations that Plaintiffs' violated section 1 of the Sherman Act. Since VidAngel fails to sufficiently allege antitrust claims, their UCL claim under the "unlawful" prong fails as well.

5

6

7

8

9

10

11

12

13

14

Likewise, VidAngel's claim under the "unfair" prong of the UCL is also premised on their antitrust allegations. "Where the same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition." *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557–58 (9th Cir. 2008); see also *Carter v. Variflex, Inc.*, 101 F. Supp. 2d 1261, 1270 (C.D. Cal. 2000) ("Thus, in light of the Court's findings under the Sherman Act, the Court finds that Variflex has failed to produce sufficient evidence to support its California unfair competition claim."); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375, 113 Cal. Rptr. 2d 175 (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason. . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."). Therefore VidAngel's claim under the "unfair" prong of the UCL fails along with its antitrust claims.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17.

1

2
### d.  VidAngel's Declaratory Relief Claims (Fourth through Seventh
3
###     Counterclaims)

4
In VidAngel's fourth through seventh claims for relief it seeks declarations that:
5
(1) its "current" system is legal; (2) VidAngel is entitled to decrypt Discs without
6
liability under the DMCA; (3) the FMA authorizes VidAngel's service; and (4) the
7
FMA relieves VidAngel of the obligation to get licenses to stream Plaintiffs'
8
copyrighted works.  The exercise of jurisdiction under the Federal Declaratory
9
Judgment Act, 28 U.S.C. § 2201(a), is committed to the sound discretion of the
10
federal district courts.  *Huth v. Hartford Ins. Co.*, 298 F.3d 800, 802 (9th Cir. 2002)
(Citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-83, 132 L. Ed. 2d 214, 115 S. Ct.
11
2137 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494-95, 86 L. Ed.
12
1620, 62 S. Ct. 1173 (1942); *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1223
13
(9th Cir. 1998) (en banc)).  Therefore, even if the district court has subject matter
jurisdiction, "the district court must also be satisfied that entertaining the action is
14
appropriate.  This determination is discretionary, for the Declaratory Judgment Act is
15
'deliberately cast in terms of permissive, rather than mandatory, authority.'"  *Dizol*,
16
133 F.3d at 1223 (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237,
250, 97 L. Ed. 291, 73 S. Ct. 236 (1952)).  Among the reasons for which a court may
17
properly decline to hear a claim for declaratory relief are: "avoid[ing] needless
18
determination of state law issues… discourag[ing] litigants from filing declaratory
19
actions as a means of forum shopping; and avoid[ing] duplicative litigation." *Huth*,
298 F. 3d at 803.

20
Each of the issues that VidAngel raises in its claims for declaratory relief will
21
be decided through Plaintiff's claims in this action or Defendants affirmative defenses
22
thereto.  Because this would amount to duplicative litigation, the Court, in its
23
discretion, denies VidAngel's fourth through seventh claims for declaratory relief.

24
### e.  <u>VidAngel's Copyright Misuse Defense</u>
25

26
Plaintiffs move to strike VidAngel's seventeenth affirmative defense of copyright
misuse.  Under Federal Rule of Civil Procedure 12(f), a district court may strike from
27
the pleadings "an insufficient defense or any redundant, immaterial, impertinent, or
28

scandalous matter."  Copyright misuse is an affirmative defense to copyright infringement.  *Apple, Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011).  The purpose of the copyright misuse defense is to "prevent[] holders of copyrights 'from leveraging their limited monopoly to allow them control of areas outside the monopoly.'" *Id*. (quoting A&M Records v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001)).

In *Triad Sys.Corp. v. Se. Express Co*., 64 F.3d 1330, 1337 (9th Cir. 1995), the Ninth Circuit adopted the Fourth Circuit's view that copyright misuse involves restraining development of competing products.  The Ninth Circuit has only upheld the copyright misuse defense in one case, *Practice Mgmt. Info. Corp. v. AMA*, 121 F.3d 516 (9th Cir. 1997).  There, the copyright licensor prevented licensees from using any competitor's product.  VidAngel has not alleged that Plaintiffs' licensing agreements prevent licensees from using competing products.  Rather VidAngel alleges that Planitiffs license film content only on the express written condition that the licensee not filter.  (FACC, ¶ 28).  The allegations here are analogous to those in *A&M Records v. Napster, Inc*., 239 F.3d 1004 (9th Cir. 2001).  In *Napster* the Ninth Circuit upheld a district court's rejection of a copyright misuse defense where plaintiffs' licensing agreements merely sought to control reproduction and distribution of their copyrighted works.  *Id*. at 1026.  The *Napster* Court held that the exclusive rights of copyright holders "include the right, within broad limits, to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable." *Id*.  (quoting *UMG Recordings, Inc. v. MP3. com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y.).  VidAngel does not allege facts showing that Plaintiffs licensing agreements improperly extended their rights pursuant to the Copyright Act to control an area outside of the Plaintiffs' copyrighted works.  Although VidAngel alleges that Plaintiffs sought to eliminate filtering, this is not the proper subject of a copyright misuse claim.  VidAngel has not, and cannot allege that their filtering service is "a competing product" to Plaintiffs' movie production studios.  Moreover, VidAngel seeks to use Plaintiffs' copyrighted works in conjunction with its filtering service, and therefore, this case does not implicate an "area outside the monopoly" conferred by Plaintiffs registered copyrights.  Based on the foregoing, the Defendant has not adequately plead copyright misuse.  Therefore, the Court strikes this affirmative defense.

1

## V.    CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Plaintiff's Motion to Dismiss Defendant's First Amended Counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6).  Additionally, the Court hereby **STRIKES** VidAngel's copyright misuse defense pursuant to Federal Rule of Civil Procedure 12(f).  Because VidAngel has previously amended its counterclaim, and there is no indication in the record or the pleadings that VidAngel can identify additional facts to support its claims, the Court hereby **DISMISSES** VidAngel's Counterclaims **WITHOUT** leave to amend.

**IT IS SO ORDERED.**

Dated:  August 10, 2017       _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE