UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISNEY ENTERPRISES, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VIDANGEL, INC.,<br><br>Defendant. | Case No. CV 16-04109 AB (PLAx)<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY** |

Before the Court is a Motion for Summary Judgment on Liability ("Motion," Dkt. No. 248) filed by Plaintiffs Disney Enterprises, Inc., Lucasfilm Ltd. LLC, Twentieth Century Fox Film Corporation, and Warner Bros. Entertainment Inc. ("Plaintiffs"). Defendant VidAngel, Inc. ("VidAngel") filed an opposition and Plaintiffs filed a reply. The Court heard oral argument on January 18, 2019. For the following reasons, the Motion is **GRANTED**.

I.  **BACKGROUND**

This Order assumes familiarity with the Court's Order Granting Plaintiffs' Motion for a Preliminary Injunction and the Ninth Circuit's Opinion affirming it. *See Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 964 (C.D. Cal. 2016) ("*Disney I*" or "PI Order"), *aff'd*, 869 F.3d 848 (9th Cir. 2017) ("*Disney II*").

1.

Plaintiffs produce and distribute copyrighted motion pictures and television shows. VidAngel offers a number of Plaintiffs' movies and television shows for video-on-demand streaming to its customers. VidAngel's service allows customers to apply filters to the works so that objectionable content—such as nudity or violence—is omitted, resulting a filtered stream. At issue in this action is VidAngel's streaming service based on DVDs and Blu-ray discs ("discs"). This service is described in detail in the PI Order, and, in relevant part, as follows by the Ninth Circuit[1]:

> [VidAngel] purchases multiple authorized [discs] for each title it offers . . . VidAngel uses AnyDVD HD, a software program, to decrypt one disc for each title, removing the CSS, AACS, and BD+ TPMs on the disc, and then uploads the digital copy to a computer.[] Or, to use VidAngel's terminology, the "[m]ovie is ripped from Blu–Ray to the gold master file." After decryption, VidAngel creates "intermediate" files, converting them to HTTP Live Streaming format and breaking them into segments that can be tagged for over 80 categories of inappropriate content. Once tagged, the segments are encrypted and stored in cloud servers.
>
> Customers "purchase" a specific physical disc from VidAngel's inventory for $20. The selected disc is removed from VidAngel's inventory and "ownership" is transferred to the customer's unique user ID. However, VidAngel retains possession of the physical disc "on behalf of the purchasers," with the exception of the isolated cases in which the consumer asks for the disc. To date, VidAngel has shipped only four

---

[1] VidAngel does not materially or genuinely dispute this description of its service. VidAngel's submitted a declaration from its VP of research and innovation elaborating on its process, *see* McDonald Decl. (Dkt. Nol 256), but this additional information does not materially challenge the Ninth Circuit's description. To the extent McDonald's declaration purports to dispute whether VidAngel copies the Works, that dispute is not genuine for the reasons discussed herein. As such, the Court will treat the facts stated in the Ninth Circuit's description as undisputed.

discs to purchasers.

After purchasing a disc, a customer selects at least one type of objectionable content to be filtered out of the work. VidAngel then streams the filtered work to that customer on "any VidAngel-supported device, including Roku, Apple TV, Smart TV, Amazon Fire TV, Android, Chromecast, iPad/iPhone and desktop or laptop computers." The work is streamed from the filtered segments stored in cloud servers, not from the original discs. Filtered visual segments are "skipped and never streamed to the user." If the customer desires that only audio content be filtered, VidAngel creates and streams an altered segment that mutes the audio content while leaving the visual content unchanged. VidAngel discards the filtered segments after the customer views them.

After viewing the work, a customer can sell the disc "back to VidAngel for a partial credit of the $20 purchase price," less $1 per night for standard definition purchases or $2 per night for high-definition purchases. VidAngel accordingly markets itself as a $1 streaming service. After a disc is sold back to VidAngel, the customer's access to that title is terminated.[] Virtually all (99.6%) of VidAngel's customers sell back their titles, on average within five hours, and VidAngel's discs are "re-sold and streamed to a new customer an average of 16 times each in the first four weeks" of a title's release.

*Disney II*, 869 F.3d at 853–54.

Plaintiffs sued VidAngel for copyright infringement, contending that VidAngel's streaming service copies and publicly performs their copyrighted works without authorization. *See* First Am. Compl ("FAC," Dkt. No. 64-72.)[2] Plaintiffs also

---

[2] When the Court entered its preliminary injunction order, the original Complaint was operative. However, the FAC simply added additional plaintiffs. The conduct alleged in both complaints is the same.

3.

assert that VidAngel violates the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201, *et seq.*, by circumventing technological protection measures ("TPM") on discs that contain Plaintiffs' works. FAC ¶¶ 73-81.

In the PI Order, the Court found that Plaintiffs showed a likelihood of success on the merits of their claims. First, the Court found that VidAngel circumvented Plaintiffs' TPMs by using software to allow read-access to the discs and upload files onto a computer, an unlawful practice referred to as "space-shifting." The Court also rejected VidAngel's defense under the Family Movie Act of 2005 ("FMA"), 17 U.S.C. § 110(11), finding that the FMA does not establish an exemption to the DMCA's anti-circumvention provision. Second, the Court found that VidAngel violated Plaintiffs' exclusive rights to copy and publicly perform their works, and rejected VidAngel's defenses, holding that the FMA did not apply because VidAngel's filtered transmissions were not from a "authorized copies" of the works as required for protection under the FMA, and that VidAngel was not likely to succeed on the merits of its fair use defense. The Ninth Circuit affirmed.

Plaintiffs now move for summary judgment on the issue of liability as to four works that they say are representative of all works in issue. They argue that this Court and the Ninth Circuit already determined that Plaintiffs established at least a prima facie case of liability and that VidAngel's defenses were without merit, and they contend that VidAngel simply cannot raise triable issues to overcome those rulings. VidAngel responds that new facts developed since the preliminary injunction litigation give rise to triable issues and preclude summary judgment.

Upon review of the record, the Court finds that there are no triable issues of material fact because VidAngel either admitted all of the material facts, or its purported factual disputes are not genuine. In addition, VidAngel cannot avoid the questions of law that this Court and the Ninth Circuit resolved against it. Thus, Plaintiffs are entitled to summary adjudication that VidAngel is liable for copyright infringement and for violating the DMCA.

## II. UNDISPUTED FACTS

The undisputed material facts, taken from Plaintiffs' Separate Statement and VidAngel's Response thereto ("SUF," Dkt. No. 254), are as follows.[3]

Plaintiffs have valid copyright registrations, registered within five years of first publication, for each of the four representative works (*Frozen*, *Star Wars: The Force Awakens*, *Ice Age*, and *Harry Potter and the Sorcerer's Stone*) ("Works"). SUF 1.

Plaintiffs have not authorized VidAngel to copy or stream (or otherwise exploit) their Works or to bypass or remove (or otherwise circumvent) the technological protection measures ("TPMs") that control access to their copyrighted works on DVDs or Blu-ray discs ("Discs"). SUF 2.

VidAngel has offered each of the Works on its service. SUF 3.

Plaintiffs use CSS, AACS and BD+ to control access to their copyrighted works on Discs. SUF 4.

CSS, AACS and BD+ are TPMs that control access to copyrighted works on Discs. SUF 5.

VidAngel circumvents Plaintiffs' TPMs by using "a commercially available software program to automatically allow read-access for the purpose of mounting the DVD [and Blu-ray] files for uploading onto a computer, in the process removing restrictions on DVD [and Blu-ray] encryption." SUF 6.

VidAngel copies the underlying digital files onto its computers. SUF 7; *see also* McDonald Decl. ¶¶ 13, 18, 19, 21, 22, 23, 25.

VidAngel stores "master" ripped digital copies of Plaintiffs' works to servers, from which it streams filtered content to its customers. SUF 8.

VidAngel's purpose is to bring "popular movies and shows" to viewers who may want to watch that work without certain "objectionable" content. SUF 9.

---

[3] VidAngel offered 30 additional facts but they are immaterial, argumentative, conclusory, or not supported by the evidence, and thus do not preclude summary judgment in Plaintiffs' favor.

VidAngel's service is commercial. SUF 10.

## III. LEGAL STANDARD

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id*. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson,* 477 U.S. at 255). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

## IV. DISCUSSION

### A. VidAngel Violated the DMCA's Anti-Circumvention Provision.

Section 1201(a)(1)(A) of the DMCA provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work

protected under this title." A technological measure effectively controls access to a copyrighted work if "the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B).

To prevail on their circumvention claim, Plaintiffs must prove that (1) they employ "technological measure[s] that effectively control[] access to a work protected" by copyright; and (2) VidAngel "circumvent[s]" those measures. 17 U.S.C. § 1201(a)(1)(A).

VidAngel admits that the protection measures Plaintiffs use—CSS, AACS and BD+—"are encryption access controls" under the DMCA. VidAngel also admits that it circumvents Plaintiffs' TPMs by "'us[ing] software to decrypt'" those controls. These facts were established at the time of the PI Order and the appeal thereof, and VidAngel expressly admits them in its response to Plaintiffs' SUF. *See* SUF ¶¶ 4-6. It is therefore undisputed that VidAngel has violated the DMCA.

VidAngel advances several arguments to evade liability, but they are unavailing. First, VidAngel argues that because it uses third-party decryption software, rather than writing its own, it is like any other person who legitimately views a work using an authorized disc player, and that the third-party is responsible for deciding to use unauthorized decryption. But these arguments were previously rejected. VidAngel does not claim that the third-party software that it uses (AnyDVD HD) to circumvent Plaintiffs' TPMs is *authorized* by Plaintiffs or the licensing organizations of CSS, AACS and BD+ to access the works. Thus, the Ninth Circuit's observation that VidAngel "was never given the 'keys' to the discs' contents—only authorized players get those keys" remains undisturbed. *Disney II*, 869 F.3d at 864–65. Accordingly, "VidAngel's decision to use other software to decrypt the TPMs to obtain a digital copy of the disc's movie thus is exactly like 'breaking into a locked room in order to obtain a copy of a [movie].' [] Nothing in the legislative history suggests that VidAngel did not circumvent an access control simply because there are

authorized ways to access the Studios' works." *Id*. VidAngel also quibbles with Plaintiffs' previous characterization of its conduct as "remov[ing]" the encryption, when in fact the TPMs remain in place and are never removed in VidAngel's process. *See* Opp'n 8:5-9. First, VidAngel itself has described its process as "removing" encryption. *See, e.g.,* Am. Counter-Compl. (Dkt. No. 77) ¶ 120(b) ("VidAngel uses a commercially available software program to automatically allow read-access for the purpose of mounting the DVD files for uploading onto a computer, in the process ***removing*** restrictions on DVD encryption") (emphasis added). It appears that VidAngel is actually saying it only *temporarily* removes the encryption, and that the contents of the discs are not changed, but this is a distinction without a difference under the DMCA. The DMCA prohibits "circumvention" of TPMs, conduct that VidAngel expressly admits it engages in. *See* Response to SUF 6 (responding "undisputed" to fact that "VidAngel circumvents Plaintiffs' TPMs . . ."). Plaintiffs have therefore established their prima facie case that VidAngel has circumvented their TPMs in violation of the DMCA.

### 1. VidAngel Has Not Raised a Triable Issue as to Its Fair Use and First Amendment Defenses to Its DMCA Violations.

VidAngel asserts a fair use defense to liability for circumvention, but that defense does not apply to this DMCA violation. The fair use defense, 17 U.S.C. § 107, provides that certain uses of a work are not copyright infringement in violation of § 106 and § 106A. The DMCA's prohibition of circumvention is in § 1201. Therefore, circumvention is not among the violations to which the fair use defense applies. This makes sense, as "§ 1201(a) creates a new anti-circumvention right distinct from the traditional exclusive rights of a copyright owner." *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 950 (9th Cir. 2010). The DMCA only "targets the circumvention of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the *use* of those materials after circumvention has occurred." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429,

443 (2d Cir. 2001). Thus, neither the text of § 107 nor the nature of the conduct targeted by the DMCA (circumvention) supports applying the fair use defense to a DMCA violation.

VidAngel also argues that its circumvention conduct is protected by the First Amendment because it circumvents in order to pursue its expressive interests and to build a community of like-minded subscribers. *See* Opp'n 10:5-11:1. VidAngel's theory is poorly developed and depends on a string of attenuated propositions. While VidAngel is correct that its "computer code, and computer programs constructed from code can merit First Amendment protection," *Corley*, 273 F.3d at 449, it does not follow that everything VidAngel does with that code is also protected. Section 1201(a) regulates conduct—the circumvention of TPMs—and not expression—the use to which a person puts TPM-protected works—so § 1201 does not appear to tread on expressive or associative rights. Finally, VidAngel argues that the "basic problem" with § 1201 in the First Amendment context is that it "prohibits transformation of information from that property [the discs VidAngel lawfully acquired] into subsequent speech and new creativity, analysis, and cultural expression." Opp'n 10:24-27. But § 1201(a) does none of those things; it has nothing to say about the use (transformative or otherwise) to which a person puts TPM-protected materials, but only regulates circumvention of TPMs. Neither the constitution nor fair use "guarantee [] access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original." *Corley*, 273 F.3d at 459 (finding the DMCA's antitrafficking provisions don't violate the constitution or "impose even an arguable limitation" on fair use because a user is not entitled to "copy . . . by the fair user's preferred technique."). Accordingly, VidAngel's First Amendment defense has no merit.

Because Plaintiffs have shown that there is no triable issue as to its claim against VidAngel for circumvention in violation of the DMCA, and because VidAngel has not raised a triable issue as to any defense, Plaintiffs are entitled to summary adjudication of liability on this claim.

**B. VidAngel Is Liable For Copyright Infringement.**

To prevail on their copyright infringement claim, Plaintiffs must establish that (1) they own or control the exclusive rights at issue; and (2) VidAngel infringed at least one such exclusive right. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Plaintiffs assert that VidAngel has infringed two of its exclusive rights: the right "to reproduce the [Works] in copies," and the right "to perform the [Works] publicly." *See* 17 U.S.C. § 106(1), (4). It is undisputed that Plaintiffs own valid copyrights in the Works, SUF 1, so they have established the first element. VidAngel contends, however, that Plaintiffs cannot establish he second element because (1) it has not infringed on Plaintiffs' rights (a) to copy or (b) to publicly perform the Works; (2) its use of the Works is protected by the Family Movie Act; and (3) its use of the Works is fair use.

**1. VidAngel Copies Plaintiffs' Works.**

The Copyright Act grants Plaintiffs the exclusive right "to reproduce the [Works] in copies." 17 U.S.C. § 106(1). The Act defines "copies" as "material objects . . . in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. At the preliminary injunction stage, both this Court and the Ninth Circuit found that VidAngel copies works from the discs onto its computers and servers. Now, the Court finds that it is *undisputed* that VidAngel copied the Works. VidAngel argues otherwise, but it fails to raise any genuine dispute.

First, earlier in the litigation VidAngel repeatedly admitted that it "makes a copy of" or that it "copies" works. For example, VidAngel's founder, Neal Harmon, testified that VidAngel employees "make a copy" of the files from the disc, which VidAngel has called "intermediate copies." Harmon Depo. (Ehler Decl. Ex. EE, Dkt. No. 30-31) 58:1-4. VidAngel's general counsel stated that VidAngel "made temporary copies of each movie to permit their contents to be tagged . . . and had then uploaded

10.

encrypted copies of the tagged contents into the Cloud." Quinto Decl. (Dkt. No. 187-1) ¶ 2. And before the Ninth Circuit, VidAngel "concede[d] that it copies the Studios' works from discs onto a computer." *Disney II*, 869 F.3d at 856.

Second, in response to the undisputed fact that it copies, VidAngel strains to avoid using that the word "copy" in describing it filtering process, but describes conduct that amounts to copying, and ultimately ends up using the word "copy." Specifically, VidAngel asserts that it "used a software program to extract the subtitle/caption data files and then created temporary ('locally cached') Matroska files of the feature films" and "stored a single encrypted *copy* at each of four bitrates in the Cloud." SUF 7 (emphasis added). *See also* VidAngel Am. Counter-Compl. (Dkt. No., 77) ¶ 120(c). Thus, VidAngel even now admits that it extracts data files from which is creates "locally cached" files, i.e., copies, and then stores a "single encrypted copy." This is copying. *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) ("transferring digital files 'from a permanent storage device to a computer's RAM' is 'copying' under § 106").

Third, VidAngel argues that new facts show that it does not copy any of the pre-existing files on the discs, but that it uses a player to "view the digital data on the disc, and then rendered and saved a newly created digital file on its own storage location." Opp'n 11:17-19. VidAngel argues that this process creates a "separate and new rendition, unique and distinct from the digital files on the" discs. Opp'n 11:19-21. Although VidAngel uses the words "render" and "rendition" instead of "copy," the conduct is describes is in fact *copying* the Works: the "rendition" of the Works saved on VidAngel's "storage location" (i.e., a computer) is a "material object[] . . . in which a work is fixed . . . and from which the work can be perceived. . . ." 17 U.S.C. § 101. The declaration of VidAngel's senior engineer Jarom McDonald similarly tries to shield VidAngel from this conclusion by using the words "render" and "rendition" instead of "copy." *See* Jarom McDonald Decl. (Dkt. No. 256). But what McDonald describes is copying. For example, McDonald says that a VidAngel employee uses a

player to access the disc's data (*id.* ¶ 13), and from that access "construct[ed] audio and visual streams into a new single digital rendition of the motion picture" and stored it onto its "Filtering Preparation Workstation ('FPW'), which is a computer located in VidAngel's secure headquarters facility." *Id.* ¶18. Again, this describes a process by which VidAngel copies the Works. Indeed, in the very next paragraph, even McDonald can't avoid describing this as resulting in a copy: "By this process, VidAngel obtained ownership of an authorized *copy* of the motion picture at issue, and from this authorized *copy*, created its digital filtering files and all subsequent processes." *Id.* ¶ 19 (emphasis added). McDonald describes several other elements of its filtering process, and they each involve copying the Works:

- VidAngel's employee would "extract, where present, subtitle files from the disc, and those files (the master rendition of the video and audio streams, along with the digital file of the subtitles) are jointly referred to as pre-filter files ('PF files')." *Id.* ¶ 21.
- The master rendition was generally remuxed [sic] (repackaged) during the process mentioned above, in the Matroska container format. . ." *Id.* ¶ 22.
- "VidAngel would then upload these pre-filter files to a secure storage bucket on a cloud storage service ('CSS'). . ." *Id.* ¶ 23.
- To prepare the PF files for tagging and filtering VidAngel, would "creat[e], from our master rendition, a low-fidelity [] digitally ready performance of the motion picture [and create] four Transport Stream files ('TS files') that were each a separate version of the master rendition." *Id.* ¶ 25.

Each of these steps involves "fixing" the work in "material objects" "from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. VidAngel therefore copied the Works. In sum, VidAngel has not presented any new material facts; instead, it has attempted to use new words—"render" and "rendition"—to describe the same conduct—copying. This does not raise a triable issue as to whether VidAngel

copied the Works, and the Court finds that there is no dispute that it did.

### 2. VidAngel Violated Plaintiffs' Public Performance Rights.

The Copyright Act grants Plaintiffs the exclusive right "to perform the [Works] publicly." *See* 17 U.S.C. § 106(4). To perform a work "publicly" means, as relevant, "to transmit or otherwise communicate a performance . . . of the work . . . to the public, by means of any device or process." 17 U.S.C. § 101 (definition of public performance). At the preliminary injunction stage, this Court found that when VidAngel streams (i.e., transmits) the Works to its customers, it performs them to members of the public. The Court now finds that it is undisputed that VidAngel publicly performs the Works. Again, VidAngel argues otherwise, but it fails to raise any genuine dispute.

At the preliminary injunction stage, VidAngel argued that its streaming service is just a private performance because its customers own the discs and therefore those customers have the right to have the content of those discs streamed to them. The Court rejected this argument on the ground that VidAngel was streaming from a master copy from its server, not from a disc actually owned by the customer. VidAngel again raises this argument, and the Court again rejects it, as it has presented no evidence to establish its claim. To the contrary, the McDonald Declaration establishes that VidAngel is not streaming directly from any discs, but instead from a master copy it has created and stored on a server. *See* McDonald Decl. ¶¶ 13-25.

VidAngel makes several convoluted arguments that all turn on its claimed distinction between a copy and a rendition, but as discussed above, the Court rejects this premise and it remains undisputed that VidAngel streams the Works from a master copy it stores on a server. VidAngel also argues that its streaming service is similar to the way any DVD player works, because in neither case is the viewer viewing the actual digital files, but instead a player assembles the files in a way that enables the work they store to be performed. The gravaman of this argument is not clear, but in any case, it does not raise a triable issue. First, it is a strawman argument:

of course a work stored to a disc cannot be perceived by "viewing" the disc's files directly; rather, a device must process the disc's files to result in a viewable performance. And second, that VidAngel's filtering process and ordinary disc players both, at some point, use a player to assemble those files does not detract from the fact that VidAngel *is also* making unauthorized master copies of those Works from which it then streams its filtered versions to customers. VidAngel has not pointed to any evidence that raises a triable issue of fact as to whether it infringes Plaintiffs' public performance rights, and the Court finds that it did.

### 3. VidAngel's Infringement Is Not Protected by the Family Movie Act.

"The FMA was designed to allow consumers to skip objectionable audio and video content in motion pictures without committing copyright infringement." *Disney II*, 869 F.3d at 857. To this end, the FMA establishes two exemptions from copyright infringement: (1) for "the making imperceptible . . . of limited portions . . . of a motion picture . . . for private home viewing, from an authorized copy of the motion picture," and (2) for "the creation or provision of a computer program or technology that enables for such making imperceptible . . . if no fixed copy of the altered version of the motion picture if created by such computer program or technology." This Court previously found that VidAngel's conduct was not within the scope of FMA protection because "the statute clearly requires that a performance of transmission of filtered content must come from an 'authorized copy' of the motion picture . . . [but] [the content] that VidAngel streams to its customers is not from an authorized copy. VidAngel streams from a digital copy that it acquires by circumventing [TPMs] on Plaintiff's DVDs in violation of § 1201(a) of the DMCA." *Disney I*, 224 F.Supp3d at 972. The Ninth Circuit affirmed, holding that "VidAngel does not stream from an authorized copy of the Studios' motion pictures; it streams from the 'master file' copy it created by 'ripping the movies from the discs after circumventing their TPPMs." *Disney II*, 869 F.3d at 860.

VidAngel again argues that new facts compel a different outcome, but again, it

14.

presents nothing new. VidAngel argues that its "master file" is created directly from an authorized copy—a disc—so therefore its service is protected. But the Ninth Circuit rejected this argument, stating that "virtually all piracy of movies originates in some way from a legitimate copy," and that VidAngel streams not from an authorized copy, but "from the 'master file' it created by 'ripping' the movies from discs after circumventing their TPMs." *Disney II*, 869 FG.3d at 860. VidAngel does not and cannot deny that it streams from its "ripped" master files. Accordingly, this ruling forecloses VidAngel's defense under the FMA, and VidAngel has failed to raise a triable issue as to this defense.[4]

### 4. VidAngel's Fair Use Defense Of Its Infringement Fails.

VidAngel argues that it is making "fair use" of the copyrighted works under 17 U.S.C. § 107, and is therefore not infringing them. Section 107 reads, in pertinent part, "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of a copyright." 17 U.S.C. § 107. Four factors govern whether a use of a copyrighted work is fair use:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work. *Id.*

---

[4] VidAngel also refers to this Court's and the Ninth Circuit's reference to the ClearPlay service, suggesting that those orders turned on a misunderstanding of ClearPlay. It suffices to say that the references to ClearPlay were tangential and both orders turned on the interpretation of the FMA.

This Court found that all of the factors weighed against fair use and that VidAngel was not likely to succeed on this defense; the Ninth Circuit affirmed. VidAngel seeks to revisit that analysis, arguing that there are "historical facts in dispute" that render summary judgment inappropriate and require a jury trial, and that the fair use factors are also jury question.

First, the "historical facts" that VidAngel says raise a triable issue—"(1) the history and origin of VidAngel's 'master' file; [and] 2) whether VidAngel's access to copyrighted material was authorized"—are not disputed. VidAngel points to no evidence raising any material issue as to either fact. As discussed above, VidAngels' McDonald explains the "history and origins" of the "master" file, and his account simply confirms that VidAngel makes this file by using a Player to access the Works on discs, from which it makes copies. And, also as discussed above, it is not genuinely disputed that VidAngel's copies are unauthorized.

Beyond raising these "historical facts," VidAngel seeks to revisit all of the fair use factors. This effort does not raise a triable issue. Although fair use depends on a multi-factor tests, it can nevertheless be adjudicated on summary judgment: "if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1115 (9th Cir. 2000) (deciding question of fair use on summary judgment). The Court will address each of the four factors in turn.

First, the "purpose and character" factor considers whether the work's purpose was for or not-for-profit and "to what extent the new work is transformative" and does not simply "supplant" the original work. *Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, 800 (9th Cir. 2003). VidAngel's use is commercial in nature—a fact that VidAngel expressly concedes. As the Ninth Circuit held, it follows that VidAngel's use is presumptively unfair. *Disney II*, 869 F.3d at 861 ("VidAngel concedes its use is

16.

commercial, and thus 'presumptively . . . unfair.'") (citation omitted). But VidAngel now contests this point, claiming that its use is nevertheless fair because when it purchases discs, it "pay[s] the customary price" for the rights it exercises. Opp'n 16:15-21 (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985)). But when VidAngel purchases the discs, it acquires the right to view the Works stored thereon using an authorized Player. VidAngel is instead circumventing the TPMs on those discs, making unauthorized copies, and publicly performing the Works—rights not conveyed by merely purchasing discs.

And, the character of VidAngel's use is not transformative. A use is transformative if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell v. Acuff-Rose Music Inc.*, 510 U.S. 569, 579 (1994). This Court previously found that VidAngel's use is not transformative because its "service does not add anything to Plaintiff's works. It simply omits portions that viewers find objectionable," and transmits them for the "same intrinsic entertainment value" as the originals. *Disney I*, 224 F. Supp. 3d at 973-974. The Ninth Circuit affirmed. None of VidAngel's counterarguments has merit. First, VidAngel points to the mechanics of how it processes the content ("tagging of 80 types of content" and "making [] 1,300 fragments stored in the court or streaming," Opp'n 17:4-15) as being transformative, but does not explain how these back-office processes establish that the streamed content is transformed. It remains undisputed that the content that VidAngel streams to its customers "does not add anything" to the Works and "simply omits portions that viewers find objectionable." VidAngel's CEO stated that its purpose is to offer popular movies to viewers who prefer to watch without certain objectionable content. In other words, VidAngel filters and streams for the same entertainment value inherent in the unaltered Works. VidAngel claims that its use is transformative because its service supports a "network or community of users who subscribe not just to a single movie, but to the expressive and associative purpose of VidAngel." Opp'n 17:25-18:3. But the fact that there is a

market for filtered movies does not render the filtering transformative. VidAngel offers neither authority nor compelling argument in support of this proposition. Finally, VidAngel points to a parody that one Plaintiff (Fox) made of its own movie and a scholarly paper by Professors Lichtman and Nyblade that analyzes VidAngel's user data. But the fact the a Plaintiff parodied its own work has no bearing on whether VidAngel's use is fair, and the scholarly paper is inadmissible hearsay and is therefore excluded. Thus, the commercial purpose and non-transformative character of VidAngel's use weighs strongly against it being fair.

VidAngel concedes that the second factor—the nature of the copyrighted work—weighs against fair use but urges the Court to give it little weight in light of the claimed transformative nature. But VidAngel has not established a triable issue as to whether its use is transformative, so the Court will not discount this factor.

The third factor evaluates both the quantity of the work taken and the quality and importance of the portion taken. *Campbell*, 510 U.S. at 586. "This factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too." *Id.* at 577. The Court previously found that VidAngel copies Plaintiffs' works in their entirety, and that although VidAngel omits portions of the Works from its streams, the elements that comprise the heart of the Works remain unchanged. *Disney I*, 224 F. Supp. 3d at 973-974. VidAngel evidently conceded this element at the Ninth Circuit, but now tries to challenge it on the ground that its users can apply multiple filters, and that filtering is evidently important to its customers. But VidAngel does not genuinely dispute that it copies the works in their entirety, that its filtered streams omit only portions of the works, and the heart of these Works remains unchanged. This factor weighs against fair use.

The fourth factor evaluates "the extent of market harm caused by" the infringing activity and "whether unrestricted and widespread conduct of the sort engaged by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. The Court previously

found that given that VidAngel's "use of Plaintiff's copyrighted works is commercial and non-transformative," the likelihood of market harm "may be presumed." *Disney I*, 224 F. Supp. 3d at 974 (citing *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 531 (9th Cir. Cal. 2008). The Ninth Circuit affirmed that conclusion. VidAngel's counterarguments are unavailing. VidAngel points to data from the Lichtman/Nyblade study, but as stated above, that study is inadmissible. VidAngel also resurrects its claim that its service does not harm and actually benefits Plaintiffs because "VidAngel gives [Plaintiffs their] cut" and its service "increased the market for the studios' content." Opp'n 23:3-24:2. But the Ninth Circuit rejected this line of argument, holding that "VidAngel's purchases of discs also do not excuse its infringement." *Disney II*, 869 F.3d at 861. Furthermore, when none of the other three factors favors fair use, the market harm factor is less important. Thus, even if VidAngel can point to admissible data from which it *may* argue that its service does not cause market harm, the potential dispute raised thereby is immaterial because the other three factors weigh decisively against fair use. *See Worldwide Church of God*, 227 F.3d at 1120 ("The fact that the secondary use does not harm the market for the original gives no assurance that the secondary use is justified. Thus, notwithstanding the importance of the market factor, especially when the market is impaired by the secondary use, it should not overshadow the requirement of justification under the first factor, without which there can be no fair use.") (quotation omitted); *see also Morris v. Guetta*, No. LA CV12-00684 JAK, 2013 WL 440127, at *13 (C.D. Cal. Feb. 4, 2013) (summarily adjudicating fair use defense, and relying on *Worldwide Church of God* for conclusion that "any dispute over the market effect is immaterial because a lack of harm would not change the determination of an unjustified use under the first factor").

Finally, VidAngel argues that, beyond the non-exclusive four-factor list relevant to the fair use analysis, social criticism is a form of fair use, and that there is a "triable issue as to whether VidAngel's offering is a protected form of social criticism and whether VidAngel's offering has socially significant value as free speech under

the First Amendment." Opp'n 24:27-5:4. But VidAngel does not meaningfully substantiate this position. VidAngel simply posits that its use *could be* a form of social criticism without actually claiming that *it is* social criticism, and surrounds this query with two non-sequiturs: a reference to Fox's release of a parody of its own movie, and a reference to Plaintiffs' allowing "Mr. Skin" to stream all of the nudity in their content. *See* Opp'n 24:27-25:14. But neither Fox's parody of its own film, nor whatever "Mr. Skin" may be doing with Plaintiffs' Works (with or without Plaintiffs' authorization) are relevant to VidAngel's fair use defense of its service. VidAngel fails entirely to describe what it is criticizing, and fails to present any meaningful legal analysis that would tend to show that its streaming service is a form of social criticism protected by fair use.

VidAngel has failed to raise any triable issue of material fact as to its fair use defense. The undisputed facts establish that the first three fair use factors—the purpose and character of the use; the nature of the copyrighted work; and the amount used—weigh heavily against fair use. The final factor, market harm, is at most neutral, but this does not create a triable issue as to the entire defense because the first three factors are dispositive under the circumstances. And, VidAngel has not raised any triable issue as to its last-ditch argument that its service may be social criticism protected by fair use.

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Summary Judgment and finds that VidAngel is liable for circumvention in violation of the DMCA, and for copyright infringement.

**IT IS SO ORDERED.**

Dated: March 06, 2019

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE